## Case No. 16,175.

### UNITED STATES v. ROBINS.

[Whart. St. Tr. 392; 7 Am. Law J. 18; Bee, 266.]

District Court, D. South Carolina. 1799.

EXTRADITION OF FUGITIVES — CONSTITUTIONALITY OF BRITISH TREATY—MURDER ON WAR VESSEL ON HIGH SEAS—JURISDICTION OF COURT.

[1. The 27th article of the treaty of 1794 (8 Stat. 116), between the United States and

---

[1] [Reported by Hon. William Cranch, Chief Judge.]

Great Britain, which provides for the reciprocal extradition of fugitives charged with the crimes of murder and forgery, is not in contravention of the constitution of the United States, as violating the right of trial by jury; and it applies to citizens of the United States who have committed those crimes within the jurisdiction of Great Britain, and have afterwards come hither, as well as to foreigners.]

[Cited in Re Sheagle, Case No. 12,734; Re Metzger, Id. 9,511.]

[2. A murder committed on board a British vessel of war on the high seas is committed within the jurisdiction of Great Britain, within the meaning of the treaty; and, if the murderer is found in this country, we are bound to deliver him up.]

[3. In the absence of any provision in the laws or the treaty in respect to which department of the government shall execute the provisions relating to extradition, recurrence must be had to the general powers vested in the judiciary by law, and by the constitution, which, in the 3d article. declares by express words that the judicial power shall extend to treaties.]

The question before the court was grounded on a habeas corpus, to bring up Jonathan Robbins, who was commited to jail in February, 1799, on suspicion of having been concerned in a mutiny on board the British frigate Hermione, in 1791; which ended in the murder of the principal officers, and carrying the frigate into a Spanish port; and on a motion by counsel, on behalf of the consul of his Britannic majesty, that the prisoner should be delivered up (to be sent to Jamaica for trial), in virtue of the 27th article of the treaty between the United States and Great Britain, which article runs thus: "Art. 27. It is further agreed that his majesty and the United States, on mutual requisitions, by them respectively or by their respective ministers or officers authorized to make the same, will deliver up to justice all persons, who being charged with murder or forgery, committed within the jurisdiction of either, shall seek an asylum within any of the countries of the other: provided that this shall only be done on such evidence of criminality as, according to the laws of the place where the fugitive or person so charged shall be found, would justify his apprehension and commitment for trial, if the offence had there been committed. The expense of such apprehension and delivery shall be borne and defrayed by those who make the requisition and receive the fugitive." The commitment of the prisoner, and the consequent demand made of him by the consul of his Britannic majesty here, were grounded on the two following affidavits:

"South Carolina District: William Portlock, a native of Portsmouth, in the state of Virginia, upwards of eighteen years old, appeared before me, and being duly sworn and examined, saith that he went out before the mast in the schooner Tanner's Delight, which was commanded by Captain White, who arrived here about three weeks ago; that a person who answered to the name of Nathan Robbins, came also in the said vessel before the mast, with him; that he, the said Rob-

bins, is a tall man, middle size, had long black hair, dark complexion, with a scar on one of his lips; that on or about last Christmas night he was present, and heard the said Robbins talking, in the harbour of the city of St. Domingo, to some French privateersmen who were on board the Tanner's Delight, when and where he informed them, in his hearing, that he, the said Robbins, was boatswain's mate of his Britannic majesty's frigate Hermione, when she was carried into the port of Cavillia, and added that they had no occasion to take any notice of that. And after the above time, sometimes when he was drunk, he, the said Robbins, would mention the name of the Hermione, and say, bad luck to her, and clench his fist.

his
"William X Portlock.
mark

"Sworn before me this 20th February, 1799, Thomas Hall, J. P. Q. U."

"United States of America, South Carolina District, ss.: Personally appeared before me Lieutenant John Forbes, who, being duly sworn on the Holy Evangelists of Almighty God, deposeth, that a person confined in the jail of this district, who calls himself Nathan Robbins, but whose real name this deponent believes to be Thomas Nash, was a seaman on board the Hermione British frigate, in which this deponent was a midshipman from the 8th of February, 1797, until the 30th of August following, during which time the said Nash was personally known to this deponent; that this deponent was removed from the said frigate to the sloop-of-war Diligence, on the said 30th day of August, 1797; this deponent further deposeth, that on the 19th of September following, he was sent on board the said frigate, at which time he saw and left the said Nash in the same station on board that vessel, as he was at the time of this deponent's being a midshipman therein. That on the 22d day of the said month, the crew mutinied on board the said frigate, killed the principal officers, piratically possessed themselves of her, carried her into Laguyra, and there disposed of her to certain subjects of his Catholic majesty. That the said Thomas Nash was one of the principals in the commission of the said acts of murder and piracy, whose conduct in that transaction has become known to this deponent by depositions made and testimony given in courts martial where some of the said crew have been tried.        John Forbes.

"Sworn before me this 18th April, 1799, Thomas Bee, District Judge, South Carolina."

The judge had received a letter some days before, from the secretary of state of the United States, mentioning, that application had been made by the British minister, Mr. Liston, to the president, for the delivery of the prisoner under the 27th article of the treaty, and containing these words—The president "advises and requests" you to de-

liver him up. This letter though not read in court, was shown to the counsel on both sides, and is hereunto appended.

The following certificate and affidavit were produced in behalf of the prisoner:

"United States of America, State of New York, ss.: By this public instrument, be it known to whom the same doth or may concern, that I, John Keese, a public notary, in and for the state of New York, by letters patent under the great seal of the state, duly commissioned and sworn; and in and by the said letters patent invested 'with full power and authority to attest deeds, wills, testaments, codicils, agreements, and other instruments in writing, and to administer any oath or oaths, to any person or persons,' do hereby certify that Jonathan Robbins, mariner, who hath subscribed these presents, personally appeared before me, and being by me duly sworn, according to law, deposed that he is a citizen of the United States of America, and a native of the state of Connecticut, five feet six inches high, and aged about twenty-three years. And I do further certify that the said Jonathan Robbins, being a citizen of the United States of America, and liable to be called in the service of his country, is to be respected accordingly, at all times by sea and land. Whereof an attestation being required, I have granted this under my notarial firm and seal.

"Done at the city of New York, in the said state of New York, the twentieth day of May, in the year one thousand seven hundred and ninety-five.

"Quod Attestor,          John Keese,
"Notary public, and one of the justices for the city of New York.

"Jonathan Robbins, mariner, a prisoner now in custody of the marshal of the district court of the United States for South Carolina, being duly sworn, saith he is a native of the state of Connecticut, and born in Danbury in that state; that he has never changed his allegiance to his native country; and that about two years ago he was pressed from on board the brig Betsey of New York, commanded by Captain White, and bound for St. Nichola Mole, by the crew of the British frigate Hermione, commanded by Captain Wilkinson, and was detained there, contrary to his will, in the service of the British nation, until the said vessel was captured by those of her crew, who took her into a Spanish port by force: and that he gave no assistance in such capture.

                                "Jonathan Robbins.

"Sworn this 25th July, 1799, before me, Thomas Hall, federal clerk, and J. R. Q. U."

The signature made by the prisoner to this affidavit in court, appeared to be in the same hand-writing as the signature to the one made in 1795, from which circumstance it is presumable, that Jonathan Robbins is the prisoner's real name. The body of the affidavit made in New York, in 1795, was printed; the names, dates, signatures, &c., were filled up in writing; it had the notarial seal of John Keese, Esq. affixed; and had the appearance of being a genuine paper, deemed at that day by seamen to be a protection. It appears, however, by the result, that these affidavits, and the question, whether the prisoner was an American, and an impressed seaman, or not, were, in the opinion of the court, altogether immaterial; as the court would have felt itself bound to deliver up any respectable citizen of the United States, if claimed under the circumstances of the prisoner.

Mr. Ker, against the motion, expressed his regret that the short time he had given to the consideration of the prisoner's case, did not enable him to pay it that attention which its importance required: that whether it were considered as simply relating to the prisoner, or in a more extensive view as embracing great constitutional principles, in its relation to the citizens of America, in either case it must appear as a question of the highest magnitude, and requiring the most serious discussion. Shall a citizen of America be tried by his country, or be delivered up to a foreign tribunal? He hoped he should be able to show the court, that the prisoner's case was not within the 27th article of the British treaty; and if it were, that it was unconstitutional. The prisoner's certificate and affidavit, he contended, were proof of his having been impressed into the service of his Britannic majesty. By the late president's proclamation of neutrality, the citizens of the United States were prohibited from entering into the service of any of the belligerent powers: that the court could not presume, without the colour of evidence, that the prisoner had violated the laws of his country, unsupported as such a presumption would be by any legal charge of that nature against him. Hence it follows, that the prisoner must have been taken forcibly into the service of his Britannic majesty, in the face of his protection, and in contempt of our neutrality. Let those who make the requisition, that he be delivered up, show by the ship's articles, or by any other legal testimony, that he entered voluntarily into their service, and submitted himself to their discipline. If they cannot, the presumption is strong in favour of the prisoner. Taking the point then as ceded, that he was impressed, he was warranted by the most sacred rights of nature, and the laws of nations, to have recourse to violence in the recovery of that liberty, of which he had been unjustly and unlawfully deprived. These were facts proper to be submitted to a jury of this country; they would well know how to appreciate a defence of this nature, if it were necessary to make it. The court know, that in England a man would be excusable for murder in resisting a press-gang; but here, the prisoner being an American, his rights ought to have been peculiarly respected by a foreign nation, and resistance on his

part was not merely the exercise of the rights of an individual, but it was a duty he owed to his country. The principle contended for was supported by the best authorities. It is laid down in Vatt. Law Nat. bk. 3, c. 8, § 139: "An enemy attacking me unjustly, gives me an undoubted right of repelling his violence, and he who opposes me in arms, when I demand only my right, becomes himself the aggressor, by his unjust resistance: he is the first author of the violence, and obliges me to make use of force for securing myself against the wrongs intended me, either in my person or possessions. For if the effects of this force proceed so far as to take away his life, he owes the misfortune to himself; for if by sparing him I should submit to the injury, the good would soon become the prey of the wicked."

The constitution of the United States of America has expressly secured to every citizen thereof the trial by jury, and if the treaty went to deprive him of it, it would be invalid; it is inferior and subordinate to the constitution, and when it unhappily stands in hostility against it, or where there is a collision, it must, of necessity, yield. Treaties, however sacred, with whatever good faith they ought to be preserved, however high their authority, are not to receive a construction hostile to the sound principles of the constitution, and derogatory to the rights of the citizen. It is a general maxim in the construction of treaties, that every interpretation which leads to an absurdity ought to be rejected. Vattel (book 2, c. 17, § 282) says, "that we should not give to any peace a sense from which follows anything absurd, but interpret it in such a manner as to avoid absurdity." Can it be supposed that it was the intention of the contracting parties to deprive the citizens of America of the trial by jury, on which are bottomed the best principles of American freedom? Certainly not; it is an unfair and inadmissible inference. Hence it follows, that a citizen ought not to be delivered up to a foreign tribunal for any offence, which is within the jurisdiction and cognizance of his country. The atrocity of the crime with which the prisoner is charged, has nothing to do with the principle contended for; the requisition could be made with equal propriety, were it of a trivial nature. Piracy and murder is an high offence against all nations, and all nations have an interest in bringing offenders to justice, and all are equally competent to try them. A requisition is made under the 27th article of the treaty, to deliver up a citizen of the United States, on a vague allegation contained in two affidavits, which afford a mere suspicion of the prisoner having been on board the Hermione frigate at the time of the mutiny. If a citizen can be delivered up on ground so slight, in the present general political conflict among mankind, when the violence of party spirit knows no bounds;

when vindictive passions are substituted in lieu of reason, justice and humanity; no man, however prominent and respectable among his fellow-citizens, can be secure against the operation of this law. The prisoner is an obscure character, and, although in the bosom of his native country, from the nature of his profession, being constantly removing from one place to another, is as destitute of friends as if he were on the opposite side of the globe.

Mr. Ker next adverted to the words of the 27th article of the treaty, under which the requisition is made. He contended, that the words "murder or forgery committed within the jurisdiction of either," manifestly implied the exclusive jurisdiction of the one or the other power, and not the jurisdiction of the high seas, where the United States have a concurrent one in common with all nations; that the laws of nations provide against offences committed on the high seas, and therefore a particular stipulation was unnecessary; that the apparent object of the article was to bring offenders to justice, and therefore provided against the crimes of murder and forgery being committed within the exclusive jurisdiction of either; but that the law did not apply in the present case, as the United States possessed competent power to try the offender, and bring him to justice; that if the offence had been committed within the kingdom of Great Britain, under the municipal laws of that country, the article affords a remedy, as our laws could not reach the offence; and further, that a construction should not be given to the treaty which abridged the jurisdiction of the United States, and that we ought not to presume that the government of the United States had abandoned any of its judicial rights to any nation, and that neither the letter nor spirit of the article warranted the conclusion.

Col. Moultrie, also for the prisoner, arose. After premising the importance of this case, and stating it as one in which the dearest interests of the Union were involved, he advanced the following grounds for consideration:

(1) On the constitutional ground: That the constitution of the United States contained the constituent principles of our social union as a nation: that it is the compact by which our government was formed, and under which alone it exists; and that from this compact, all civil power and authority, and every constituted branch of our society, as a nation, was derived, and is exercised: that mankind, in quitting a state of nature for that of society, gave up part of their natural rights, which they all possessed in common, to promote the good of the whole, and to secure the remainder which were not surrendered; that the natural rights so given up, were either totally relinquished, or were modified only under restrictions, and became political rights; and those not given up, formed a sacred residuum in the hands

of the people, and which are unalienable by any act of legislation: that this was no visionary theory of ancient writers, but is the true and modern ground of all social union: and it is fully recognized in our free constitution; for by article 12th, of the amendments to our constitution, it is declared, "that all powers not delegated to the United States by the constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people." And the 11th section declares, "the enumeration in the constitution of certain rights, shall not be construed to deny or disparage others retained by the people."

(2) On treaties: Treaties and laws made by legislatures, he said, were only acts of the constituted agents and subordinate ministers of the constitution: that they were of derivative authority only, and derived from the primitive authority of the constitution, and therefore must be subordinate to, and could not counteract or control it: and that the treaty making power was derived only from the constitution, is evident from the 2d section of the 3d article, which creates and gives it. He next pointed out the absurdity of the treaty-making power being allowed to counteract or control the constitution; as by that means, by a treaty, our constitution, the very foundation of our government and guardian of our liberty, might be overset and destroyed, and every sacred right of the people secured thereby laid prostrate; and this too at any time, and by combination with a foreign power: that no institution or sacred compact of the people for the preservation of their happiness could be formed, but what thus, by the creatures of the constitution and of the people's power, might be overset; that thus, though the government and nation might be called independent, the people might be slaves, and be in fact without any protection to their liberties. Third. That what the nature or denomination of the offences specified in the treaty were, was totally immaterial; for if the treaty-maker could insert one offence, he may insert as many more as he pleases: but the principle was, whether he had a right, for any offence, to oblige a citizen to be given up as a victim to any foreign power; a citizen, whose very liberty consisted in its being guarded by the sacred trial by jury. Fourth. That the 6th article of the constitution itself, shows that no law or treaty can be the law of the land, that is contrary to the constitution; inasmuch as it says, expressly, that laws only "made in pursuance thereof," and "all treaties made under the authority of the United States," are the law of the land. The question then was put by Mr. M., what was the "authority of the United States?" whence was it derived, and the United States itself created, but only by and from the constitution itself? That the constitution, and laws and treaties of the United States, being the supreme code of the law of the land, was evi-

dently intended by the 6th article (as expressed) to be only as supreme to the local constitutions and laws of each state: but such laws and treaties stand on an equal footing; and both must be made in pursuance of, and under the authority of the constitution. That two supremes are of equal authority, and both must be equal: that two equal opposite forces, or powers, acting in opposition, destroy each other; and if not equal, one or the other must be superior, (either the constitution or treaty;) and that all laws and treaties can, only be legal when made in pursuance of, in subordination to, and under the authority of the constitution; but that this treaty was opposite and repugnant to the constitution. Fifth. That in the 7th and 8th articles of the amendments to the constitution, the citizens are secured in all cases the trial by jury, except for naval and military offences by sea and land, in time of actual war, "flagrante bello," (during the rage of war;) and that no treaty could contravene these articles of the constitution: that the trial by jury is a sacred and unalienable right; as all the powers given by the constitution for the privation of the cardinal natural rights of life and liberty, are only a conditional cession of those rights to the care of society, under the advantage of a trial by jury of fellow-citizens, as the mutual safeguard and security of such rights so deposited; and that the exception of courts of militia, and in the navy, during the rage of war, is an exception by the constitution itself, on the necessity of the case, for the people's safety; and that such exception proves its full extent and operation. Sixth. That even if the treaty was legal, the present offence which the prisoner is in custody for, is not within the meaning and construction of the treaty: for the 27th article of the treaty relates to murder and forgery, committed within the jurisdiction of either Great Britain or the United States: that is, within the peculiar exclusive jurisdiction of either, where the offence is committed, and to which the jurisdiction of the one or the other, to which the party flies for refuge, or as an asylum, could not extend; that it relates, therefore, only to the respective territories of the contracting powers: but that the offence now before the court was done supra altum mare, (upon the high seas,) where all nations have equal jurisdiction, and no defect of justice could arise from a want of jurisdiction here to extend to the offence: that it was against the law of nations, which style a pirate hostis humani generis, (the enemy of mankind,) and over whom all nations claim a criminal jurisdiction equally, and over whom the United States have a concurrent jurisdiction. Vattel says, on the construction of treaties, that nothing shall be so construed as to make the treaty an absurdity; and it never can be supposed the learned civilians and casuists, who framed this treaty, would have been so

absurd as to make our nation of the United States give up her dignity, independence and concurrent maritime jurisdiction, which she holds equally in the great society of nations, with the rest of the world, or that they were ignorant of her holding such jurisdiction; or that Great Britain and the United States, by their own compact, could hold such jurisdiction exclusively; that the ocean is nature's great common, where all nations hold a common interest and authority, as tenants in common. Seventh. That the prisoner is a native citizen of America, and was arbitrarily pressed, contrary to his will, into the British service; and an attestation of his birth in Connecticut, under the seal of the city of New York, and the prisoner's own affidavit of his birth, and of his being pressed, were produced. On this it was remarked by Mr. M. that the notarial attestation appeared on its own face to be genuine, and of an age equal with its date; that by reference to New York its authenticity can be fixed, and by reference to the custom house there, the clearance and list of the crew of the vessel, and name of the prisoner, might be found, as stated in his affidavit; that all this would show his defence is not a false one; and that the signature, Jonathan Robbins, now made in open court to his affidavit, and the one made to the paper signed several years since, before the magistrate in New York, are the exact and indubitable signatures of one and the same hand. Also, that no man was to be presumed guilty of any transgression of the laws of his country, until he was legally charged and convicted thereof; that the laws and proclamations made to preserve our neutrality, and a late one to prevent our citizens going into foreign service, were very severe; that the insolent and daring conduct of Britain, in pressing our seamen and citizens, was an attack on the sovereignty of our nation, and notorious; and the presumption from these laws, and such conduct, was, that the prisoner was pressed contrary to his will, and the onus probandi (burden of proof) to the contrary, lay therefore with the prosecution; that if he was so pressed, it was meritorious, by the laws of God and man, to regain his liberty even by the death of his oppressors, and to avenge the insulted dignity of a free people; that hence the right of killing in war is founded (Vat. Law Nat. lib. 3, c. 8, § 139), and, that the prisoner, instead of being punished, "deserved well of his country." "Quid enim, potior libertate? Quid pejor quam servitute?" And here, Mr. M. added that he knew this motto was imprinted on the hearts of his countrymen; that their liberties, birthrights, and their country's honour and dignity were most sacred to them; that they would only part with them but with their lives; that ignominy and slavery were to them death; and, that they would ever hold an American unworthy the name of such, who would not sacrifice any one who, under the impious au-

thority of any nation, would dare attempt to enslave him and rob him of his national privileges. Eighth. Mr. M. commented on the laws passed by Great Britain in the beginning of her war with us, for carrying American subjects over to England to be tried, and as one of the oppressive evils we fought against, and drew a striking analogy. Further, he observed, that the office of president was an executive and ministerial office, and had no right to control this court, as appeared by the secretary's letter in this case, advising the prisoner to be given up; that constitution and laws only, formed the true sovereignty of the nation, and the judicial was the proper guardian of it; and that the executive in fact, is but subordinate to the judicial, as he is bound to enforce its decrees. Ninth. That sending a citizen from the bosom of his country and friends, and for immolation, like a lamb to the altar, to gratify the ambition or policy of any foreign power or king, was a capital punishment—what could be greater? And, Mr. M. then asked, by what law of this land such a punishment, or any other, could be inflicted here, in time of peace, without a jury or a trial? a punishment by which a citizen was to be tried, instead of by a jury, by a court martial.

(3) Of the jurisdiction: A great number and variety of other striking and forcible remarks were made; but amongst the last, he further submitted, that by the law of the federal judiciary, the district court, before whom this was brought, had no jurisdiction for crimes on the high seas, when the punishment exceeded thirty stripes, six months' imprisonment, or one hundred dollars fine; that in this case, this court, like an inferior court or magistrate, was only competent to commit and retain in custody for trial, by the circuit court, and had no jurisdiction as to the merits; that the circuit court only had the jurisdiction, and that this court undertaking after commitment, to liberate or give up the prisoner, was to intrude on and usurp the jus dicere of the superior court; at least to determine and decide on it, and, if it had any jurisdiction, to abolish it and oust it of it; that in doing so, it would be precipitate and illegal. A further remark was also made by Mr. Moultrie, on the affidavits brought against the prisoner, showing that even in a common case, they were not sufficient to exclude a prisoner from bail; and much less sufficient were they, where a man was to be punished by exile, by so capital a punishment, in the first instance without any trial; that they were vague, uncertain, and ascertained no specific charge against the prisoner; and, in short, amounted to nothing more than mere suspicion, and even that but weakly supported; and that, under such circumstances, no man's life or liberty can be safe under this construction of the treaty. That as to removing a person from one state to another, to be tried where he commits an

offence, all this is but like moving from one county to another; for the culprit is still within the jurisdiction and protection of his country: but far different it is to remove him to a distant nation, out of the protection of his country, there to meet a summary trial by a court martial, and in the end, perhaps, be hung from motives of policy, more than from the principles of justice.

Mr. Ward, counsel for the British claim, was alone on that side. The counsel for the prisoner, he said, had addressed the passions of the auditory, which was quite unnecessary in this place, where the citizens were always remarkable for humanity and tenderness to the accused. It was not necessary, at this time of day, to discuss the question of constitutionality—that had been long since settled, in the ratification of the treaty by the proper authorities. It should be remembered, he said, that the cessions contained in the 27th article, now objected to, were mutual to the two nations; if the treaty cedes a portion of the rights of American citizens to the British government, the same treaty cedes an equal portion of the rights of British subjects to the American government. In answer to the argument, that a citizen could not legally suffer under an article of a treaty which contained the rights secured to him by the constitution, Mr. Ward contended, that a treaty made by the powers pointed out for the purpose in the constitution, is co-ordinate with the constitution itself, and even paramount to it; and that the court could not make it a question, whether the treaty between the United States and Great Britain, counteracted the constitution or not; the only question for the court to settle was, is the demand made for delivering up the prisoner conformable to the treaty? He had not a doubt but it was. To prove that the crime charged against the prisoner was committed within the jurisdiction of the British government, he stated, that every action done in a vessel on the high seas comes under the jurisdiction of the nation to which the vessel belongs. In support of this, he instanced the case of a child that should be born in a British vessel on a foreign coast; this child, he said, would be considered as a British subject.

Mr. Ward made a number of other pertinent observations, and quoted several passages of the law of nations, in support of his arguments. He again insisted that treaties are co-ordinate with, and paramount to the laws and constitution, and that the court had only to consider, whether the prisoner is, or is not, comprehended in the meaning of the 27th article of the treaty. In answer to the arguments of the prisoner's counsel, that he should not only not be given up, but be released from prison on his own bail, Mr. Ward remarked, that it would be inconsistent for the court to release a man without trial, after having sanctioned the charge on which he was confined, by suffering him to remain in prison a long time under their authority; and that if the prisoner was really the American he pretended to be, he would have been able, before this time, to have made it appear more clearly.

BEE, District Judge. The question on which I am now to give a decision, is grounded on a habeas corpus to bring the prisoner before me; and on motion by counsel on behalf of the consul of his Britannic majesty, the officer authorized by treaty to make the requisition, that the prisoner, charged with murder committed within the jurisdiction of Great Britain, shall be delivered up to justice, in virtue of the 27th article of the treaty of amity and commerce between the United States and Great Britain, signed the 19th of November, 1794.

Objections have been made by counsel on behalf of the prisoner to this motion, on a variety of grounds; and this case has been very fully argued on both sides. Two papers have been produced on behalf of the prisoner: one, a certificate from a notary public at New York, dated 20th of May, 1795, that Jonathan Robbins, a mariner, had that day deposed on oath before him, that he, the said Jonathan Robbins, was a citizen of the United States, and a native of Connecticut; the other is an affidavit of the prisoner, made in open court, that he is a native of Connecticut: and that about two years ago he was pressed from the brig Betsy of New York, on board the British frigate Hermione, and was detained there against his will, until the vessel was captured by the crew, and carried into a Spanish port, and that he gave no assistance. The motion before me has been opposed on a variety of grounds. It is contended, that it is a question of magnitude whether a citizen of the United States shall be tried by a jury of his own country, or in a foreign one: that the 27th article of the treaty, on which this motion is founded, is contrary to the constitution of the United States, and is therefore void; that the treaty can only relate to foreigners: that the fact in this case being committed on the high seas, the courts of the United States have competent jurisdiction: that a grand jury ought to make inquest, before a party shall be sent away for trial. It was also contended that this would strike at the root of the liberties of the people: that the constitution secured the right of trial by jury to the citizens; and that treaties and laws altering that, were of subordinate authority; and of course void: that the treaty making power may be abused; and it could never give authority to seize a person and send him away for trial. It was also contended, that this is not an offence within the contemplation of the treaty: the word "jurisdiction," means "territorial jurisdiction"; and that the act must be confined to offences committed within the territory of either; that the sending a person in confine-

ment to be tried in a foreign country, is a punishment not to be inflicted on a citizen: that the treaty is a head without a body, legs or arms: that the affidavits do not come up to the point, and are not sufficient to prevent the party being entitled to bail.

These were the points on which the objections to this motion were argued. In the course of the arguments, warm and pathetic appeals to the passions were made on some of the old grounds of opposition to the treaty, which I endeavoured to check, because, as this treaty has been ratified agreeably to the express provisions of the constitution, and is therein declared to be the supreme law of the land, and I am religiously and solemnly bound by the oath I have taken to administer justice according to the constitution and laws, it is not in my power, nor is it my inclination, ever to deviate therefrom. If we attend to the constitution, and the amendments which are now part of it, we shall find, that all the provisions there made respecting criminal prosecutions, and trials for crimes by a jury, are expressly limited to crimes committed within a state or district of the United States. Indeed, reason and common sense point out that it should be so: for, what control can the laws of one nation have over offences committed in the territories of another? It must be remembered, also, that in the 27th article of the amendments, where it is provided that no person shall be held to answer for a capital offence, unless on a presentment by a grand jury, an exception is made to cases arising in the land or sea service, or even in the militia when in actual service, in time of war or public danger. This shows unequivocally, that trials by jury may be dispensed with, even for crimes committed within the United States; and those observations are at once an answer to all the arguments founded on the right to trials by jury, they being expressly limited to crimes committed within the United States, and even then with some exceptions.

The objections made to the treaty's being contrary to the constitution, have been so often and so fully argued and refuted, that I was in hopes no time would have been occupied on that subject, more especially as that treaty has been recognized by the legislature of the United States and is now in full operation. It is remarkable, that in the midst of all the warmth against the treaty, at its first publication, the 27th article was one of the few that was never excepted to; and I believe this is the first instance in which it had been held up as dangerous to liberty. The crime of murder is justly reprobated in all countries; and in commercial ones the crime of forgery is so dangerous to trade and commerce, that provision has been made in various treaties for delivering up fugitives from justice for these offences; and many instances may be produced of criminals sent back to be tried

where the fact was perpetrated. What says the 27th article of the treaty now under consideration? In the first place it is founded on reciprocity: in the next, it is general to all persons, who, being charged with murder or forgery, whether citizens, subjects, or foreigners. It is for the furtherance of justice, because the culprits would otherwise escape punishment; no prosecution would lie against them in a foreign country; and if it did, it would be difficult to procure evidence to convict or acquit. This clause is founded on the same principle with that part of the constitution which declares, that the trial for a crime shall be held in the state where it shall be committed; and the act of congress to prevent fugitives from justice escaping punishment, declares, that they shall be delivered up when demanded, to be tried where they committed the offence, either on a bill found, or an affidavit charging them with the offence. The principle, then, being the same, and the one being expressly founded on the constitution and laws of the United States, no solid objection can lie against this clause of the treaty. Nor does it make any difference, whether the offence is committed by a citizen, or another person. This will obviate the objection made by the counsel on that head. And I cannot but take this occasion to observe, that the two papers produced by the prisoner, are only affidavits of his own, or a certificate founded on an affidavit, which are not evidence; and if they were, prove little or nothing. It is somewhat remarkable, that a man of the name of Jonathan Robbins, with the paper produced in his possession, should continue on board a British frigate for a length of time, under another name, and acting as a warrant officer, which impressed men are not likely to be entrusted with, and that he should afterwards take the name of Nathan Robbins, and lay in jail here five or six months, without the circumstance being made known until now.

All the arguments against delivering up the prisoner seem to imply that he was to be punished without a trial; the contrary of which is the fact: we know that no man can be punished by the laws of Great Britain without a trial. If he is innocent, he will be acquitted; if otherwise, he must suffer. This would be the case here, under similar circumstances.

The objection most relied on against this motion, is to the word jurisdiction, in the 27th article of the treaty, and that the crime being committed on the high seas, the courts of the United States have a concurrent jurisdiction. There is no doubt that the circuit courts of the United States have a concurrent jurisdiction, and this arises under the general law of nations; and if the 27th clause of the treaty in question had not expressly declared the right to demand, and the obligation to deliver over, the prisoner

must have been tried here. With respect to the meaning of the word "jurisdiction," I think the case quoted from Vatt. Law Nat. bk. 1, c. 19, § 216, is conclusive, and this is corroborated by Ruth. Inst. bk. 2, c. 9, as to the jurisdiction over the men on board the vessels; and the clause itself seems to have contemplated this, because the word "jurisdiction" is used distinctly from countries in the next line; and this shows, that territorial jurisdiction, as contended for, cannot apply to the present case.

When application was first made, I thought this a matter for the executive interference, because the act of congress respecting fugitives from justice, from one state to another, refers it altogether to the executive of the states; but as the law and the treaty are silent upon the subject, recurrence must be had to the general powers vested in the judiciary by law and the constitution, the 3d article of which declares the judicial power shall extend to treaties, by express words. The judiciary have in two instances in this state, where no provisions were expressly stipulated, granted injunctions to suspend the sale of prizes under existing treaties. If it were otherwise, there would be a failure of justice.

I have carefully reviewed the arguments advanced by the counsel for the prisoner. I have looked into the constitution, the treaty, the laws, and the cases quoted: and upon a full investigation of them all, I am of opinion, that from the affidavits filed with the clerk of the court, there is sufficient evidence of criminality to justify the apprehension and commitment of the prisoner for trial, for murder committed on board a ship of war belonging to his Britannic majesty, on the high seas: that requisition having been made by the British consul, the officer authorized to make the same, in virtue of the 27th article of the treaty of amity and commerce between the United States and Great Britain, I am bound by the express words of that clause of the treaty, to deliver him up to justice. And I do therefore order and command the marshal, in whose custody the prisoner now is, to deliver the body of the said Nathan Robbins, alias Thomas Nash, to the British consul, or such person or persons as he shall appoint to receive him.

The judgment being pronounced, the court was immediately adjourned; the irons were replaced on the prisoner, and he was delivered over by the constables, to a detachment of federal troops, who had before been placed under arms opposite the court house, and had continued there during the sitting of the court. The troops immediately delivered up the prisoner to Lieut. Jump, of his Britannic majesty's sloop Sprightly, then lying in this harbour, and which sailed with the prisoner on Saturday morning for Jamaica.

NOTE. Judge Bee's decision, together with the action of the president that led to it, added a fresh stimulus to the then already too feverish state of public sentiment. The Examiner, the organ of the Virginia Republicans, began by a series of attacks, said to emanate from Mr. Madison, but which unfortunately are not preserved. This was answered in the Virginia Federalist by Mr. Marshall, as follows:

"I observe in a late paper of the Examiner, several strictures on the case of Robbins, who was delivered to the British consul at Charleston, under the 27th article of the treaty of amity and commerce between Great Britain and America, censuring the measure in general, but reprobating the conduct of the president in a particular manner. These strictures, calculated to exasperate the public mind, would probably lose their effect upon a fair explanation of the nature of the business, and therefore I have thought it worth while, for the sake of removing unjust impressions, and satisfying the minds of those who really wish for information relative to the necessary mode of proceeding in cases of that kind, to endeavour to make a just representation of the matter, as far as I am able to understand the case from the mutilated publications which we have seen of it. As to the opinion of the learned judge upon the case, I shall not enter into any arguments in support of it, because they would be useless and unnecessary, as the reasoning contained in his own excellent speech upon the subject is perfectly correct, and must be convincing to every unprejudiced mind. I shall therefore confine myself to that part of the case which respects the president's letter only; which I am induced to do, not because I think it needs any justification with candid men, who know the nature of such proceedings, but because I wish to prevent the effects which are intended to be produced from it upon the minds of those who do not possess the kind of information necessary to enable them to judge impartially on the subject. The case, from the publication which I have seen, I suppose to be this. The British government, having discovered that Robbins was in Charleston, applied to the judge for a warrant to secure him until application could be made to government for him. The warrant was granted, and an application, with the evidences of the charge, were laid before the president, who, being satisfied that it was a case within the treaty, directed the judge, as he was arrested under his warrant, to deliver him up, and the single question is, whether this proceeding in the present case was regular. By the treaty of amity made when the two nations neither did nor could contemplate this, or the case of any other individual, it is mutually stipulated that fugitives from justice who have been guilty of murder or forgery in one of the nations, and have taken shelter in the territories of the other, shall be delivered up to the injured government. Those stipulations are reciprocal, and America, whenever a case shall happen, will have the same right to demand a fugitive of Great Britain that the latter had to demand Robbins of the United States. Nor can either nation refuse, for the words are positive. They are: 'It is further agreed, that his majesty and the United States, on mutual requisitions by their respective ministers or officers authorized to make the same, will deliver up to justice all persons who, being charged of murder or forgery committed within the jurisdiction of either, shall seek an asylum within any of the countries of the other, provided that this shall only be done on such evidence of criminality as, according to the laws of the place where the fugitive or persons charged shall be found, would justify his apprehension and commitment for trial, if the offence had there been committed. The expense of such apprehension and delivery shall be borne and defrayed by those who make the requisition and receive

the fugitive.' These words contain an absolute engagement to deliver such characters up, and neither nation can refuse or neglect it without a violation of the treaty. It is, therefore, a certain fact, that Great Britain, by the express words of the treaty, had a right to demand Robbins in the present case, who was accused of murder, one of the enumerated offences for which fugitives were to be delivered up. There must, therefore, have been some mode of carrying the provision of the treaty in this respect into execution, or else the articles would be nugatory; and it would be absurd to suppose the parties meant to stipulate for a thing which could not be performed. The question then is, what mode should be pursued when a requisition of this kind is made, and what proceedings should take place in order to comply with it. The treaty has not pointed out any mode, and therefore we must recur to principles and the nature of things in order to discover it. As nations do not communicate with each other but through the channel of their government, the natural, the obvious, and the proper mode, is an application on the part of the government (requiring the fugitive) to the executive of the nation to which he has fled, to secure and cause him to be delivered up. (1) Because the government being the only channel of communication between the nations, the British government, in cases of this kind, has nothing to do with the detail and internal regulations of ours, nor we with theirs. For as the governments have respectively undertaken to do the thing which is required, the injured nation is not concerned any further with the business than merely to exhibit the proofs and call on the other for the performance of the treaty; and the nation called on must attend to the details and internal regulations themselves. (2) Because the government to which the fugitive has fled ought to be informed why an inhabitant is forced away from its territories; and therefore a removal of any person therefrom, without an application to the chief magistrate, would not only be dangerous to the personal safety of individuals, but would be an indignity and an affront which ought not to be offered. (3) Because, without such an application, the injured nation could not complain of an infraction of the treaty on the part of the other government in not delivering up the fugitive. For it would be an irresistible argument to such a complaint, that no application was ever made to the government itself. Nor would it strengthen the complaint, that an application was made to some inferior authority; because an application to subordinate officers who do not represent the general national concerns, would not only be improper on account of the inconvenient practices it might introduce (for by that means a man might be carried off without government having an opportunity of protecting him), but, in case the requisition were not complied with, could not be a just ground of reproach to the government itself, which was never informed of the application. (4) Because, it is manifest from what has been said, as well as from the very nature of things, that government must have a right to decide whether a fugitive should be delivered up or not. For it is a mere question of state, and all questions relative to the affairs of the nation emphatically belong to the government to decide upon. Therefore, in case of a requisition for a fugitive by the United States from Great Britain, the application would be to the executive, and not to the judiciary, or any other inferior department of the government. It follows, therefore, that an application to the government itself is essential; and accordingly, in the case under consideration, such an application was actually made. But surely the business was not to rest there. Some further steps were necessary, or else the application would have been to no purpose.

"The government, as we have already seen, was bound by engagement to cause delivery to be made; and therefore the president was under the necessity of taking some order in the business which might produce the object of the application. For, having been informed that the man was under confinement, upon the charge on which the application was made, until the determination of government upon the subject could be known, he was bound to give some directions in the business, so that the prisoner might either be liberated or delivered up, and those directions could only be given in writing. If the president had said to the British ambassador: 'You must apply to the judge under whose warrant he was arrested, and he will deliver the prisoner to you,' the obvious answer would have been, 'Sir, 1 cannot do so without your warrant. If I apply to your judge, I shall certainly be told again as I was told before, that he cannot interfere in a business of state without the knowledge of government; and it will be in vain for me to tell him that I have your instructions upon the subject, unless I am able to produce some evidence of them.' It follows, therefore, that the president was bound to give some written instructions upon the subject; because no other would, or ought to have been credited by the judge.

"The only question then is, whether the letter of the secretary of state contained the proper instructions or not? If 1 am right in my position that the application, in all such cases, should be made to the executive, and that the executive has a right to decide whether the requisition should be complied with or not; it follows necessarily, that when information was given to the judge that application had been made, it ought to have been accompanied with some expression of the will of government upon the subject. For it would have been ridiculous in the president to have ordered a letter to be written to the judge, informing him that such an application had been made, without informing him also what government had resolved to do in the business; because that would have left the judge exactly where he was; and he would have been at liberty to have considered it as a mere private letter from one gentleman to another, and not as an official document, on which he was bound to act. So that, if under that impression he had resolved to have taken no steps in the business, he not only would have stood excused himself, but the British government would have had just cause to complain that our conduct was illusory, and that the stipulations of that treaty were evaded. But, if it be admitted that any declaration of the president was necessary upon the subject, more eligible terms than those used by the secretary of state, even according to the garbled publication which we have of them, could not have been chosen. For they are the usual phrases all over the United States, from the governor down to the county court magistrate. There is not a mandate of any kind in use amongst us, which does not contain the word 'require'; and it will surely be admitted that the word 'advise' is at least as harmless as the words 'command' and 'at your peril,' which are to be found in the warrant of every superior to his inferior officer throughout the United States. Let me now, then, ask any candid man, if the inference drawn by the Examiner from this letter, namely, that the president had endeavoured to influence the opinion of a judge, in a matter depending before him, be a correct one? On the contrary, it is manifest from what has been said, that the matter never was, nor could be regularly before the judge, until he had received this letter, which was the ground and foundation on which he was to proceed. Until then he had no authority to act definitely upon the question; and so the judge evidently appears to have considered it himself. For

it was handed to the counsel on both sides, plainly as the authority on which he proceeded. Otherwise, he would not have shown it at all, or else he would have done it in a very different manner. It was, therefore, a mere official paper, and not a letter which was intended to be intruded upon the judge, in order to influence his determination in a matter depending before him. It was itself the very process, if I may use the expression, which brought the case before the judge.

"Perhaps it will be said that the judge himself has denied the authority of the executive; and there is a passage in his speech which looks that way. But this is a part of the opinion of the judge which seems liable to be questioned; and I strongly suspect it is not truly stated in the public prints, or else it comes to this, that the judge was of opinion that everything relative to treaties was to be transacted by the judges and not by the executive; a position which he certainly did not mean to maintain, and, therefore, the passage alluded to ought to be understood with some qualification.

"Perhaps the following solution may reconcile his opinion with the doctrine I have been contending for: The judge probably meant to say, that he once thought it a question which exclusively belonged to the executive. and therefore, that he, as a judge, could not in any manner be required to aid in the execution of the treaty. But finding, by recurrence to the constitution, that the judicial power extended to treaties, he was then satisfied that the judges might be called on, where circumstances rendered it proper, to take the necessary steps, in order to have the treaty carried into effect, as by issuing a warrant to secure the fugitive, until the determination of government could be known, and after that was promulgated, giving the necessary orders for carrying the determination into effect. With this qualification, the opinion of the judge was correct. and I therefore incline to think that he ought to be so understood in the passage under consideration. Upon the whole, the president appears to have done no more than his duty. For suppose it had been said that the British government had applied to the president for a fugitive from justice under the treaty, and that the latter, instead of ordering him to be delivered up, had refused or neglected to do it, without assigning any reason for it. How could the president have justified his conduct in that case? And might it not then have been said with propriety, that he had neglected his duty and omitted to execute one of the supreme laws of the land, which he was bound to observe and have carried into effect? In short, if some men would use but half the industry in examining into the real motives of the president's conduct upon any occasion, that they do in finding out reasons to reproach him, they would soon be convinced that, in no instance of his administration, has he either encroached upon the duty of others, or omitted to perform his own." 1 Hall, Jour. Jur. 28.

The opposition view was fully set forth in the following letter, written, as afterwards appeared, by Mr. Charles Pinckney, then a senator from South Carolina, which first was published in the newspapers, and subsequently was circulated, with one or two others, in a pamphlet, signed—"A South Carolina Planter":

"To the Citizens of the United States: As congress must by law provide, at their next session, for any similar cases which may occur under the British treaty, and as it is of general importance to the citizens of the United States, the following examination of the case of Jonathan Robbins, lately decided in the district court of South Carolina, is with deference submitted to their consideration: Fellow Citizens—As I believe you have not been much troubled with my remarks on any subject, I hope you will more readily excuse the favour I now ask, in requesting your attention to the present. I am induced to make them, because the question is of very great public consequence, and involves the dearest and most valuable rights of every man in the United States. It reaches all situations, as well the elevated and opulent as the most indigent. It affects the knowledge and independence of our judicials in the most important manner; and as I know it has excited the sensibility of the people, and must be so far made the subject of inquiry in congress as to enable them to provide for similar cases; I have supposed some examination of it may be necessary, in that spirit of deference and delicacy in which all such inquiries should be conducted. I shall not go into a definition of the principles of a free government, and the blessings its citizens ought to expect; because few of our own, even amongst the most illiterate, are ignorant of the nature of a representative government, the right of suffrage, and the inestimable privilege of the trial by jury, in all cases in which their characters, lives or property are concerned. To a people so informed, it is scarcely necessary to remark, that to men of feeling the value of character, of honorable fame, is dearer than life or property, or even the most tender connections; that to all men, whether of the nicest honour or otherwise, the love of life is dearer than that of property, and that they would readily sacrifice the one to preserve the other. Hence it follows, that those privileges which guard the character and lives of our citizens are viewed with a more jealous eye, and will be asserted with more firmness and promptitude, than even those which protect their properties, vigilant as they are with respect to these. A number of our citizens, therefore, believing that the inestimable privileges secured to them by the constitution and laws of the United States, have been affected in the case of Jonathan Robbins, that it is one which may if established as a precedent, reach some valuable inhabitants of this country, and to the intent that these privileges should be more carefully guarded by a positive law in future, the following remarks are submitted, with a view to bring this business more fully before the public than it has hitherto been. The following is the statement of the case, with the accompanying affidavits: It appears, however, by the result, that these affidavits, and the question whether the prisoner was an American, and an impressed seaman or not, were, in the opinion of the court, altogether immaterial: the court would have felt itself bound to deliver up any respectable citizen of the United States, if claimed under the circumstances of the prisoner. It appears by the preceding statement, that the judge, under the circumstances of this case, would feel himself obliged to deliver up any respectable citizen of the 'United States.' I do not mention this because he used the words 'respectable citizen'; but I do it to show, that this is a question which seriously concerns every part of the community, and that no citizen whose business may oblige him to go to other countries, is hereafter safe from such demands. It will not depend upon him to say he is not a mariner, or to show proofs or certificates to the contrary. It will depend upon the force with which he is attacked, and the temper or violence of the officer who directs it. Instances, it is said, have lately occurred where not only the seamen but the passengers have been impressed, who, although declaring they were not seamen, were still impressed as such, and obliged to perform their duties. No production of papers, no entreaties availed them: they were compelled to submit. Had these men been enterprising, or an opportunity offered, and they had possessed themselves of their oppressors, and brought them into port: or had they, in the attempt to regain their freedom, been obliged to destroy them, while the world would have applauded the act, the judge must,

from the decision, have delivered them to a similar demand; neither influence, fortune, or friends could have saved them. However superior in these, in political privileges they were only equal to the unknown and friendless Robbins. A consistent and inflexible magistrate must view them with the same impartial eye: he must give to them the same construction of the law or constitution; he could not vary them without the immediate loss of character. An enlightened people, therefore, will as attentively, nay, they ought more carefully to guard them in the person of a poor and unprotected than a rich or considerable man. The latter will always find powerful friends to support and protect his privileges; while the rights of the former may in silence and with impunity be unattended to merely because he is unknown, and has not an advocate to assert them. This would probably have been the case in the present instance, had not some gentlemen voluntarily offered themselves to examine and discuss its consequences. The public are obliged to them; it is an excellent example, I hope it will be followed upon every occasion, and that it will make us infinitely more vigilant of our rights than ever. We must never forget that in this country the poor and the rich, the humble and the influential, are entitled to equal privileges; that we ought to consider a violation of the rights of the most indigent and unprotected man, as an injury to the whole: while we have a pen to guide, or a voice to lift, they should constantly be exerted against the exercise of tyranny or oppression, by whatever nation committed or to whomsover the violence may be done.

"I now proceed to examine the case and the nature of the evidence, on which Mr. Bee determined to deliver Jonathan Robbins to the demand of the British minister. I believe it is the first instance which has occurred, of a demand under the British treaty in the United States; certainly, in this state. The law respecting the delivery of fugitives from justice was silent on the delivery of fugitives to foreign powers, therefore the judge conceived himself not only authorized but bound to interfere. By his own statement it appears to have been entirely a new case, in which I should suppose he had considerable discretion, and was not bound by any particular legislative act to deliver on a mere affidavit or any 'trivial surmise or hearsay evidence.' It was his duty to have maturely considered what were the legal import and meaning of the words, 'charged with murder and forgery,' and how far, according to the laws of this country, there was such evidence of criminality as would justify the sending any man, claiming to be a citizen, and not disproved as such, from his country, to be tried by a foreign tribunal, and most probably by a court martial. The judge's auditors must have been surprised when they heard him say 'that no man can be punished by the laws of Great Britain without a trial; if he is innocent, he will be acquitted; if guilty, he must be punished.' This observation was by no means applicable to the present case: the true question before the court was, whether Jonathan Robbins, producing a notarial certificate of being a citizen of the United States, and asserting that he was impressed by violence into the British service, was, from the nature of the affidavits before him, to be torn from his country and connexions, and deprived of all the rights of citizenship, and sent to be tried by a foreign tribunal, acting without a jury, in the most summary manner, and by martial law. I do not pretend to equal legal knowledge with the judge: but I have sometimes attended to points of this kind; and as far as I am able to form, am clearly of opinion that the prisoner, not having been disproved to be a citizen of the United States, there was not such evidence before the court as justified the judge in giving so important an order, as to

surrender him to the demand of the British consul. This I will endeavour to prove from the examination of the affidavits, and the nature of the testimony required by our laws, as sufficient even to justify the putting a citizen upon his trial in this country, without adding to it the inexpressible disgrace and danger of sending him to be tried by a foreign tribunal. The first affidavit is William Portlock, on which I suppose the judge could not have rested at all: he appears from his age, and the statement in the affidavit, to have been a sailor lad as little known in this country as Robbins himself, and to have been so illiterate as not to have been able to write his name. This lad says, he heard a person who answered to the name of Nathan Robbins, declare he was boatswain's mate on board the Hermoine, when she was carried into the port of 'Gavilla;' and that sometimes when he was drunk, he would mention the Hermoine, clench his fist, and say 'Bad luck to her.'. From this statement it results that this Portlock was an illiterate sailor lad, so ignorant as not to know the name of the port the frigate was carried into. It does not appear that he was shown the prisoner, or that he could swear that Jonathan Robbins was the person he knew on board the Tanner's Delight; he avowedly knew nothing of himself. He does not say the person he spoke of confessed to him that he was concerned in the murder or piracy charged on him. From the youth, ignorance and situation of Portlock; from the vague and uncertain account he gave, I must still be of the opinion that the judge could not have rested at all on his testimony; he knew, that even if Portlock had sworn positively to the identity of Robbins, and the latter had when sober made any confession of guilt to him, that it was the duty of a judge not to have attended to it. Any confession of a criminal must be made in a particular manner, before magistrates, or in open court, to operate to conviction. An elegant writer, treating on this subject, says, 'The confession of a criminal, when taken even before a magistrate, can rarely be turned against him, without obviating the end for which he must be supposed to have made it. Besides, we have known instances of murders avowed, which were never committed; of things stolen, which had never quitted the possession of the owner.'

"The evidence of words alleged to have been spoken by the person accused, and connected with the criminality of the charge, ought also to be received with great distrust. Such words are either spoken in the zeal of unsuspicious confidence, and cannot be repeated without a breach of private faith, which detracts much from the credibility of the witness; or, in the unguarded hours of boasting dissipation, in which case they are not unlikely to be false in themselves, and very likely to be falsely repeated. In every situation, therefore, in which Portlock can be received as a witness, or the testimony he gave examined, it must at once be seen, that it was not such as a grand jury could have found a bill on, or such as will be considered sufficient to justify the delivery the judge has ordered. It must, therefore, have been altogether on the single testimony of Lieutenant Forbes he ordered it, and this remains to be examined. The whole of Lieutenant Forbes' examination says, that a man confined in the jail of this district, who calls himself Robbins, but whose real name he believes to be Thomas Nash, was a seaman for a certain time on board the Hermione; that after he left the Hermione, she was seized by the crew and carried into an enemy's port; and that he has heard from the depositions of others in courts martial, that the man whom he believes to be named Thomas Nash, was a principal in the commission of the said acts of piracy and murder, &c. From this account, Mr. Forbes has confessed that he knows nothing of himself—that he was not sure what the

prisoner's name was, but that he believes it to be Thomas Nash, and what is extremely important, he does not attempt to say he is an Irishman, and not an American, or that he was not impressed into the British service. But that from the depositions of others, and what he has heard, he considers him as one of the principals in the said act. He does not explain what is the nature of the testimony he has heard on the subject, as it respects Nash—by whom given—whether by respectable or unprincipled witnesses, by such as were intimidated and forced into a confession of anything, or by ignorant and illiterate men (without a jury to interpose their lenient and impartial decisions) before a court of strict military officers, the severity and despatch of whose decrees they are every moment fearing to experience themselves. His testimony, therefore, being altogether hearsay, ought, in strictness of law, to have operated less forcibly upon the mind of the judge than even Portlock's, for however more respectable as an officer and a gentleman Mr. Forbes is, yet, when he tells you himself he was not on board the frigate when the murder and piracy were committed, and that he knows nothing but by hearsay, either from the relations or depositions of others, he at once comes within that description of testimony, which the laws of England, and the decisions of the best judges, and our laws borrowed from them, forbid either a judge or a jury to receive in any case affecting the life or limb of a subject of the one, or a citizen of the other.

"This being the state of the evidence before the judge, two important questions arise: (1) Whether the judge was strictly authorized, and if there was a doubt, whether he ought to have decided alone upon this question; and, (2) whether in deciding he had any, and what discretion, as to the nature of the evidence to be required, and whether his decision was such as the security of the personal privileges of our citizens, or the policy of the United States demanded.

"To the first question—It appears that, from laws of congress respecting the delivery of fugitives from justice from one state to another being silent, the judge was of opinion, on the application being first made to him, that it was a matter for executive interference; but that upon reconsideration, as the law and the treaty were silent, he was under the necessity of deciding. I think a further view of this subject must have, by this time, convinced him that he was mistaken, and that no possible construction that he can give to the 3d article of the constitution, can justify the opinion he formed of his having a right to decide on this case. The article respecting the judicial, after vesting in congress the right to establish superior and inferior tribunals, defines the important powers they shall exercise, but leaves the boundaries of each to be ascertained by congress. They have accordingly detailed the duties and fixed the limits of the supreme, circuit, and district courts in a manner so clear, that it is astonishing a doubt should have for a moment arisen as to the court really having jurisdiction to decide this question. The district courts have no right to decide on any crime, where the punishment is to exceed thirty stripes, one hundred dollars fine, and six months imprisonment: in any case exceeding these, and particularly for capital offences, however the judge, like any other magistrate, may, on proper testimony, commit for trial, here he has no right to decide: this authority is given to the circuit court. Had, therefore, Robbins been committed for trial in this state, could Mr. Bee have tried him? Certainly not. He must have remained to be tried by the circuit court. With what authority, therefore, could he decide upon a question which not only went to divest the prisoner of his right of citizenship, banish him from his country, and

deprive him of the trial by jury, but also to dispossess the circuit court of a right to decide upon as new, delicate, and important a subject as ever came before them: one which I hoped would have been reserved for much more ample discussion and consideration, and in which I should have supposed the public would have been pleased to hear the opinions of all the most experienced counsel at the bar, and to have seen decided by the supreme court. It is no answer to say that the 27th article of the treaty speaks of commitment, because the latter clause qualifies it, and makes this commitment depend upon the evidence of criminality according to our laws; and there is surely an astonishing difference between a mere commitment for trial, and a delivery over to a foreign tribunal. Nor is it more just to say that the law of congress respecting fugitives from justice in the different states makes them deliverable on a bill found or by an affidavit, because they are only removed from one state to another, where the same laws, same right of jury and same forms exist: and what is equal to all, the invaluable right of habeas corpus, where a prisoner, improperly committed, can, after delivery and removal, demand to be brought before a judge, and have the reasons of his confinement examined. But where is the habeas corpus that can, in this situation, reach an unfortunate American? However slight or unfounded the accusation against him, or erroneous the opinion of a single judge who delivered him may be, when once delivered he is forever deprived of this invaluable privilege. The moment the order is given, he is hurried in chains on board an armed cutter, from whence, on his arrival in a distant and foreign port, he is immediately transferred to another vessel, on whose deck, after a summary military trial, he is doomed to meet his fate.

"I will pause here, and ask you, my countrymen, if there is no difference between this and an ordinary commitment by a magistrate for trial here? Your own good sense, and the security you must wish to the rights of your fellow-citizens and yourselves, will best dictate the answer you should give.

"There is another important reason why the judge ought not, upon this occasion, singly to have decided. I think if it had occurred to him he certainly would have postponed the decision until the meeting of the circuit court. It is this: That however all nations may have agreed upon the propriety of delivering up fugitives from justice, in the case of forgery, yet that in times of war, and particularly in revolutions, when different nations hold such opposite opinions upon what are piracy or murder, and what justifiable resistance to tyranny and oppression, when it is so extremely difficult, and requires all the acuteness, and all the knowledge and experience of the ablest judges to draw the line between them, most certainly in this country our judges ought not to have decided in cases that may hereafter be quoted as precedents, without the utmost caution and deliberation. They should have reflected, that in all trials where there was a claim of birthright or citizenship on the part of the accused, and where there was not the fullest and most positive proof of his criminality, that it was safest to try him here.[1] In this instance they ought certainly to have

---

[1] The following is taken from the advertisement of the British government of Antigua, April 14, 1798, describing Thomas Nash, with the other men that were on board the Hermione: "Thomas Nash, an Irishman, one of the forecastlemen, about five feet ten inches high, dark complexion, long black hair, remarkably hairy about the breast, arms, &c., had left the ship in Porto Cabello, had entered on board either an American or Spanish trading schooner." In this advertisement it is remarkable that Thomas Nash is not called a warrant offi-

done so. The testimony was slight and trivial; it was nearly all hearsay. It was indispensable, therefore. to justice, that the prisoner should have had an opportunity of sending to New York and Connecticut to prove, if he could, his birthright and citizenship, in the case of such delicate importance, and of such slight proof. Could the British government have censured the procedure? It was as easy for them to send their witnesses here, as to have sent an armed cutter to carry him away. Justice would have been done to all parties; and venerating, as their nation is said to do, the trial by jury, a generous and free people would have applauded the respect that was paid to it here.

"To the second question it has been already observed, that this was a new case, in which congress had not legislated, and the more, that if the judge thought proper to assume the power of deciding, he was bound by no particular act of restriction, but at liberty to declare the nature of the evidence on which, in his opinion, so important a decision should have been made. Supposing him, as the district judge, to have been at all authorized to decide, his discretionary power certainly would have extended to this; and the point then for consideration is, that having the power to determine on what evidence so important an order should be founded, what ought to have been his conduct, and what the nature of the proof he should have required? My own opinion, decidedly is, that, he should at least have required such proofs, as a grand jury would have thought sufficient to find a bill. Perhaps he ought to have gone further, and before he consented to his removal into a foreign country and military tribunal, he should have demanded complete proof of his guilt, such as would have induced a petit jury to convict him. But that he should at least have required the proof necessary to find a bill, no one, I think, will contend. The inquiry then is, what is the proof which the English laws and the laws of this country require to enable a grand jury to find a bill? Although I think there are many defects in the administration of justice, such, for instance, as the dependence of the judges on the crown, from which they receive their appointment, and to whom they may be looking up for further promotion and honour; that of being removable by an address from parliament which a minister can always command, and whose views and wishes, therefore, none else but an inflexible magistrate will dare oppose; and, particularly, in the sheriff's having the power to summon whom they please as jurors, and to pack them, if they think proper. Yet there is one part of their system which I have always admired, that is, the institution of a grand jury. Their laws have wisely and humanely considered, that next to the disgrace of being convicted of an infamous offence, is the dishonour of being charged with one; and therefore, before they would submit a subject to the danger and inconvenience of being publicly arraigned, an impartial jury are on their oaths to declare the just cause for accusation. We have copied their system and improved upon it. Our juries cannot be packed: they are drawn by lot, and, in my judgment, criminal trials in this state, are as perfect as they can be. The nature of the evidence which can alone be properly of-

cer; he is only advertised as a common seaman, and not charged as one concerned in the murder of the officers. But the most remarkable thing is this, that while Robbins' certificate says that he is a man five feet six inches high, the other (that is the Antigua advertisement) says he is five feet ten inches. Now, four inches is so conspicuous a difference in the height of a man, that surely it was of sufficient consequence in fixing the identity to have deserved attention.

fered to a grand jury, although not entirely conclusive as to the actual guilt of the prisoner, must be such, as if offered to the petit jury, would be legal evidence. Even examinations taken agreeably to 2 & 3 Philip & Mary, c. 10 (of force in this state), can only be given in evidence before a jury, when the court is satisfied the witness is dead, unable to travel, or kept away by the means or procurements of the prisoner. No other examinations can be given, or ought to be received in evidence; and a presentment founded upon any other, would not be that due presentment, without which a citizen's life should not be put in danger.

"The above opinion is founded on the highest law authorities. A learned English judge, speaking on this subject, says: 'The evidence to be given ought to arise to a high degree of probability. Absolute positive proof is not to be insisted upon before a grand jury, and slight trivial suspicion and hearsay evidence, are not sufficient to ground such presentments upon; for although they are only in the nature of a charge, and do not carry a conviction, yet many inconveniences as well as expense and danger attend a charge of this sort, which no subject ought to undergo, but upon legal and sufficient evidence.' This is the law of England on the subject of legal evidence, sufficient to enable a grand jury to find a bill. Our law is taken from, and founded upon it; and the public can now judge, whether the testimony submitted in this case, was such as ought, in one of so much importance and danger to the prisoner, to have authorized his delivery.

"Some distinctions are attempted to be drawn respecting territory and jurisdiction, the counsel for the prisoner having contended, that the treaty entirely alluded to the peculiar exclusive jurisdiction of each. I have no doubt, in my own mind, that Mr. Jay meant no other than the exclusive territorial jurisdiction of each nation. He seems to have carefully omitted the word 'piracy,' aware of the difficulty I have before mentioned, of distinguishing between what may be called piracy, or what laudable resistance to violence and oppression. This omission, therefore, must at once convince us, that Mr. Jay could only have meant private acts of premeditated and deliberate murder, arising from motives unconnected with any attempts which individuals, coming to be the citizens of this country, might at any time make to free themselves from the tyranny of imprisonment. It is wonderful, however, to me, that Mr. Jay having seen the necessity of omitting piracy, did not also omit, at least during the existence of the war, murder also. For, in attempts to regain vessels or escape from impressment, it is certainly as difficult to distinguish what is murder, as what is piracy. Upon an occasion of such importance to the future safety of his fellow citizens, Mr. Jay certainly ought, and will, I suppose, explain, what was his meaning in that article of the treaty. The quotations from Vattel and Rutherford did not apply at all. They are merely meant to refer to the cases of children born at sea, to ascertain, as Vattel does very properly, the right as subjects or citizens of the nation to which the vessel they are born in belongs. To suppose that Vattel designed to extend the doctrine, so far as to mean that the ships of a nation are, with respect to the space of water they cover on the ocean, its territory as to jurisdiction, as completely as its lands or rivers are, is to prove him not only guilty of an inconsistency unbecoming so well-informed an author, but to make him flatly contradict doctrines expressed in other parts of his work. He then contradicts that neutral vessels do not make free goods; and it is on his authority the British rest, more than any other, their right to search neutrals.

"Among the reasons which should make our judges very cautious in deciding against the claim of citizenship, by persons assuming to be

citizens, there is one peculiar to this country, and which should be carefully attended to; it is, the difficulty of distinguishing between the natives of some of the Middle and Southern states, and the natives of Ireland. Germany, and, in some instances, Scotland. The emigrations from those countries to America were formerly very great. Whole counties have been entirely settled by them, with scarce the intermixture of any other. The children hearing nothing but the language of their parents, will as naturally have the German, Irish, or Scotch accent, as if they were born in Europe. Instances of this sort must have occurred to any man, the least acquainted with these states. Indeed, it is well known that, in some places, many native Americans, born of German parents, have been met, who could not speak the English language. If, then, any of these men, born of German parents, will it not be impossible to distinguish between them and Europeans? And can there be a more fallacious mode of determining than from the voice or accent? I know of none more so than that of the countenance; and to neither should an acute or experienced judge ever attend.

"I now come to the policy of the measure in the United States. More than any other nation, except Great Britain, ought the privileges of our seamen to be vigilantly attended to— they are the instrument of our commerce, and to them their country must look up as the true means of becoming an important naval power—of having the ability to protect and guard their rights, and to insure to its citizens the blessings of peace: they are more exposed to the attacks and insolence of powerful and overbearing nations than any other class of our citizens, and are therefore more entitled to the care and attention of our public guardians. Possessing as the United States do, bulky products, every day increasing, and to export which great quantities of shipping and numbers of seamen are necessary, to what portion of their citizens can they look with more anxiety than to them? Numerous as they may become within these ten years, who knows to what extent the parental and fostering hand of government may increase them within the like succeeding period? But to effect this we must value and cherish them. We must recollect that they are not our men, but citizens—that they do not, the moment they become impressed by a superior foreign force, lose their rights or become lost to their country. Can it be supposed, because they are seamen, they have no families, no tender connexions, no comforts to endear their homes to them? Rough and boisterous as is the element they traverse, and laborious as are their lives, among none of our citizens are to be found more true independence and generosity, or more ardent attachment to their country. If, then, they have those passions, that impatience of insult, that invincible thirst for revenge, which indignities like impressment and tyranny never fail to provoke, are they to be punished for using opportunities to exercise them? Are they to submit to the manacle and the lash, without a murmur, because they fear their country, however possessing the means, may not have the inclination to protect them? If so, adieu to your commerce and your navy! Your seamen will fly to other governments more sensible of their value, and more disposed to assert and maintain their rights.

"I will here take notice of the letter which the judge was said to have received from the secretary of state, mentioning, that 'the president advises and requests the delivery of the prisoner,' because it has made some noise, and I do not view it in the same light with others. I believe that neither of them meant to influence the opinion of the judge—that they supposed it was a mere matter of course—that there was no doubt as to the identity or country of the prisoner; and they probably never heard of his claim of citizenship; that they were anxious, on the part of this government, faithfully to execute the treaty, and that the letter to the judge had another intent. This I really believe to be the case; but the noise it has made will show the extreme impropriety of the higher executive officers of our government ever touching, in the most distant manner, on any subjects that may come before the judicial. However innocent the intention, as I think it was in this instance, it is very apt to give rise to unfavourable opinions:—and none more dangerous to a community can be entertained, than that of a wish of the executive to influence the judicial. It weakens the confidence of the public in both; and lessens the respect it is their wish to show them. The present instance will probably operate to advantage; because it is to be supposed that after this our secretaries will be careful to avoid ever writing to a judge on any subject that may possibly come before him. In one thing I perfectly agree with Mr. Bee; and that is, in his avoiding to question the constitutionality of the treaty, although I think it constitutional. On no subject am I more convinced, than that it is an unsafe and dangerous doctrine in a republic, ever to suppose that a judge ought to possess the right of questioning or deciding upon the constitutionality of treaties, laws, or any act of the legislature. It is placing the opinion of an individual, or of two or three, above that of both branches of congress, a doctrine which is not warranted by the constitution, and will not, I hope, long have many advocates in this country.

"I shall here conclude my remarks on this case. They are made in that spirit of deference and respect, which is intended to avoid giving offence, while it examines with candour the subject under discussion. My earnest wish is to draw the attention of congress to the amendment of the act, and to prove to them the necessity of providing in future against the delivery of any fugitives, unless a bill is found against them by a grand jury: to guard them against entering into any articles on this subject in other treaties, unless they assent to it; and particularly to warn them against ever forming any agreements respecting fugitives from justice, except with nations whose citizens possess the right of trial by jury, and are willing to reciprocate so indispensable a provision.
"A South Carolina Planter.
"Charleston, August 3d, 1799."

(The following are such of the documents appended to the above letter as are not contained in the president's message of Feb. 7, 1800, given post):

Letter from Mr. Moodie, British consul at Charleston, to Judge Bee:

"Charleston, Nov. 27, 1799.

"Sir: In consequence of the very great opposition made to the delivering up under the 7th article of the treaty of amity, &c. Thomas Nash, alias Nathan Robbins, one of the principal mutineers on board his Britannic majesty's late ship Hermione, and of the numerous publications on that subject, as well in this as others of the United States, I wrote to Admiral Sir Hyde Parker, requesting he would send me minutes of the court martial, meaning to communicate the contents to you: but being informed that a compliance with such request would have been contrary to the rules of the British navy, I beg leave to enclose you a copy of the admiral's answer, which I consider fully adequate to the purpose I intended. Whilst on this subject I cannot help remarking, that about the time my counsel moved for a habeas corpus, I happened to be in the court of common pleas, when Mr. Ker, a gentleman of the bar, addressed me, and mentioned his intention to oppose the delivery of the prisoner,

under an idea of his being a citizen of the United States of America: on this I expressed some surprise, that a person should at so late a day interest himself in behalf of the prisoner, particularly as his majesty's cutter Sprightly had been here a very short time before for the purpose of carrying him off, and that it was from your opinion of the transaction being an executive one, that he was not then delivered up: he answered that Mr. Sasportas* had spoken to Colonel Moultrie and himself. I have the honor to be, sir, your most obedient humble servant,            Benjamin Moodie.

"The Hon. Thomas Bee, Esq."

Extract of a letter from Admiral Sir Hyde Parker, to Benjamin Moodie, Esq., his Britannic majesty's consul in Charleston: dated on board the Abergavenny, in Port Royal harbour, Jamaica, 13th September, 1799:

"Sir: I have received your letter of 21st of last month, with a copy of another (not yet received) of the 3d of same month; and in answer to both, am to acquaint you that Nash has been executed and hung in chains, agreeably to the sentence of a court martial, and that he confessed himself to be an Irishman: and it further appears by the Hermione's books† that he was born at Waterford; on the 21st of December, 1792,‡ entered a volunteer on board the Dover; received three pounds bounty money, and was removed to the Hermione 28th January, 1793, and with respect to transmitting minutes of his trial, that is not in my power, but rests with the lords of the admiralty only."

"I had the command of the boats of the squadron on the day of his execution, and attended with them to see his body hung in chains, agreeably to an order for that purpose, from Sir Hyde Parker, Kt., commander-in-chief, &c., &c., at Jamaica.            Geo. Hans Blake, "Late commander of his majesty's sloop L'Ameranthe."

"The foregoing was duly attested before me this 29th November, 1799.
              "John Mitchell, Q. U."

Letter from Mr. Moultrie to Mr. Moodie:

"To Benjamin Moodie, Esq., his Britannic Majesty's Consul in Charleston—Sir: Having discharged my duty as a counsellor in the case of Jonathan Robbins, and having but little time to bestow on newspaper altercations, it was neither in my expectation nor my wish to be called forth further on this subject, and especially, as the author of a publication in a newspaper: but, sir, I find I am indebted to your politeness and moderation, or the zeal of your printer, (if he is your commentator,) for this occasion of my coming forth in this publication. In your letter of the 27th ultimo, to Judge Bee, respecting the case of Robbins, you conclude by saying you were informed by Mr. Ker, that Mr. Sasportas had spoken to Mr. Ker and myself as Robbins' counsel, and with an asterism annexed to the word Sasportas, referring to an annotation below, this brilliant note is in italics, as follows:—'Mr. Sasportas was the agent for the French Republic at the time their cruisers were permitted to sell their prizes in this port. The records of the District

* Mr. Sasportas was the agent for the French republic, at the time their cruisers were permitted to sell their prizes in this port. The records of the district court in admiralty causes will prove this.
†Copies of the ship's books and accounts of the British navy, are made up every two months, and transmitted to the lords of the admiralty. The admiral procured transcripts of this ship's books, in order to describe the persons and names of the crew.
‡Jonathan Robbins' certificate was dated at New York, 20th May, 1795.

Court in Admiralty causes will prove this.' If I understand right, and can read right, and if I understand the sentiments and views of the advocates of your nation in this country, (and think I have contemplated them since the dawn of our Revolution,) this bright note and those capitals are intended as an insinuation to the world, that French influence was at the bottom of Robbins' defence, consequently was the mover of his counsellors. If I am mistaken, sir, in my sentiments you will pardon me, and I hope at the same time correct the error; but, sir, these sentiments are the natural impressions of your conduct, and I will hold them till properly effaced. The cry or insinuation, sir, of French influence may be an admirable engine of British policy in this country, and serve to promote many of their purposes, but as to myself or any injury it may work towards me in this case, you have lost your aim, sir. The mens conscia sibi recti defies your attack; your shaft has no sting, sir, its poison is ineffectual; and your own disappointment shall be your own punishment. When I was first called on in Robbins' case I considered it generally and gave my opinion that I thought such was the prevailing influence of opinions and sentiments of those in power, that every effort would be vain; he had not then been represented to me as an American citizen, and I considered the case on the point of jurisdiction only. I gave it but a short consideration, and soon determined, and thought no more of it. Matters rested thus for some days—till the day before Robbins was tried. I was then accidentally informed, in conversation with a friend, that Robbins was an American. I was struck and alarmed to think I had deserted him. I immediately went to Mr. Ker and desired him to prepare himself for the argument next morning. I went home and considered the case, and met Mr. Ker in court the next day. I had never yet seen Robbins, nor had I ever any intercourse with him till he was pointed out to me, and I went up and spoke to him in court, the day of his trial; nor had I till then ever seen one of his papers. On my coming into court, amongst the first things I did, I asked the clerk for the papers, and amongst them found Robbins' certificate of nativity and citizenship. I examined it and found it had every mark of authenticity; no erasure, no obliteration; that its colour and appearance were natural and correspondent with its date, and that the handwriting of the notary was genuine and can be proven here. But one thing further struck me: on inquiring of the clerk if this paper was found on Robbins when first taken, and being informed it was, I was of opinion it was genuine; and was clear if it was not, it was no fabrication in Charleston. Under these circumstances, sir, I undertook the cause of Robbins; a cause, sir, in which the rights of mankind and those of my country were deeply involved; a cause, sir, which I held myself bound in duty, as an American, to defend and support; which pointed at the constitution and vital principle of American independence. And, give me leave further to tell you, that in this cause, I neither undertook it from French influence or an idea of advancing their interest, nor from the promise or expectation of any fee or reward, and that I never have received any such. Every one, sir, who knows me, knows my politics; they have been uniform since 1775, and I hope will continue so to my latest hour. I honour and respect all nations: but I hate tyrants. I love my country and will defend its freedom. I am, sir, with due consideration, your humble servant,            Alexander Moultrie."

Letter from Mr. Sasportas:

"Messrs. Freneau & Paine: The unexpected attack of Mr. Moodie, the British consul, in Timothy's paper of Monday last, I am induced to notice, not from any apprehension of its injurious effects on the public mind, respecting my

conduct in the case of Robbins, because the publication bears its own insignificance on the face of it; but. as he has thought proper to arraign the motives which induced me to employ counsel in his behalf, I shall briefly relate the circumstances which brought Robbins under my observation. Being drawn to serve as a grand juror for the district of Charleston, we were requested by the court to visit the jail, in order to make a report of the state of the same. In the exercise of this duty I saw Robbins, confined in irons; who communicated to me the cause of his commitment, and his defence to the charge, viz: that of his being an American citizen, impressed by the English. From his relation, and his certificate of citizenship then shown me, I was induced to employ counsel in his behalf, in order that his innocence or guilt might be established by an appeal to the laws of the country. The world must be at a loss to trace any connection between my conduct on this occasion and my having acted as commercial agent for the republic of France upwards of six years since. Hence, it follows that Mr. Moodie can have no other object in view than a desire to establish a prejudice against me in the eyes of my fellow-citizens. Mr. Moodie states that he expressed his surprise to Mr. Ker, that at so late a day he meant to oppose Robbins being delivered up. The fact is I had spoken to the counsel the very day I saw the prisoner in jail, but his avocations. I presume, did not permit him to attend to the case. The consequence was. that rather than the cause should be wholly neglected, I applied to other counsel, with whose exertions I have no reason to be dissatisfied. But I presume this is the first instance where a prosecutor has assumed to himself the right of dictating to the accused party, when, and how he shall seek redress. I am, gentlemen, your most obedient servant, Abraham Sasportas.

"N. B. No one knows better than Judge Bee that I was agent to the French republic, and no one knows better than myself that Mr. Moodie was agent for the British government; by the repeated vexatious impediments which were raised up by him in every case, without the colour of a legal defence. The numerous decrees of the supreme court of the United States, in favour of the captors, prove the fact."

Immediately upon the meeting of congress a call was made upon the president for papers, &c., connected with Robbins' surrender, to which the following answer was given:

"Message from the president of the United States, transmitting a report of the secretary of state, and sundry documents relative to the requisition for and delivery of Jonathan Robbins, in pursuance of a resolution of the house of representatives of the 4th instant.

"Gentlemen of the House of Representatives: In consequence of your request, to me conveyed in your resolution of the fourth of this month, I directed the secretary of state to lay before me copies of the papers intended. These copies, together with his report. I now transmit to the house of representatives for the consideration of the members. John Adams. "United States, February 7, 1800."

"Report.

"Department of State, February 6, 1800.

"The secretary of state has prepared, as directed. and now respectfully submits to the president of the United States, copies of the papers which probably were contemplated by the house of representatives in their resolve of the 4th instant, although no requisition, as the resolve supposes, has ever been received, nor any communication made to the judge of the district court of South Carolina, concerning any man by name of Jonathan Robbins. But by the pro-

ceedings before that judge, as they have been published. it appears that a seaman named Thomas Nash. the subject of the British minister's requisition, did assume the name of Jonathan Robbins and make oath 'that he was a native of the state of Connecticut, and born in Danbury in that state.' The secretary, therefore, besides the copy of the requisition, and the copies of his letter to the judge of the district court of South Carolina, and of the judge's answer, has prepared, and herewith encloses. copies of the certificates of the select men of Danbury, and extracts of letters from Admiral Sir Hyde Parker, satisfactorily proving that the Thomas Nash calling himself Jonathan Robbins, who, on the requisition of the British minister, was delivered by the judge aforesaid, with the assent of the president of the United States. was not an American citizen, but a native Irishman, who, to his other crimes, added perjury, in the hope thereby to escape the punishment due to piracy and murder. The original certificates of the select men and town clerk of Danbury are in the secretary's possession, and he has compared the extract of Admiral Parker's letter to Mr. Liston with the original, and the extract of the admiral's letter to the British consul at Charleston with the passage as recited in the consul's original letter to Mr. Liston. All which is respectfully submitted.            Timothy Pickering."

(No.1.)

Copy of a note from Robert Liston. Esq., envoy extraordinary and minister plenipotentiary of his Britannic majesty. to Timothy Pickering, secretary of state of the United States:

"R. Liston presents his respects to Col. Pickering, secretary of state. A seaman of the name of Thomas Nash having beeen committed to jail in Charleston. South Carolina, at the instance of his majesty's consul there, on suspicion of his having been an accomplice in the piracy and murder committed on board his majesty's ship Hermione, and information of the circumstance having been transmitted to Admiral Sir Hyde Parker, a cutter was dispatched to Charleston with an officer on board, to whom the man was well known, in order that his person might be identified. and that he should be carried to the West Indies for trial. But, on the application of the consul for the restoration of Nash. in conformity to the treaty of 1794, Judge Bee and the federal attorney were of opinion that he could not with propriety be delivered up without a previous requisition on my part made to the executive government of the United States. May I therefore request. sir. that you will be pleased to lay this matter before the president, and procure his orders that the said Thomas Nash be delivered up to justice.

"Philadelphia, May 23, 1799."

(No. 2.)

Letter from the secretary of state to Judge Bee:

"Department of State, Philadelphia,
June 3, 1799.

"Sir—Mr. Liston, the minister of his Britanic majesty, has requested that Thomas Nash, who was a seaman on board the British frigate Hermione, and who, he is informed, is now a prisoner in the jail of Charleston, should be delivered up. I have stated the matter to the president of the United States. He considers an offence committed on board a public ship of war on the high seas to have been committed within the jurisdiction of the nation to whom the ship belongs. Nash is charged, it is understood, with piracy and murder, committed by him on board the above mentioned British frigate, on the high seas. and consequently 'within the jurisdiction of his Britannic majesty,' and therefore, by the 27th article of the treaty of amity with Great Britain, Nash ought to be delivered up, as requested by the British minister, provid-

ed such evidence of his criminalty be produced as, by the laws of the United States or of South Carolina, would justify his apprehension and commitment for trial, if the offence had been committed within the jurisdiction of the United States. The president has, in consequence thereof, authorized me to communicate to you 'his advice and request,' that Thomas Nash may be delivered up to the consul or other agent of Great Britain who shall appear to receive him. I have the honour to be. &c., &c.

"(Signed)               Timothy Pickering.
"The Honourable Thomas Bee, Esq., Judge of the District Court of South Carolina."

(No. 3.)

Letter from Thomas Bee, Esq., to the secretary of state, dated:

"Charleston, South Carolina, 1st July, 1799.

"In compliance with the request of the president of the United States, as stated in your favour of the 3d ult., I gave notice to the British consul, that at the sitting of the district court on this day, I should order Thomas Nash, the prisoner charged with having committed murder and piracy on board the British frigate Hermione, on such strong evidence of his criminality as justified his apprehension and commitment for trial, to be brought before me on habeas corpus, in order to his being delivered over, agreeably to the 27th article of the treaty of amity with Great Britain. The consul attended in court, and requested that the prisoner should remain in jail until he had a convenient opportunity of sending him away. I have therefore directed that he remain in prison until the consul shall find it convenient to remove him. I have the honour to be, with great respect, your most obedient servant,
"Thomas Bee,
"District Judge of South Carolina.

"Honourable Timothy Pickering, Secretary of State."

(No. 4.)

"Danbury, Sept. 16th, 1799.

"We, the subscribers, select men of the town of Danbury in the state of Connecticut, certify that we have always been inhabitants of said town, and are from forty-five to fifty-seven years of age, and have never known an inhabitant of this town by the name of Jonathan or Nathan Robbins, and that there has not been, nor now is, any family known by the name of Robbins within any limits of said town.

"Certified per:               Eli Mygot.
                              "Eben Benedict.
                              "Justus Barnum.
                              "Ben. Hichcop."

"Danbury, September 16th, 1799.

"The subscriber, late town-clerk for the town of Danbury, in the state of Connecticut, certifies that he kept the town records twenty-five years, viz.—from the year 1771 until the year 1796; that he is now 56 years of age, and that he never knew any person by the name of Robbins born or residing in the said town of Danbury, during that term of twenty-five years, before or since.               Major Taylor."

(No. 5.)

Extract of a letter from Admiral Sir Hyde Parker to Robert Liston, Esq., envoy extraordinary and minister plenipotentiary of his Britannic majesty to the United States, dated:

"Port Royal Harbour (Jamaica), September 9th, 1799.

"I have had the honour of receiving duplicates of your excellency's letters numbered 10, 11 and 12, and in answer thereto, acquaint you that in consequence of Nash, one of the ringleaders in the mutiny, murders, &c., on board the Hermione, being delivered up by the United States to me, he has been tried at a court-mar-

tial, and sentenced to suffer death, and afterwards hung in chains, which sentence has been put in execution. He acknowledged himself to be an Irishman."

(No. 6.)

Extract of a letter from Benjamin Moodie, Esq., consul of his Britannic majesty at Charleston, (South Carolina,) to Robert Liston, Esq., envoy of his said majesty to the United States, dated:

"November 19th, 1797.

"In consequence of many obstacles I had to encounter in obtaining the delivery of Thomas Nash, late of his majesty's ship Hermione, and of the numerous publications to the northward, and in this place, I wrote to Admiral Sir Hyde Parker, requesting he would be good enough to send me minutes of the court-martial; to which he answered under date 13th September—I am to acquaint you that Nash has been executed agreeably to a court-martial, and that he confessed himself to be an Irishman: and it farther appears by the Hermione's books that he was born at Waterford; on the 21st December, 1792, entered a volunteer on board the Dover, received £3 bounty-money, and was removed to the Hermione, 28th of January, 1793. And with respect to transmitting the minutes of his trial, that is not in my power, but rests with the lords of the admiralty only."

The following letters subsequently were produced to the house:

Extract of a letter from the secretary of state of the United States, to the president of the United States, dated:

"May 15th, 1792.

"Mr. Liston informs me. that an information received by Admiral Sir Hyde Parker, of one of the mutineers and murderers of the officers of the British frigate Hermione, being at Charleston, South Carolina, the admiral sent thither a vessel on purpose to receive and carry the culprit to the fleet to be tried; but that the district judge had not deemed it proper to deliver him up. This question has occurred before, respecting the crew of the Hermione, in consequence of some of them being apprehended in New Jersey, where they were tried and acquitted. One only was detained some time longer, on a suggestion or expectation of decisive evidence against him: but it appeared afterwards that this man was not involved in the offence, and at Mr. Liston's request he was discharged. The only and legal question was, whether an offence committed on board a public ship of war, on the high seas, was committed within the jurisdiction of the party demanding the offender, on a just construction of the 27th article of the treaty. Upon a further consideration of the subject, I am inclined to answer in the affirmative; I supppose the offence committed on board the Hermione to have been a most atrocious act of piracy accompanied with murder: that all nations having jurisdiction in this case, if the pirates be found within their dominions, any of them may try and punish them; but wanting the full evidence for that purpose, it would seem reasonable, and essential to the due administration of justice, that the culprits be delivered up to the government of the country to which they belong; all nations being interested in the punishment of such pests to society. On the point above-mentioned about the jurisdiction, it may be observed, that besides the general concurrent jurisdiction held by Great Britain on the high seas, her officers have, and exercise, a particular jurisdiction on board of their own ships. For these reasons, and as the 27th article of the treaty especially requires the delivering up of murderers. I respectfully submit my opinion, that the judge of the district of South Carolina should be directed to deliver up the offender in question, on the demand of the British government by its minister."

Extract of a letter from the president of the United States to the secretary of state, dated:

"Quincy, May 21st, 1799.

"Your favour of the 15th is received. I have no doubt that an offence committed on board a public ship of war, on the high seas, is committed within the jurisdiction of the nation to which the ship belongs. How far the president of the United States would be justifiable in directing the judge to deliver up the offender, is not clear. I have no objection to advise and request him to do it."

House of Representatives, Feb. 21, 1800.

Mr. Livingston, in consequence of a reference of the message of the president on the case of Jonathan Robbins to a committee of the whole house, and of another resolution proposed by Mr. Bayard thereupon which had also been so disposed of, the amount of which resolution was an approbation of the conduct of the executive in his proceeding on that subject, proposed the following resolutions: "Resolved, that it appears to the house that a person calling himself Jonathan Robbins, and claiming to be a citizen of the United States, impressed on board a British ship of war, was committed for trial in one of the courts of the United States for the alleged crime of piracy and murder, committed on the high seas, on board the British frigate Hermione. That a requisition being subsequent to such commitment, made by the British minister to the executive of the United States for the delivery of the said person (under the name of Thomas Nash) as a fugitive, under the 27th article of the treaty with Great Britain, the president of the United States did, by a letter written from the department of state to the judge who committed the said person for trial, officially declare his opinion to the said judge that he 'considered an offence committed on board a public ship of war to have been committed within the jurisdiction of the nation to whom the ship belongs,' and in consequence of such opinion and instruction, did advise and request the said judge to deliver up the person so claimed to the agent of Great Britain, who should appear to receive him, provided only, that the stipulated evidence of his criminality should be produced. That in compliance with such advice and request of the president of the United States, the said person so committed for trial, was, by the judge of the district of South Carolina, without any presentment or trial by jury, or any investigation of his claim to be a citizen of the United States, delivered up to an officer of his Britannic majesty, and afterwards tried and executed on a charge of mutiny and murder. Resolved, that inasmuch as the constitution of the United States declares that the judiciary power shall extend to all questions arising under the constitution, laws and treaties of the United States, and to all cases of admiralty and maritime jurisdiction, and also that the trial of all crimes (except in cases of impeachment) shall be by jury; and such trial shall be held in the state where such crimes shall have been committed, but when not committed within any state, then, at such place or places as congress may by law have directed; and inasmuch as it is directed by law, that the offence of murder committed on the high seas shall be deemed to be piracy and murder, and that 'all crimes committed on the high seas, or in any place out of the jurisdiction of any particular state, shall be in the district where the offender is apprehended, or into which he may be first brought.' Therefore, the several questions, whether the aforesaid crime of piracy or murder was committed within the exclusive jurisdiction of Great Britain; whether it comes within the purview of the said 27th article; and whether a person stating that he was an American citizen, and had committed the act of which he was accused in attempting to regain his liberty from illegal imprisonment, ought to be delivered up without

investigation as to his citizenship, or inquiry into the facts alleged in his defence, are all matters exclusively of judicial inquiry, as arising from treaties, laws, constitutional provisions, and cases of admiralty and maritime jurisdiction. That the decision of those questions by the president of the United States, against the jurisdiction of the courts of the United States, in a case where those courts have already assumed and exercised jurisdiction; and his advice and request to the judge of the district court, that the said person thus charged should be delivered up, provided only, such evidence of his criminality should be produced as would justify his apprehension and commitment for trial, are a dangerous interference of the executive with judicial decisions; and that the compliance with such advice and request on the part of the judge of the district court of South Carolina, is a sacrifice of the constitutional independence of the judicial power, and exposes the administration thereof to suspicion and reproach."

The question of a reference to a committee of the whole was taken and carried: ayes, 55.

Tuesday, February 25th.

The house having resolved itself into a committee of the whole, on the message of the president respecting Jonathan Robbins, Mr. Edmond was called to the chair. A short debate took place, whether the committee should take up the business of the resolution first proposed by Mr. Bayard, or on those subsequently offered by Mr. Livingston. Mr. Bayard seemed inclined to withdraw his motion, but the committee seeming of opinion that both resolutions were within their jurisdiction, and that they might proceed on either, the question was taken whether the committee should proceed on the resolution of Mr. Livingston, and carried in the affirmative. Messrs. Bayard, Rutledge, Otis, &c., voting in favour of the question; and, Messrs. Livingston, Nicholas, &c., voting against it. Mr. Livingston entered upon an argument in support of the resolutions which he had some days before submitted to the house, and which now were taken up. Soon after he began the discussion he was proceeding to read a deposition of Jonathan Robbins, and certificates accompanying the same, to prove himself a citizen of the United States, in which the deponent swore, before the court of South Carolina, that he was born at Danbury, in the state of Connecticut, and that he was impressed from on board the American brig Betsey, by the crew of the British frigate about two years before, where he was detained, contrary to his will, until the mutiny occurred: when Mr. Bayard opposed the reference to a fact so incompetently authenticated as the report of a case upon newspaper testimony, especially when, if it had been the desire of the gentlemen to have introduced it as evidence, it was extremely easy to have procured the record of the court before he proceeded on his allegations. If such evidence as this was to be admitted, other, and perhaps more important, might next be introduced to oppose upon the committee. Besides, it certainly must be looked upon as ex parte evidence, which it was impossible to repel. Mr. B. submitted to the house, whether it could be in order to admit any such evidence to support the resolutions when all the documents which had been asked for, and which had come to the knowledge of the executive, had been admitted to the house. Mr. Gallatin, on the question of order, contended for the admission. This document, he said, was referred to as authentic, in his letter. That, by the proceedings before the judge (Bee), as they have been published, it appears that a seaman named Thomas Nash, did assume the name of Jonathan Robbins and make oath that he was a native of the state of Connecticut, &c. Certainly it cannot be improper to refer to the identical document there mentioned. If it was proper for the secretary of state to make the allusion, the house could

take it up under the same idea. He did not think it was introduced as evidence before the committee. Mr. Dana said he was very sorry the gentleman had been interrupted; he could not think of admitting it as evidence, but the gentleman might read it as part of his speech, which perhaps might otherwise have a chasm in it. Mr. Bayard was fully of opinion with the mover of these resolutions, that it was a very serious business; he believed that there was a very serious object in view. He believed the affidavit was introduced as evidence, also why should the gentleman have taken this in the rotation, after he had been stating the facts contained in the message.

It was further said that this deposition was referred to by the secretary. Surely then it was introduced as evidence upon that authority, but how had the gentleman been assured that this was the same deposition, an extract of which was taken by the secretary? Did it follow that because the secretary referred to a printed paper, that this was the authentic one? He presumed no gentleman would vouch for the veracity of this paper. The secretary had only extracts from the document of such parts as he deemed necessary for the information of the house, supposing this was the case meant. Mr. Nicholas was surprised that the gentleman should oppose the reading of what he supposed the secretary had authenticated copies of in his office; the secretary had certainly referred to an authenticated affidavit which was published, and it was presumable this was the one. The result of this declaration must be, if the gentleman thinks the house is imposed upon by a reference to a false paper, that the committee must rise, and the house ask for the authentic copies, which may aid their decision. But, Mr. Nicholas thought the information was sufficiently authentic; the house had asked the papers of the president, some papers were sent, and instead of sending this original paper, he had referred to the printed report. This had never been contradicted, and had every appearance of authenticity. He really hoped that the objection would not be insisted on, and the discussion arrested in this stage. Mr. Rutledge hoped the paper might be read, but not for the purpose for which it was introduced; he wished it as part of the gentleman's speech, but he did not think this was the proper time; he did not think the gentleman was come to that chasm in his speech which was supposed by the gentleman from Connecticut. The gentleman had produced facts and stated evidence, among which he was proceeding to introduce this paper. Mr. Rutledge said he was willing to procure all the information, and that other gentlemen should also be possessed of it, on which account, when the subject was first mentioned, he moved its reference to a select committee; in that case, all the facts and every necessary light would have been procured, but it was referred to a committee of the whole. Mr. Sedgwick (as speaker), thought as this was merely a question of order, and as the acts and deliberations of the committee of the whole were prescribed, it could only have been proper to have made it an act of the house. The committee of the whole, he said, were limited to the documents referred to it by the house, and if they found them insufficient, it was their duty to rise and go to the house for more. If it was the intention of the gentleman to read this as evidence, (which we must suppose was intended,) and it was not evidence, it might shed darkness, but it could not illuminate. He was surprised, that gentlemen, who were sitting there in their inquisitorial capacity, should bring forth charges of a serious nature against two officers, of high confidence, and, deservedly so in the public opinion, upon evidence which cannot be deemed authentic, when, for merely asking, they could receive that which was authentic. Mr. S. said, he was not afraid of the reading of any papers whatever, on any sub-

ject, because he must possess a desire to come at the whole truth. "If there be a man," said he, "who possesses the public confidence unworthily, strip him of that confidence and his power too, but do it not, sir, on bare newspaper publication." Mr. S. said, that his reasons for opposing the reading were, not because that paper was deficient o. that formality which courts of justice require; he should, therefore, waive formalities, except the evidence should appear evidently false. But the deposition itself he believed to be perfectly irrelevant to the object of inquiry. It was not, in his opinion, material whether this man claimed to be an American citizen or not, nor was it material whether the paper under question was in the office or not; he thought the only inquiry to be, whether the president had interfered with the judicial authority or not; and, whether the judge had been guilty of a breach of his duty, in obeying the orders given him by the executive of the United States. There were, to be sure, allusions made to a printed trial, but it was by the secretary of state, and not by the president; he had said no such thing, and therefore he was not culpable. The only thing which he believed the president considered was, what must appear a very clear and well ascertained fact, to wit: that a ship or vessel, of any power, was to be considered as the jurisdiction of that power to whom it belongs, and not whether the man was an American citizen or not. Mr. Livingston said, he did wish to read this paper as part of his speech, and he believed it a very material part, because it was a justification of a point which he wished to establish. He wished to show the committee, that Jonathan Robbins claimed to be an American citizen, and that he said he was impressed; this he swore in court, and that he did so he hoped would be admitted. He said he only introduced it with this view. Surely he could not be so far mistaken in his law knowledge as to be thought to have said, that the culprit could be evidence in his own behalf. If he did say he was a citizen, then the matter, upon examination, must appear more serious than gentlemen would be willing to think. "Did the speaker think it was his desire," Mr. Livingston asked, "to criminate the man who stood so deservedly high in the public estimation?" Surely the mere reading of this paper could not contribute to that crimination, since it was with the other papers, furnished to the house, as documents which were asked for by the house. The house received their papers (this among others, for to this the secretary referred the house) to assist them in forming their judgment. If "newspaper evidence" was given to the house, if unauthenticated affidavits, who then was to blame? The house asked for all papers relative to the subject, the president furnished this, and therefore, if any blame attached, it must be to him.

It was said, that this paper was in the office of the secretary of state; that this was not an act of the president, that this was a report of the secretary of state, and that he only was answerable for it. "Sir," said Mr. L., "when the president says, that he, in conformity to the request of the house, had ordered the secretary to bring him the papers, and that he submits them to the house for their consideration, does he not take the act off the secretary and appropriate it to himself? Certainly he does. The conduct of the gentlemen must appear a little strange when it is considered that a part of these papers, such as certain affidavits from Connecticut, that Robbins was not born there, and a letter from the British admiral in the West Indies, stating that he was an Irishman, and entered into the service,—I say it is unaccountable that gentlemen are willing to admit this part of the report, which was never required by the house, and refuse another part which was, and of which it was the duty of the house to be informed, if information could

be had. Information is had, but it must not be admitted! Sir, this is to be considered as an act of the president. It is to be considered that this affidavit is quoted and ought to be wholly read, since it is the part upon which we are to proceed to the investigation."

Mr. Bayard had no doubt but it was the gentleman's intention to impress the force of the facts contained in that paper, upon the minds of that committee; and, to suppose it would have no impression, would be absurd. It would afterwards be said that this man was admitted to be an impressed American citizen, and that he was praisewori,y in committing what would then be called the homicide. The decision of the committee would be much affected, he said, by the kind of evidence which was alleged. If this was admitted, it would be impossible to ascertain the extent of the principle. Other depositions may be produced; indeed, he had no doubt but the gentleman could get proof to any point which he might think it material to ascertain. In saying this, he did not mean to insinuate that any improper steps would be taken by that gentleman, but there were volunteers enough to be found who would step forward, in order to answer party purpose, and make oath of anything. But what the gentleman had now acknowledged, his reference to that paper was a work of supererogation; he now said, that he only wanted to prove that the man claimed to be an impressed American citizen. This is admitted in the letter of the secretary of state—"Sir," said Mr. B., "you are about to inculpate the conduct of the president, and of the district judge of South Carolina; and to do this, shall you do it on the affidavit of a man at the hazard of his life; and a man who could commit murder and piracy, for which he was then going to be executed? It was the last resource of the wretch himself." Mr. B. had no doubt, but the gentleman would have brought that paper as evidence, and though derived from the vilest possible source, he would certainly have turned it to serve his point. With this idea, and for the sake of consistency, (for the rules of the house would admit, in any other part of the examination, what was now admitted,) and viewing the principle injurious, he had thought it his duty to put a stop to it in time. Mr. Livingston supposed he should increase the astonishment of gentlemen still more, when he declared, that he did not believe a word of the affidavit, but he believed Nash was an Irishman, and that he entered on board and committed all the crimes charged to him. It was clear that the affidavit could not be evidence. In admitting this, he believed he did not surrender one point of the resolutions; he should prove that all he wished to ascertain was that such a claim was made to the court. Mr. Gallatin did not consider the question to be, whether this should be considered as evidence, but whether the gentleman might be permitted to read the paper—whether as part of his speech or whatsoever. It was certainly no legal evidence, and therefore if a trial was holding, or if the ground was an impeachment, refusal would be proper; but upon what ground the gentleman was interrupted at this time was inconceivable, except it was to throw all possible impediments in the way of the investigation. The letter from the British admiral to the British consul was not legal evidence, but yet that was inserted in the report of the executive, that was sent no doubt to disprove some fact which was related. What was that fact? Why, that this man had laid claim to citizenship; and surely, while the gentleman was stating the facts contained in his resolutions, he had a right to elucidate that fact by reading a paper so intimately acquainted therewith. Mr. G. said, he did not know what use the gentleman made of this paper, but it is certainly proper to hear what he intended by the reference, before he ought to have been stopped. There certainly could be no doubt, Mr G.

thought, that the secretary of state knew this affidavit to be authoritative, by the reference he made to it. If this paper could not be read for himself, he should wish to procure further information, before he should think it proper to proceed. Mr. Bayard asked, where could be the necessity of proving a fact which every member of the house was willing to admit? No man but would acknowledge that Nash claimed to be an American citizen; but perhaps the will of the gentleman was to have additional light on this subject, on which account he introduced the deposition. Mr. B. said, he was willing only to proceed upon what the house knew from the documents before them, and not take a step on precarious ground. It must be well known what the gentleman wanted to get this admission for: he no doubt wished to prove that upon his own mere suggestion, that he was an American citizen, and that he was impressed, he was entitled to a trial by jury in this country, and on that account, that the act of sending him away was unconstitutional. This would lead to an extensive field of argument. If there was any necessity for more evidence, or to call witnesses to the bar of the house, let proper measures be taken to procure it, but let it not come forward in any other way. Mr. Dana read the resolution first offered to the house for a call of papers relative to Jonathan Robbins.—This was answered, he said, by the secretary of state, that no requisition or proceedings had been had in that name, but he presumed allusion was made to the case of Thomas Nash, concerning whom proceedings were had in the district court of South Carolina in that way, and that only the secretary made reference to the printed report. In this blundering way, Mr. Dana said, the business was begun. (He was called to order.)—In addition to this, he said the proceedings of gentlemen were erroneous, but notwithstanding that, Mr. D. said he would gratify the wish of the gentleman as far as his vote would go, to read it, but only as part of his speech; no doubt he wished to support some point of his argument by it, and in that view he had a right to read it; but that it was evidence, he denied. General Lee said, he did not profess to understand the rules of the house perfectly, but he must indulge a presumption, that they could have but one grand object in view, to encourage and maintain full and fair discussion, on every subject, whatever it might be, that could come before the house. That being necessary, surely a rule must be bad, indeed, that would bar a gentleman from reading anything that might tend to elucidate the subject. He therefore, thought it the duty of the committee to allow the gentleman from New York to read this, and every other paper which might enable him to proceed on so serious a charge as the one exhibited in the resolutions. Were not gentlemen fully adequate to judge what may be wrong, when he should come to the application? If he asked the papers of the president of the United States, was he to be content with those only which should come through his ministers? That could not be the true ground of proceeding. Suppose the gentleman be stopped from reading what he thinks material, and the resolutions which he has introduced should afterwards be negatived; "I pray you to say, sir," said Mr. Lee, "what would be the consequence? Would not the people say that no other possible decision could be had by the house, because the committee of the whole laid their hand upon every effort the gentleman used to substantiate his charges? They certainly will, and no act can more increase the means of the opposition to the measures of the government." Upon this ground he hoped the gentleman would be permitted to proceed, and the whole truth be made to appear. If gentlemen should determine it out of order, he would move that the committee rise in order to get hold of all the authentic papers.

The chairman having stated his reasons, con-

cluded with an opinion that the member could not proceed to read the affidavit.

Mr. Gallatin appealed to the committee from the decision of the chair, when there appeared 39 in favour of the decision, and 48 against it.

Wednesday, Feb. 26th.

Mr. Davis moved, that the committee of the whole house be discharged from the further consideration of the resolutions proposed by Mr. Livingston and Mr. Bayard on the subject of Jonathan Robbins. The small progress, Mr. G. said, which was made yesterday in the discussion, fully convinced his mind that nothing at all would be done in it; besides, were he convinced that the discussion would be impartially conducted, he did not know of any possible good that could arise from the adoption of the resolutions. If there had been any error in the proceedings of the executive, he conceived that error would correct itself. If there was an improper interference, he was certain it could not have arisen from improper motives, and therefore he sincerely hoped he should not be called upon to give an opinion on the subject. Nor, on the other hand, was he at all prepared to compliment the executive, or any officer of the government, for having done what he thought to be right. If he had done right, it was his duty. He did not think it of any great importance, but most assuredly, if the argument was extended, it would be made a case of great importance. It was better, however, to let the case of Jonathan Robbins sleep in the committee of the whole, where it was. He was not prepared to criminate, nor was he prepared to applaud. Mr. D. did not think the evidence before the house was sufficient to form a decision upon, and he professed himself unable to make up a determinate opinion; but if he could form any, the deficiency of evidence furnished must raise his suspicion. Reference was yesterday made to a paper; it might be authentic or it might not: it was impossible to say to what papers gentlemen might be disposed to refer, and for gentlemen to sit there as judges having papers read the authenticity of which it was impossible to know, was to judge in the dark. He hoped that if the house were not prepared to discharge the committee of the whole, they at least were for a call for such authentic papers as could be procured, for from the present documents it was impossible to form a correct judgment upon this very disagreeable and irksome business. He had no doubt but many gentlemen had formed their judgments one way or the other, but he had not. Mr. Randolph said that no gentleman had a higher respect for the motives of the gentleman from Kentucky than himself; but however disagreeable it might be, he must differ from him in his present opinion. He really hoped the gentleman would reconsider the motion he had made, and not stop the gentleman from New York in this early stage of the business. If there were any defects in the papers, and their authenticity was questionable, it must not arise from the gentleman from New York, but from those whose duty it was to furnish all the facts relative to the business. He was obliged to read a printed paper, because those with whom the authoritative copies are, have not thought proper to furnish the house with them. He hoped, if a stop was put to the proceedings, it would not be to discharge the committee, but to call for authentic copies of all the papers within reach of the government. It must be acknowledged that the man whose case the house are considering, did put in his claims to citizenship, and the protection of his country on that account. If that acknowledgment is refused on account of the paper which has been produced being a newspaper, reference must be made to what is within reach of the house—more authentic papers. The gentleman had supposed that most of the members had made up their minds on the business with-

out other papers; where he procured that information, Mr. R. could not tell; but certain it was that his mind was not made up; he professed to be still in a state of incertitude; he therefore was sorry the gentleman had not made his motion until it would be known by the house whether the gentleman from New York had any further evidence to adduce. Could he undertake to say that his mind would not be made up, and the subject appear to him in a very different point of view after a full and fair discussion? Mr. R. thought the very reason which the gentleman had given for his motion would operate as a strong argument against it; with him it certainly had that impression; he thought a discussion was more proper to remove incertitude from the mind, than that, because such a state existed, the committee should be discharged. The public mind, he believed, was very uneasy on the subject, and this inquiry should not be eluded; he therefore ought to have withheld his motion, that a discussion might be had from which the people could draw their deductions. If, after all the evidence that was to be produced, he could draw a conclusion similar to that expressed by the gentleman, Mr. R. said he would cordially join with him, that no expression ought to be made by the house without being well supported by facts. General Lee considered the motion would have the complete effect any gentleman could wish whose desire it was to reprobate the conduct of the administration of our government. How could the motion be necessary —how useful? "If they were to ask more evidence," said Mr. Lee, "I would vote for it to be produced; they have brought the subject before the house; let us see it in the purest colours which it can be placed in. We are ready to meet them here; we are willing that they have every evidence that can be obtained to elucidate their charge, but let not the executive be hung up to reproach without a trial; let not suspicion be encouraged, which must have all the effects of a substantial charge. I wish them to go on with the discussion, that all truth may be disclosed, and every fair light be given which the case will bear, for now the people of the United States have their eyes fixed upon our proceedings on this important question." Mr. Macon was in favour of the motion; if the committee of the whole was not to be discharged, he hoped at least the business would be postponed till the public business of the session was over; there were many public bills, he said, that must be passed. The house was called upon to judge with almost no testimony, and yet upon this uncertain ground, perhaps a whole week might be spent of the most precious time of the house, for if the house was to rise at the time proposed, the loss of this time would certainly be felt. As to the impression it would leave on the minds of the people, they had as many facts to judge from as the house, and they certainly would form an opinion whether the house did so or not. Gentlemen were very much mistaken, he said, if they undertook to lead the people; they would think, and they would show what their judgment was when a proper time came for that purpose. The time the people would take to show their approbation or disapprobation of the measures of the administration, was at elections, and then they would do it. Gen. Smith said if the object of the motion was to get better testimony, he thought it a very proper one; the house certainly ought to be possessed of the documents of the district court of South Carolina, on this case, in an authentic form, and not from newspaper information. He professed himself to be in the precise situation of the mover, and if called upon to vote without more evidence, should be at a loss to know how to vote. Mr. Dana was against the postponement or the rising of the committee. It was to be recollected that the business had assumed its present shape only in consequence of the zeal of the gentle-

man from New York and his coadjutors, to censure the executive. On the 7th of February it was committed to the whole house; contrary to the opinion of a number of gentlemen who wished the facts investigated by a select committee, thirteen days then elapsed before he had prepared his resolutions—resolutions not calculated to make an inquiry into the conduct of the executive, but expressive of the most pungent censure upon its conduct. These resolutions were produced upon the papers which, at the desire of those gentlemen, were submitted to the house. The only question then is, do the papers upon which those resolutions are based, warrant the censure contained in them, or not? It certainly would be a high reproach to the very idea of a public inquisition to admit more evidence upon those grounds. Still, however, let gentlemen go on in their heterogeneous proceeding; the house would have the wisdom justly to appreciate the various attempts made to clear themselves of a predicament in which their over-arduous attempts to censure had thrown them.

Gen. Shepherd thought the best way would be to let the resolutions take their course; they must be debated sooner or later, and the sooner it was got rid of, the better. He was sorry they had ever been introduced in the house, but as they were, he hoped no postponement would take place.

Mr. Livingston conceived it his duty to answer the observations of the gentleman from Connecticut (Mr. Dana), as to the resolutions being founded upon the facts before the House. He did not think the facts were precisely sufficient to warrant every idea contained in the resolutions. When the original call for papers was passed by the house, he hoped that something more authentic than newspaper testimony would have been referred to by the executive, and upon that he was called to act, if at all.

"The gentleman had further said that my zeal," said Mr. L., "and that of my coadjutors, to censure the executive, has brought us into this situation. Who, sir, I would ask the gentlemen are my coadjutors? That gentleman himself was my coadjutor, and every gentleman in the house, because the resolution was adopted; the house directed the inquiry and every gentleman must therefore take the burthen in part with me. It was upon the suggestion of the notoriety of the facts that the inquiry was made, and now we are about to enter into the inquiry upon the facts with which we are furnished. We never can act but upon the evidence we have to guide that action; if the facts contained in the resolutions cannot be substantiated, if they shall fail to justify the conclusions we mean to draw from them, we certainly cannot be worthy of blame for not possessing more." "I consider the affidavit yesterday produced," said Mr. L., "as only supporting one branch of the conclusion that may be drawn from the whole. Whatever gentlemen may think as to the folly or hasty zeal of the resolutions, I can assure them that they are the results of many days' most serious reflection; they were not drawn in haste, and I am not afraid to say that they can be well substantiated—every fact contained in them. I am sufficiently prepared to proceed, and therefore hope this motion may be negatived, and a calm and deliberate investigation be had. If the deductions I shall make will not be satisfactory, then let it drop; I am, however, well satisfied of their force." Mr. Craik said that very early in this business he thought the house were entering into it very improperly, either having nothing at all to do with it, or else taking wrong measures; if they had, he thought then, and was yet of opinion, that if the object was to impeach the president, measures ought to have been taken accordingly. He never did look upon the house of representatives as having either the power to censure or to approbate the conduct of the executive, and therefore equally disapproved the resolutions of the gentlemen from New York and Delaware; and upon that ground he felt strongly inclined to vote with the gentleman from Kentucky for giving the whole business the go-by, and getting clear of it by any possible means.

The motion being to discharge the committee of the whole from both questions, was giving an opinion upon neither one nor the other, and therefore it could not be received as a censure agreeably to the apprehensions of the gentleman from Virginia, (Mr. Lee.) Mr. C. believed the people of the United States were too wise and too intelligent to form unjust conclusions upon the conduct of the house on this subject. They had the whole subject before them, they could judge, and they had a right to do it, but the house had not, except the avowed object of impeachment, which was not the case; the house had nothing to do with it, and therefore they ought not, in this unnecessary way, spend time upon it. Mr. Harper agreed with gentlemen that it would be folly for the house to spend time in useless discussion, which could lead to no decision, but viewing this resolution as he did, he must conclude it of more importance; he thought it the direct road to an impeachment of the president of the United States, and if so, surely it must be important. The resolution declared in express terms, that the executive had exercised unconstitutional powers, one of the most dangerous crimes he could commit; if he had so exercised his power, the inevitable consequence must be that the president of the United States must be impeached by this house. Then how could any gentleman say this was a trifling question, and one with which the house had nothing to do? Certainly no question can be more important. If, as it respected the motion of the gentleman from Delaware, no motion had been made to criminate the executive, he should not think it right to approbate his conduct; he should, in short, have been of an opinion that the house had nothing to do with it, but it having been, he should consider it very disrespectful not to express a sense of the propriety of the executive conduct. He was willing, nay desirous of meeting the charge with all its terrors, and never should shrink from a decision on it. He presumed gentlemen had a meaning in what they did; and if they had any meaning, it must be that the house ought to proceed against the executive. He did not think, however, from the total evidence which appeared, that there was one idea in the resolution but ought to be scouted with disdain from the house. He wished to have an opportunity of showing to the world that the house disdained to look with unconcern at a serious and unfounded charge upon the executive of the United States. He wished to give an opinion upon these charges, and treat them as they merited. Mr. Rutledge regretted that he could not join with his friend from Maryland (Mr. Craik) in thinking this consideration useless; he believed the attention of the people had been called to view this subject, and they were anxiously looking for a decision in some way. Neither did he think with his honourable friend that the house had nothing to do with it because no impeachment could grow out of it. It was impossible to say what the gentleman meditated in his motions, but one thing was certain: if the gentleman had wished to promote an impeachment, he could not have taken a more direct means for it, if the resolutions could be carried. He thought the friends of the administration would act a very unfriendly part towards the administration if they should agree to smother the business at this stage. The minds of the people had been raised to the highest pitch of expectation. They had been told, in certain public prints, that it loudly called for the interference of congress; they had also been told so by an honourable member of the other house that congress

must interfere. Attempts having been made to lead the public mind astray, and the house having proceeded so far on resolutions calculated to procure the object it would be extremely wrong not to remove that disquiet by a suitable proceeding. It would not be useless to rescue the executive from the very serious charges which had been thrown on him, and prove to the world that his actions had been consistent. Mr. Kitchell thought no good could arise from the investigation of this subject, because he did not know what was to be done in it, let the decision be what it might. The gentleman from South Carolina (Mr. Harper) wished to have an opportunity of showing that every part of the resolution was built on false ground; every gentleman in the house was not so fond of speaking or of hearing as was that gentleman, and he hoped merely on that account the house would not spend time on what (in his opinion) could not possibly lead to impeachment. What effect could a discussion have but to show the world that there were parties in the house, and to raise a rancorous disposition? He did not know what in the resolution could lead to an impeachment; nor did he know what the house, in their censorial capacity, had to do but to impeach—he believed it equally out of the power of the house to applaud. In short, he did not think they had anything to do with it. Mr. Nicholas hoped the discussion would proceed. Although there might not be sufficient ground on which to impeach the executive, he could not agree that, therefore, no inquiry ought to be made into his conduct; there might be an error in his conduct, and no impeachment be necessary to be raised out of it, and if so it would be extremely wrong to suffer it to go out to the world without a decision after the business had once been taken up by the house. Where there might be no bad intention, or wicked design, the actions might be of a dangerous tendency and proper to be inquired into, in order to express an opinion thereon. Mr. N. said he was well pleased that his opinion, that the motion ought to be negatived, accorded with that of the gentleman of South Carolina, because it would afford him an opportunity of showing what he said he could show. Mr. Bayard had no doubt of the competency of the house either to impeach, to censure, or to approbate the conduct of the executive, and of course both resolutions were within their power.

Several gentlemen had intimated that the authentic evidence, and the whole of the documents were not before the house, and that the executive department was to blame for the deficiency. It appeared that the gentleman himself had forgotten the import of his resolution; it called for such documents as might be in possession of the department of state. Now what could possibly be in possession of that department? The president of the United States had his duties to perform, and the judge of the district his duties; each had their separate documents, and as neither interfered with the other, therefore it could not be expected to be in the power of the president to furnish the papers belonging to the court of South Carolina, any farther than they came within the joint duties of both. Agreeably to treaty the British consul made a requisition for the person; a copy of this and the several letters and instructions were sent to the house, but it was not in the power of the executive to order the judge to furnish him with a record of the proceedings; he was not bound to furnish it if the president had called for it; but the president had not required it, and no doubt had furnished the house with every paper in his possession. The idea in the resolutions being to criminate the judge as well as the executive, Mr. B. thought he ought to have had an opportunity to furnish the papers of his department, and those could and ought to have been called for before his conduct ought to have been so deeply implicated.

Mr. Otis said, when first the motion was made by the gentleman from Kentucky, he felt for a moment inclined to lean to it; the motives of that gentleman appeared to be so candid and liberal, that, for the moment, Mr. O. confessed, his feelings got the better of his reason. But a short reflection induced him to change an opinion thus hastily formed, and he felt satisfied that to vote with him would be to display, in the conduct of gentlemen who wished to support the administration of the country, worse than censure. He joined that gentleman in regret that it had gone so far, but certainly it was a subject of the most irritating nature possible—a charge the most serious—a breach of the law by the executive magistrate, who is bound to support it and see it carried into effect—it is certainly a charge of much importance, and however disagreeable it might feel to him, Mr. O. said, he must vote that every argument should be used that could possibly tend to substantiate the charge, that nothing of truth might be hidden.

An insinuation was thrown out that the president had suppressed part of the information which ought to be had on the business. Lest this should take hold of the minds of gentlemen, he would observe that the president, in his message, says: "I have directed the secretary of state to lay before me copies of the papers intended, which I now transmit to congress." If, therefore, there is any blame, it is not attached to the president, but to the department of state; but it does not appear that the secretary of state has any more papers in his possession than those the house are furnished with. This may be inferred from the readiness with which he furnished the papers he has given; he says he has no papers respecting any person of the name of Jonathan Robbins; "but, by the proceedings before that judge (Bee), it appears that a seaman named Thomas Nash, the subject of the British minister's requisition," &c. He having been, therefore, asked for papers relative to Jonathan Robbins, expressed his willingness by furnishing what he supposed was intended. Mr. Otis said he did not know to what points the evidence required by the gentlemen from New York could apply, except it was to that of his being an American citizen, and of his being impressed. An affidavit was produced to prove these facts, but it would be found from an examination of the documents, that nothing relating to those points was in the office of the department of state, for the date of the affidavit of Robbins is the 25th of July, but the order of the secretary of state bears date the 5th of July, so that no papers as to his claim can be in the possession of that department. Mr. Otis thought that the documents before the house contained everything that was important to the point. Admitting the position gentlemen had taken to be true, which he positively denied, but admitting that the president had given an opinion upon a judicial question, it was only as respected the delivery up of the man which was, in fact, an executive duty; but if the evidence should prove insufficient to support the charge exhibited against the executive or the judge, he was certain that the gentleman from New York would rejoice as much as himself, to find the charges unfounded and the character of those gentlemen beyond blame. Mr. Craik was sorry that gentlemen who advocated this motion should be charged with an opposition to the administration of the government; he believed his conduct had heretofore evinced a different line of conduct. He still denied that the mode taken by the resolution could lead to impeachment. It certainly did contain a very great censure, and one which the house had no authority to inflict. Gentlemen had supported their resolutions upon the ground of the necessity of the various departments being kept distinct, but the very object of the resolution was dereliction of that principle, since it exemplified an interference on the part of the house with a judge of the United

States and with the executive of the United States. When the house undertook to decide upon executive or judicial acts, and call their conduct into review before them not with a view to impeach but to inflict a severe censure, they certainly interfered with the separate powers of those departments, which in his opinion was setting a very dangerous precedent. He thought it ought not to be in the power of any member to lay such a resolution upon the table, or, if it was laid there, it ought not to be discussed, unless it was found to contain principles over which the house had power; it should not be in the power of any gentleman to call the attention of the house to what could not have any good effect, but might have a very dangerous one. The power of impeachment by the constitution was not a power to inflict any punishment; it was only a power to investigate facts to be tried by another tribunal; the house were not to judge, they were only to charge; but by this proceeding they had taken upon them to consider the propriety of punishing as well as charging, for most assuredly to censure, to injure a man's character, must operate as a punishment. Mr. Gallatin considered the motion to be grounded on two ideas, one that there was not sufficient foundation for the house to act upon, and therefore that it was necessary to discharge the committee, or postpone the subject for want of further evidence. It is clear, said Mr. G., that the evidence is not sufficient to impeach the district judge of South Carolina. If an impeachment of him was the object, it would be impossible to carry it forward without an authoritative copy of the record of the court; but if there was no intention to impeach, he did not think there was any material evidence wanted in order to decide upon the resolution, since it only meant an implication of censure upon the executive and the district judge, and not impeachment. The only business being to consider of the propriety or impropriety of censuring or approving the conduct of the president and the judge, all the material facts were before the house. If any censure was due to the president, it was on account of the opinion and advice he expressed by his letter to Judge Bee. This letter was before the house, and nothing more could be wanted to base the resolution upon; the fact was sufficient to form a decision upon. There could be but one thing wanting, and that was the original letter of the president to the secretary of state, instructing him what to write to Judge Bee, and this could not be requisite if gentlemen would not say the letter of the secretary perhaps did not contain the precise opinion of the president. If there should be such an objection, he should certainly wish the house to possess the document. However, he concluded that no such objection could be, since a message of the president contained a full acknowledgment of every sentiment contained in that letter. Mr. G. agreed there was at first sight some weight in the sentiment expressed by the gentleman from Maryland (Mr. Craik), that the house had only a power to impeach, not to censure; but certainly, when it was considered that an act might be committed without any ill motive, and yet the act be injurious, it cannot be the subject of impeachment, but it might be of censure. The same act committed with a criminal motive would be impeachable, which without it would be of a nature not to admit of it. Again—Mr. G. thought that the house might have no ground whereupon to censure; but they had exercised that power; they had, in a number of cases, approved of the conduct of the president, and if the act of approbation had been done, they surely had as much power to disapprove and censure. As to the irritation that was apprehended from a continuation of the discussion, that consideration would not induce him, Mr. G. said, to vote with the gentleman from Kentucky: if there was any irritation to be apprehended, it must come from those gentlemen who denominated themselves exclusive friends of the administration: from those who presumed to arraign all the measures of their opponents, and who declared, that they were disposed to support not only that measure, but every measure of the administration. A number of very improper epithets had been thrown out as it respected the resolution, and certainly the distinction must be considered very narrow between those resolutions and the supporters of them; but it was too frequent for those great supporters of the administration to use high tones, and if they chose to do so, let them. Mr. G. said he was not afraid of any inquiry accruing from the high ground they had assumed to themselves.

The question was then taken on the motion to discharge the committee of the whole from the further consideration, and negatived: nays, 76; yeas, 14; majority against the motion, 62. Those who voted in the minority were, Messrs. Baily, Condit, Craik, Davis, Dent. Dickson, Freeman, Goode, Grove, Kitchell, Linn, Macon, Pinckney, and S. Smith.

### Thursday, Feb. 27th, 1800.

Mr. Davis said, as the house had yesterday thought proper to negative a proposition to discharge the committee of the whole from the farther consideration of the business, and, as one great motive for that motion was the incompetency of evidence before the house, and as he knew it was in the power of the house to procure that evidence by a proper application, he hoped gentlemen would now indulge him in the adoption of the following, which he moved, viz.: "Resolved — that the president of the United States be requested to direct the proper officer to lay before this house a copy of the proceedings of the court held in the district of South Carolina, in the case of Thomas Nash, calling himself Jonathan Robbins." Mr. Bayard said, if he was persuaded, or if the gentleman could convince him that there was any particular evidence in the hands of any officer that would tend to throw such light as to give the least explanation of the case, he certainly would be willing to accord with the resolution; but he believed every necessary fact was before the house, and this had been acknowledged by several gentlemen. If the object was to prove that Nash was an American citizen, and that he was impressed, that could not be necessary as it respected the resolutions of the gentleman from New York, for that gentleman himself had acknowledged that he believed no such thing, but that the whole claim was a falsehood. Would the gentleman then inform the house what point he wished to ascertain, or in what he expected additional proof? He wished information farther: Who was the "proper officer" to whom reference was expected to be made? There are but two officers at all in view, one is the secretary of state, the other is the district judge of South Carolina; the gentleman could not suppose that the judge would be able to transmit the records of that court previous to the adjournment of the house; and if it could be obtained, no evidence to the point could be expected from him. If on the other hand it was meant to call on the secretary of state, it was not to be expected, from the nature of the case, that any more documents were in his hands than those already furnished; he had given copies of the correspondence and requisition, which might be fairly inferred, from the nature of his office, was all of which he could be possessed. But if any gentleman doubted this fact, he could apply at the office of the secretary of state, from whom he could procure whatever was in his possession. If it was the intention of the house to close this very disagreeable business in the present session, they must negative the resolution, and let the discussion go forward. The gentleman who brought forward the resolution ought to have been provided with every document that was necessary to support

the charges, before he suffered them to appear. However, he did not think but the gentleman who proposed the resolutions thought his grounds were quite sufficient to support them. · General Smith was in favour of the resolution. He considered himself as filling the character of judge of the case. and as such he ·was inclined to think, from the documents which were laid before the house, that there were other papers which were not yet brought forward relative to the judicial proceedings of South Carolina, that would have a considerable effect on his vote. He said there was a paper, which he had seen published, which ought, in his opinion, to be in possession of the house; he meant that wherein Robbins swore he was an American citizen, and as a proof of it produced before the court a notarial certificate of New York, the date of which went to corroborate the fact. He also swore he was impressed. If this certificate was before ' the house, gentlemen would be able to compare the date of it with the declaration made by Admiral Parker, and perhaps that comparison might produce conviction some way or other. These he thought very important, if it was desirous to prove the man an American citizen. This was certainly the duty of the judge to ascertain, but it did not appear whether he paid attention to it or not. Mr. S. declared he should be at a loss to go forward in the business without these papers, if he was to decide upon the whole truth. Mr. Nicholas said he always believed that the testimony was incomplete; but when he heard a gentleman get up and mention particular testimony which he considered so important that without it he should not know how to vote. whatever, Mr. N. said, might have been his former satisfaction as to the establishment of the points, he certainly must now be inclined to grant gentlemen every point of evidence that they should think necessary, if within reach of the house.

One particular piece of testimony had been mentioned, viz: that the man filed an affidavit that he was an American citizen, and he was impressed on a British man-of-war. Could any gentleman pretend to say that no inferences might be drawn from this source and the concomitant facts? The gentleman from New York, to be sure, had declared his satisfaction with the facts that had been produced to the house, but did the gentleman from Delaware know that this was the case with any other gentleman in the house? That gentleman's conclusions and impressions were not to be taken as the opinions of others, nor were others obliged to be satisfied because he was; and, therefore, to couple others in a measure to which they were not privy, and to ascribe opinions to them which they had not expressed, was at least unfair. Some gentlemen might feel satisfied with what came out since this unfortunate man's death, but that could be no rule for others. As to this part of the papers, Mr. Nicholas could by no means understand or conceive for what they were collected and sent to the house, except indeed it was to quiet the minds of some gentlemen who thought that the measures of the government were too precipitate, in their having judged the case without proof. That certificates should be collected respecting this man after his death, and when he could not possibly appear to contradict it, or to adduce contrary evidence, was an insult to the common understanding. Suppose this man had claimed to be an American citizen, and the government had known it, he would ask gentlemen how they would justify an act done when no such evidence was known to exist as was now presented from Connecticut. What does it amount to but that there is a chasm in this business which wants to be supplied? It might be supplied to the satisfaction of some gentlemen, Mr. Nicholas said, but it was by no means so to his. Suppose, as was observed before, the certificates had proved the man to be an American, what could gentlemen have then said?

From the present ·state of information, every gentleman must acknowledge it a matter of doubt, and being so, it ought to have been searched into; this doubt might probably be removed by a reference; but the record of the court would prove another thing, and one which the gentleman who moved the resolutions expressed his intention to dwell much upon, that is, whether the judge had caused him to be arrested, and intended him for trial in the circuit court of the United States; and whether the judge had taken upon him to supersede, not his own jurisdiction, but that of the court over which he presided, in the delivery of this man ·to the British agent. For his part, Mr. Nicholas said, he had no doubt of the jurisdiction of the United States upon this man's trial, and that it was a departure from justice to deliver him up to a foreign tribunal.

Upon a review of these reasons, he must conclude that more evidence ought to be had, if more evidence could enable the house to make a better investigation, and more was attainable; for, although the gentleman from New York thought the business ripe for discussion, he could not say ▮▮was, and therefore thought it his duty to vote for the motion. Mr. Otis said he should not. for himself have the smallest hesitation, if that resolution pointed to a particular object, or to a particular officer, · who might be under the direction of the president, to agree to it. If the gentleman would modify his motion, so that the president of the United States might be directed to instruct the secretary of state, to lay before the house those papers, he should not vote against it. But he thought it his duty to declare that the secretary of state had received no further authentic or other transcript than he had furnished to the house, of the judicial proceedings on this subject. Mr.· O. said he had received this information from the secretary of state in answer to an inquiry of that officer, whether he .had any such documents. But in the present form of the resolution, he could not agree to it. If the motion was adopted, the question would be who was the "proper officer?" Even if it was to be some officer under the direction of the president, the president had already furnished the house with every paper within his power. If the "proper officer" meant, was the judge of South Carolina, Mr. Otis would say that the executive could not with propriety furnish it, because it would be to all intents an interference with the judiciary department. He did not think that the president had any right to demand the documents of that court. He thought the house were fully competent to send to that district judge, ordering him to lay before them all the papers they should think necessary; but then the question should be, were the house ready to consent that the proceeding should be postponed until such an application should be made. or, in short, till the conclusion of the session? Besides. to ask for documents which would be made use of in a way injurious both to the executive and to the judge, was a measure which gentlemen who supported the resolutions of the gentleman of New York, could have no right to expect from gentlemen who could perceive nothing improper in their conduct. If then it be true, of which Mr. Otis thought there could be but little doubt, that the judicial proceedings of that court were never before the executive, whether the judge had done wrong or not, he, and he only, would have to answer, and not the president. The conduct of the president grew out of the proceedings of the court; where, then, could be the propriety or justice of having up the president in effigy, and there suspend him until the next session of congress, subject to the thousand alarms, surmises and reproaches of the people, which must carry with it the whole object of the censure! Every man might have had access to those papers; the judge never would have refused any man a copy of all the proceedings that might

tend to elucidate a subject which they may think was deficient without it. An honourable gentleman had lately written a pamphlet on the subject; he might have produced the proceedings of that court, if he had thought them of any service, and so might the gentleman from New York. Should, then, the proceedings on this business be suspended merely for the want of evidence, which it was in the power of every gentleman to have brought forward? Gentlemen had with very great deliberation brought forward this accusation before the house—if it was in the power of every gentleman to refer to new evidence at every stage of the business, after the accusation was grounded only on the documents before the house, the evident effect must be to procrastinate beyond all bounds, a business, which the honour of our government requires should be immediately decided. In justice, therefore, to the president, he conceived himself bound to vote against the resolution. Mr. Dana thought this a most extraordinary resolution, indeed. Was the president of the United States the clerk of that court, to keep the records of it? What had the president of the United States to do with that court? It was certainly a total departure from all the forms of judicial proceedings to suppose a thing of the kind. The gentlemen must certainly have mistaken the situation held by the president, or they never would have made so vast a departure from all the forms of judicial proceedings to suppose a thing of the kind. The gentlemen must certainly have mistaken the situation held by the president, or they would never have made such a vast departure from order and propriety of proceeding. The president is not the public accuser—he is not to be called upon for papers with which he has nothing to do. When he found gentlemen outraging everything that belonged to judicial propriety; when he found them stumbling into error after error, and departing totally from all jurisprudential propriety, Mr. Dana said he could not avoid rising to oppose it. So much for the form: he believed it totally wrong, and therefore could not be adopted. But in addition to this, the house would render themselves more ridiculous than they now appeared by the adoption of measures which must make a matter appear important, that in itself was unimportant. Several gentlemen proceeded with the same zeal as though an American citizen was concerned. This was not the case; it was notorious to every man that this Nash was a foreigner; of this the house were fully apprised by respectable testimony. This man contended that he was born at Danbury, but the certificates of the clerk who kept the registers for a number of years back, to whom the annual list of all the births was transmitted and by him registered; and also the certificates of a number of old residents in that town, had incontestably proved that this man was never an inhabitant of that town. He was an Irishman—let any man from Ireland, whatever, declare that he is an American of Connecticut, in vain would he be able to impose that opinion upon the mind of any man who observes his speech; it is entirely impossible to suppose that an intelligent court could be so imposed upon. The fact of country being incontestably proved, how can gentlemen be so earnest in the face of that fact, to charge the executive with any improper influence? Could the gentleman be ignorant how many men who were aliens had taken advantage of the certificates granted to Americans, and as Americans, had procured certificates from a magistrate in attestation of their false oaths? Any gentleman who believed that possible, might account for his having procured an American certificate. Mr. Livingston said he did hope that this motion would not have been brought forward, but as he meant to vote in favour of it, after having declared his satisfaction with the documents, as sufficient to support his resolutions, he should now give his reasons, and lest he should be ac-

cused of a desire to keep alive a calumny against the president of the United States, an effect which had been stated, he took opportunity to answer the insinuation by saying that he as much abhorred so mean a principle as any gentleman in the house. Mr. L. said he would again declare that the evidence was sufficient to satisfy his mind upon the points he meant to establish, but that should not preclude other gentlemen from thinking other papers necessary; papers which he must acknowledge would throw an additional light on the subject. Though he thought the message contained all the facts absolutely necessary to establish the points he proposed to dwell on, yet it certainly did not contain all that was asked for, and what they had no right to send, was given. The resolution, Mr. L. said, asked for all the papers relative to the delivery of Jonathan Robbins. We are told that they are not in the office of the secretary of state; the president must know whether they can be procured, and he has it in his power to procure them: they may be in the hands of the district judge of South Carolina. But the house are told the president cannot procure this record, gentlemen say he has no power over that department, and yet this very president, has the power to instruct this very district judge to deliver up the person to the British government! How then can gentlemen presume to say the president has not power to call for the records of the court in a case in which himself has acted a principal part! Again. It was said that neither the president nor the judge had a right to deliver up papers that might lead to their crimination. This was the very reason why the house should require papers that would explain any doubtful parts of their conduct; for this very reason the house should demand, not only the documents, but the reasons for their conduct. The president or the judge can only be able to supply the house with those documents, and if they have been wrong, they ought to be required to furnish them. But, gentlemen, supposing the main reason for inquiring is to ascertain whether Nash was an American citizen, or not, how can it be said that the inquiry was extremely unimportant whether he was or was not? Upon that, Mr. L. said, he did not lay so much stress as some other gentlemen; he believed that it was perfectly immaterial, because he believed that the course of proceeding would be precisely the same, whether he was or was not, and because it appeared that the conduct of the executive, and of the judge, would have been the same in either event. The same might be said as to the impressment. And, therefore, though some trouble had been taken to prove that, in addition to the murder, he had been guilty of perjury, he being proved to the satisfaction of some gentlemen, to be an Irishman, was precisely the same in the case. However it had been, he should have been delivered up. Gentlemen had farther said, that he, Mr. Livingston, ought to have known all these facts before he had formed the resolutions. Mr. L. said he did not think so; as he had before declared, he was possessed of satisfactory facts, but he could not prevent himself giving loose to the desires which other gentlemen had expressed, and therefore should now accord with them in the vote. Mr. Marshall said, it was with no inconsiderable regret that he perceived so much of the time of the house, which ought to be devoted to more beneficial purposes, employed in preliminary discussion; he thought that it was impossible the house could agree to a postponement, which the motion under consideration must cause, when it was reflected how much time must be employed in procuring those papers; it could not take less than a month; for they could only be found, he presumed to say, in the court of the district of South Carolina; it was therefore scarcely to be expected that they could be obtained until just before the rising of the house, a period, if they arrived before the house rose, too unfit for

their consideration. He, therefore, considered the question precisely the same in principle, though different in form, to that which yesterday occupied the house. The question he believed essentially to be, would the house postpone the business till the next session? In this light he should treat it; and he could not see how gentlemen who voted against the motion yesterday, could advocate the present. Shall the house merely, because two or three members think such documents are necessary, agree to postpone the business? for if two or three members be indulged on this account, two or three may lay claim to the same right on another account, and thus day after day may be spent, and no determination ever be come to. It is a necessary case in every house, and upon every question; there always will be some few found who will express dissatisfaction at proceedings, and claim some privilege; but this can never operate as a general rule for a session. Gentlemen ought not to request this when the general expression of the case is, that there is enough evidence before the house to decide on the resolutions. And most particularly it ought not to be indulged in a case where so much manifest mischief would attend its inevitable consequences —delay. Let gentlemen recollect the nature of the case—the president of the United States is charged by this house, with having violated the constitution and laws of his country, by having committed an act of dangerous interference with a judicial decision of this country; he is charged so by a member of this house. Gentlemen were well aware how much the public safety and happiness depended on a well or misplaced confidence in the executive. "Was it reasonable or right," Mr. M. asked, "to receive this charge —to receive in part the evidence in support of it —to receive so much evidence as almost every gentleman declared himself satisfied with, and to leave the charge unexamined, hanging over the head of the president of the United States, until a distance of time, how long it was impossible to say, but certainly long enough to work a very bad effect?" To him it seemed of all things the most unreasonable and unjust; and the mischief resulting therefrom must be very great indeed. When the evidence now in possession of the house came to be examined, gentlemen would be unable to decide whether more would be necessary than there possibly could be at present; if more should then be wanted, the business might with propriety be postponed. If it was possible to obtain the documents shortly, he should have no hesitation to admit of the motion; but being impossible, he felt no hesitation in declaring he should put his negative on it.

The gentleman from New York, (Mr. Livingston,) Mr. Marshall said, in his opinion, had criminated the conduct of the secretary of state, in supposing that he had withheld some of the documents. The court record was mentioned, but was it to be supposed by the executive that he was to be called upon to furnish papers the property of another department of the government, supposing them material? To procure these papers, he knew was as much in the power of the house as in his power. The house could as well dispatch a messenger as the executive. How was the president then to consider those papers asked for of him? Was he to be a menial to the house in a business wherein himself was seriously charged? Certainly not. There could be no doubt but the executive thought he had fully complied with the request of the house, where he supplied them with those immediately in his power. Mr. Bayard said he could not distinguish between the present motion and one yesterday negatived, because it must act as a discharge upon the committee of the whole house. There could be no doubt but the secretary of state had furnished all the papers relative to the house in his possession; indeed he could assuredly say so. He said he held in his hand a letter from the secretary of state in answer to one from an honourable member of the house, inquiring whether there were any more documents in his office; he answered that he had no certified copy whatever, but those which he furnished the president with from whom they came to the house. Gentlemen must then perceive that the mere operation of this resolution was an absolute and inevitable postponement of the business till another session. Many gentlemen, who were yesterday ashamed to vote for a postponement, would now have a plausible cover for their vote, by calling for additional proof, to accomplish the object of the resolution of yesterday, and thus he feared it would have many advocates; but however specious the pretext, he hoped it would not be carried. Mr. B. then went into an examination of the facts contained in the resolutions of Mr. Livingston, from which he deduced the impossibility of procuring anything that could be material in the prosecution of their discussion, or that could assist the house in drawing their conclusions, except any new facts could be produced, and therefore he concluded that nothing but a postponement could be the issue. He farther contended, in an answer to Mr. Nicholas, that it was not competent for the executive to furnish papers the property of the district judge; as well might the house ask for the executive to bring the proceedings on again at their bar. In the impeachment of Blount, Mr. Bayard said, the house did not apply to the president, but appointed a committee to bring the case and all the papers to view relative to it; so it might have been in the present case. And by what authority, taking the subject in another view, could the house call upon that judge to furnish it with papers? The executive had no right to demand them of him, nor had the house. The power of the judiciary is co-ordinate with the power of the house; it is a distinct branch of the government. He would have precisely the same right to call authoritatively for a copy of the journals of the house, as the house would to call upon him for copies of his record; his proceedings are public, his records are open to view; so are our journals; we cannot call upon him for them, though we may obtain them by paying the clerk for a copy of them, as any individual might do.

The gentleman from Maryland (Mr. Smith) had considered the notarial certificate of New York, in attestation of Nash or Robbins's citizenship, to be important. If that gentleman thought this a material document, Mr. Bayard said he did not, but he thought the observation very material, as it might have an improper impression on the minds of some gentlemen. What could be more easy than for this Thomas Nash, this perjured pirate and murderer, to have got a certificate, either when he murdered some man from whom he might have procured it, or by purchase or favour? But there were facts before the house, that this man was an Irishman, that his name was Nash, and not Robbins; that it was never issued to him, and he was never entitled to it. What farther then can be wanted? Will not this satisfy gentlemen? The next thing will be, that if this objection be admitted, we shall be called upon to send to the West Indies to prove that his name was Nash. Mr. B. said, he was well satisfied that when this subject came to be analyzed, it would be made to appear perfectly clear, that the whole of the evidence necessary was before the house, and it only would be most annoying, and producing extremely injurious consequences, to grant the motion. Mr. Rutledge conceived this motion to be the same as to postpone the business. Further information was wanted, and that information could alone come from South Carolina. He wished the gentleman of Kentucky would read the resolution before he pressed his motion; he would find that the district judge was not charged; no, it was only a charge against the executive; there-

was not a word of irregularity of proceeding in the court, but the executive was seriously charged. Mr. Davis explained.—He said, his objects were to have the record in order to see whether Robbins did produce a certificate that he was an American citizen; to see a copy of the warrant by which he was committed; and thirdly, to know what stratagem, or what proceedings were used to take him out of cognizance of the court, and he must have remained so, if the president had not interfered.—These things he wished to ascertain, but that would be impossible without the court record. Mr. Rutledge said, he conceived this to be the object; but he by no means thought the gentleman would be satisfied on these points, were he to be possessed of the record. The gentleman might inquire the reasons for the executive and judicial conduct being as it was, but perhaps he should not receive the information. Every gentleman in the house would unite their vote to procure all the testimony within their reach, so as to enable the house to prosecute this business; we know, said Mr. R., what monstrous clamour has been raised about this business; we know that great pains have been taken to make the people believe that their fellow-citizen has been torn from his country; that he has been impressed into a foreign service; that the treaty has been violated; that their fellow-citizen has been taken to a foreign country, and there been tried in a summary mode and executed; we have been told for many months past that this business would be inquired into; we wished not to avoid it; we will by all means in our power assist it; we have done it. Some time since papers were asked for; we agreed with gentlemen that they should be furnished; it was done, and they are now on your table. They have been there many days; so that gentlemen had sufficient time, long before this, to have known whether they were satisfied or not. The gentleman himself who brought forward the resolutions, affected to be satisfied, but in compliance with the wish of some of his friends, he now wishes to postpone it. We want to bring the matters to a decision, and far as we can accommodate gentlemen so as to avoid delay, we will do it. "But," said Mr. Rutledge, "what will be the effect of that motion? Sir, it will hold up to the view of the world the president of the United States as having been grossly delinquent in his duty. We say, if he has offended, punish him; if he has not, discharge him from censure; but by no means expose him to popular suspicion, without an examination. What more can be wanted than the house are in possession of? The secretary of state says he has no further documents; and he cannot be suspected of any design to smother the business, by the readiness with which the call of the house was complied with. He might have said, he would send to the district of South Carolina; but instead of that, so earnest was he to give every possible information, that he trusted to newspaper publications, and this, he tells you, is all he has. What more can be asked?" After the discussion, if the evidence should be found insufficient, and more light should be necessary on which to form a decision, Mr. R. then would agree to send anywhere for evidence; but until he was convinced of a want of such testimony, except the will of gentlemen could be complied with without delay, he should be compelled to vote against the motion.

Mr. Nicholson rose to correct what he considered a mistake in the gentleman last up (Mr. Rutledge) when he said that the executive only was implicated in the resolutions; he conceived that the district judge of South Carolina was implicated, and that the papers of that court were necessary to examine the conduct of that judge. He read the resolution, and contended his deduction was accurate. Mr. N. said he wanted to know whether the district judge of South Carolina had committed this man for trial; this would appear, or be disproved by the warrant. Mr. N. said he could not believe the position laid down by a gentleman (Mr. Dana) that it was utterly impossible that Jonathan Robbins should have been a citizen of the United States. It was worthy of notice that the notarial certificate which the unfortunate man produced in court was dated 1795—the opposite authority to wit, a copy of the books of the Hermione appears to state that Thomas Nash was transferred to that ship in 1792, he, therefore, wanted to know authoritatively, whether this certificate was produced to the court, for if it was produced, it certainly went to prove that the copy of the books of the Hermione was erroneous, because if this man was in New York in 1795, he could not have been on board a British frigate in 1792, and have continued there until the time of the mutiny. That the president of the United States was not to be considered the servant of that house, he was willing to admit, but he thought that the president might with propriety apply to the judge of the district for the documents of the court. And he did not believe that the president would object to make the application. However, the object, he presumed, was to procure the papers, no matter from whom: that being the object, he hoped that the mover of the resolution would withdraw it in order to accommodate it more to the feelings of some members in the house, by adopting something like the following: Resolved, that the speaker of the house of representatives be requested to procure from the clerk of the district court of South Carolina, copies under seal of the proceedings of that court, together with the evidence produced in the case relative to the requisition for Thomas Nash, alias Jonathan Robbins, who was delivered to his Britannic majesty's consul. Mr. Davis withdrew his resolution, and Mr. Nicholas moved the substitute, which was now before the house. Mr. Harper moved a postponement of the resolution for one week. The object of the resolution which was before the committee of the whole was twofold.—a charge on the president, and a charge on the district judge. As to so much as related to the president of the United States, it was manifest that the testimony called for by this resolution could have no effect whatever upon him, because he left the whole to the judge. The president went no farther than to declare that if it should appear, that the acts committed by this man came within the purview of the British treaty, the man ought to be delivered up conformably to that stipulation.

It must be manifest that the testimony to be expected from South Carolina could have no possible effect on the part relating to the president, and therefore the house could proceed with that part of the resolution; but whether the judge, in executing the duty belonging to him, acted with propriety or not, might be more clear from the documents of that court. When the judge entered into the consideration of this business, what questions were open to him? The principle was, whether the man was guilty of the piracy and murder charged to him or not; if this was proved, no further question could arise as to the propriety of delivering him up conformably to the requisition. The consequence of these papers being called for, had been stated to be much delay; it would operate so. "Was it not an established principle," Mr. Harper asked, "that a delay of justice amounted to a denial of justice? If you suffer this charge to hang over the head of your president for eight months for no purpose, you inflict a punishment extremely severe. A charge is here exhibited against the first magistrate of the Union which must be considered as the commencement of an impeachment, for if gentlemen have any propriety of conduct, this must operate as a foundation to impeachment. This is to keep alive the idea of guilt,

to hang up suspicion as a party weapon over the head of the executive until an opportunity shall offer to make use of it on a great approaching occasion"—this, he thought, was the main intention of the motion, and this consequence was inevitable. He believed the motion now before the house to be the same in principle as the one negatived yesterday; it was an effort to shrink from a charge, the object of which could better be answered by delay than examination. Mr. Nicholas thought with the gentleman last up, that if the only inquiry was as to the conduct of the president; or if the inquiry was only to respect the judge, the papers might be dispensed with, but it was otherwise; the conduct of both was called forth to view by the resolutions, but how far the conduct of either may be reprehensible, depended on the testimony which might be made to appear before the house. It was impossible to say what the president had done until the documents should be seen. If gentlemen refused the inquiry being made of the court of South Carolina, they, by that act, made the president answerable for every part of the facts, which he believed they would not pretend to do. He really believed it extremely important to know what steps had been taken in this very serious business, to know whether this man was in a course for trial, and whether the president had acted in this hasty and premature manner, in delivering him up, which was stated. Mr. N. then proceeded to prove that the warrant was important to be seen, because the intent for which the apprehension was made, it was explicitly incumbent on the judge to record, together with the court where he was to be tried, agreeably to the provisions of the judiciary act, and, therefore, this information could be obtained by recurring to that record. A gentleman had thought the information could not be obtained from persons, when probably that information may criminate. But were the house to decide upon information short of truth because the result may lead to criminate? That is, they are to be acquitted without materials whereupon to acquit. The objection of gentlemen on account of the time it would take to procure the testimony, which they suppose would be so late that the case could not be acted upon during the present session, he believed not accurate. Mr. Nicholas declared that it was far from his desire to postpone the business; he wished it to go forward without delay, but not unless all the facts were before the house which might be necessary. The house were told by a gentleman (Mr. Marshall) that it would be extremely improper to indulge a few gentlemen in their objections. Was the gentleman confident that there would be a majority of his opinion? A few, it must be remembered, could make a decision, and if so, the result of the opinion of those few might guide the question. Much had been said about the introduction of the motion and the motives ascribed to the supporters of it, as though it was a planned object. Mr. Nicholas denied having the least knowledge of it till the motion was made, and, with respect to him, it could not be thought as an attempt to carry into effect the motion yesterday made for postponement, because he yesterday voted against that motion, and by no means would agree to postpone, but for an object which he now thought material: when the object was to obtain important information, and believing, as he did, that it would not put off the decision beyond the power of the present session, he should consider himself justified in voting for the motion. Mr. Gallatin could not help observing the disposition which gentlemen evinced of placing the opinions and sensations expressed by one gentleman to the account of others. To take a fair view of the resolutions, what did they amount to? Nothing more than the deductions which one man had drawn from the message sent to this house by the executive; these deductions, in the form

of a resolution, he had submitted to the consideration of the committee of the whole. Now, except it could be proved that that gentleman had made all the deductions of and acted for every gentleman, there could be no ground for saying that every gentleman would be satisfied without the evidence which might be collected from the records of the district court of South Carolina. Was any gentleman in the house bound to be satisfied, with the gentleman from New York, that all the facts necessary to be known were furnished? Was every gentleman in the house bound to confine himself solely to the resolutions before the house? Certainly not. It could not be denied that the evidence now required was essential to a full investigation of the conduct of the judge who was the principal agent of the executive in this case. He did not consider the question to be, whether the resolutions of the gentleman from New York required that evidence or not to support them: but whether, to come to a knowledge of the truth, and the whole truth, relative to the circumstances, it was not necessary? Although Mr. Gallatin observed he could not at present perceive how far it was likely those documents might assist the decision of the house, yet he thought them proper to come before the house; it was very probable they would tend either to criminate more, or to extenuate and perhaps to justify.

With respect to the objections on the ground of postponement, Mr. Gallatin would observe, that the motion of the gentleman from South Carolina proved that this was not the proper time to proceed in the discussion: the motion implied that gentleman's acknowledgment of it, or he would rather have at once rejected the motion than moved its postponement for a week. He therefore presumed that gentleman thought additional testimony necessary. Mr. Harper had said that neither the testimony to be expected, nor the postponement could have any possible bearing on the part relating to the president, and therefore that ought to be decided; but as far as related to the judge, evidence might be necessary. Taking this to be the mind of the gentleman, Mr. Gallatin said, he did not know in what manner he could apply his argument to the motion. For himself, Mr. G. said, he was ready to vote on the resolutions without more documents; but as other gentlemen were not, he should not vote without them. He confessed he was the more earnest in this, because on the very threshold of the business a gentleman was stopped while reading a paper he thought useful to bring forward. Gentlemen had now got up and declared themselves compelled to call for evidence which might substantiate a fact contained in that paper, which, though known to be true, was not stamped with that legal credit that was necessary. Let gentlemen then come forward at once and give this fact its legal importance, or prove its non-existence.

Another fact stated was, that the president had undertaken to discharge the man, when the court had already assumed jurisdiction of the case. This it was possible to prove or disprove by the record of the court. That this record, agreeable to law, was to contain the name of the court before which the case was triable, and process upon which the man was arrested, he quoted the judiciary act. 1 Stat. 73. He was, however, well satisfied from the letter of the judge and the nature of the case, that this man was committed for trial before a court of the United States, and what corroborated the opinion was that no power was given by our laws to hold a man in prison on any other ground. On the whole, Mr. G. said, as one fact had been, and others might be, disputed, if produced, it would perhaps be the most expeditious, as it certainly would be the most satisfactory method to procure every fact authentically attested before the proceeding was had. General Lee hoped that the gentleman

from South Carolina would withdraw his motion. He would mention some reasons which would induce him to vote differently from gentlemen with whom he usually had the honour to vote. Considering this a question of very great importance not only to the American people, and to the reputation of the house, but also the highly respectable character presiding over our government, he trusted the house would, in its whole progress, be led by principles so fair and candid as not to leave the least room for a charge of derogation from its own dignity, or the great subject it was discussing. He would vote for the motion calling for the papers; but he would do it with an expectation that it would not postpone the discussion of the business, so far as related to the conduct of the president of the United States. It appeared that the conduct of the president, as charged, was fully before the house; there could be no difficulty, therefore, to proceed on it; but as far as it respected the judge, Mr. Lee trusted the record of the court would be sent, for he thought it but fair to gratify gentlemen who considered there was any material evidence wanting.

If the view of gentlemen was to postpone the whole of this business, until a return from South Carolina, he would ask the gentleman from New York, and his friends, whether they could wish any means to be adopted more completely to effect the object of the resolutions than by postponement? "Were I the high character," said Mr. Lee, "to whom this resolution refers, I would infinitely rather have the disapprobation of this house to the full extent which the censure goes, than to have the subject postponed and exposed to the conclusions and surmises of the world. I will not attribute to gentlemen that which the gentleman from South Carolina has expressed; I cannot think the member from New York wishes to suspend the decision of this house until that high character shall be before that tribunal which is to estimate his merits or demerits, for knowing that no baser motive can be cherished, I will not even suspect it of him; but whatever may be the motive which may induce a postponement, it cannot fail of having that effect." He therefore wished to proceed as it respected the president. Mr. Dana acknowledged his very high sense of the opinion of the gentleman last up; but he could not agree with him at present: he did not think it would consist with general justice to delay the case for the time contemplated by the resolution; he well knew that if the inquiry was not made, gentlemen would talk about liberality and about motives, but that he should not in the least regard, assured that his conduct would be guided by the strictest rules of legal propriety and justice. Mr. D. could not admit that much propriety marked the conduct of the gentleman from Maryland (Mr. Nicholson); that gentleman well knew that the executive ought not to be called upon, and that the speaker of the house was the true medium by which evidence could be obtained for that house, but as the argument was in favour of a complete investigation of the business, Mr. D. could not help calling to the recollections of gentlemen a motion (which was negatived) to put this previous examination in the hands of a select committee; for want of that very necessary measure, gentlemen now found themselves in a disagreeable situation, for, having accused these officers, they could not prosecute their accusation as they wished, and therefore they would fain make further inquiry. He objected, farther, to it because it was unnecessary; he did not believe the least good could spring from it. But it was extremely unreasonable, and highly unbecoming the dignified character of grand inquisitors general, because there was no proof to make the charge appear, that they should suspend the business while gentlemen sought for proof which they ought to have known when the resolutions were proposed, which they ought by no means to have brought upon slight grounds. Did the gentleman know that public officers professed reputation; and that the preservation of that reputation was essential to preserve public confidence in them? He would not stretch a man on the bed of torture, for time unknown, while he searched for proof of a supposed crime. "Sir," said Mr. D., "by this treatment you chain your public officers to a rock, for this spirit of patriotism, like a vulture, to prey on their hearts. This is conduct I abhor, and therefore cannot, for my part, indulge it. Sir, they have brought the charge; we are willing to meet it—we are willing to give full weight to their charge—we are not disposed to vindicate the executive, or any other public officer, if doing wrong—but it is because we respect honest men in public stations, that we are prepared to hear what the tongue of accusation can produce; we are unwilling to leave them exposed to calumny, as they must be unheard and unjustified except it be by clamour, which a suspicion must inevitably raise." Mr. Varnum would vote for the resolution proposed; he thought it was doubtful whether the president had acted with propriety or not, but he believed if there had been any incidental impropriety of conduct, it never was done with an evil design, or with a view to interfere with any other department of the government: but certainly to deny this evidence, which several gentlemen stated to be necessary to assist them in making up their minds, would stamp a censure on the conduct of those officers as great as that contained in the resolution. He thought that the gentleman from New York had a right to bring the subject to the view of the house; if he saw any proceeding which to him appeared to be dangerous, it was his duty to commence an investigation; no man ought to flinch from what he thought right. The only way to give public satisfaction, in a matter that had given so much public attention, was to give all the evidence which could be procured, and let the matter be investigated to the bottom; and most assuredly the only way effectually to clear the characters implicated, if they were innocent, was to leave no doubt as to the desire of the house to scrutinize their conduct. But certainly the very great reluctance which gentlemen showed to procure all the evidence, and after all their denial of it, must leave a suspicion much bordering on guilt. Mr. Bayard rose, in answer to Mr. Gallatin and others, and observed that with respect to Nash calling himself an American citizen before that court, an object which it was desired to prove by this call for evidence, they were asked to admit the fact. Mr. B. asked, would those gentlemen admit that Nash was guilty of the dreadful murders committed on board the British frigate; would they admit that he falsely made the claim? However, he had no disposition to rest on that point. Another fact, however, which it was required to admit was as to the jurisdiction of the court of the United States upon the case. Mr. B. denied this, and repeated the former arguments in proof of his opinion. He insisted that the whole arrest and proceeding were had at the instance of the British consul and minister, in proof of which he quoted their letters. The record, he said, could not possibly dispense any light to this fact; the record would only give the warrant and some of the depositions first taken before the judge; but as to the court being designated where the cause was to be tried, he contended that it was not usual to insert it on the warrant, he never saw one so drawn. It was possible that Nash was committed with a view to be delivered up to the British, before the letter was received by the judge from the president, and it was very reasonable to suppose that the whole previous business was at the instigation of the British agent; but it was impossible to prove that jurisdiction had attached before the letter directing the delivery to be made was received. Mr.

Jones said, that finding himself, from the vote he was about to give, implicated in the charge made by the gentleman from Delaware (Mr. Bayard), that gentlemen who were yesterday ashamed to vote for the proposition to discharge the committee from further consideration of the subject in general and express terms, because it would imply a distrust of sufficient ground to support the principles of the resolutions, were disposed to effect the same object by a decision which would in fact go to evading the question during the present session, he felt himself impelled by a respect for his own conduct to explain the motives which would govern his vote on the present question. He considered the case which had been called into view by the proposition of the gentleman from New York (Mr. Livingston), as one that involved in it the dearest interests and deepest concerns of the people of the United States. The gentleman from Delaware (Mr. B.) and the gentleman from Connecticut (Mr. Dana) had indulged themselves in the most violent invectives and unnecessary abuse, against the unfortunate, the obscure, and insignificant character, now dead, who was the subject of this proposition; on this topic they had exercised all their powers of passionate declamation. If this was a grateful theme for the employment of their talents, he did not envy them the enjoyment of it. How that kind of argument could apply to the question he left to the house to determine. For his part he deemed it totally immaterial whether the man was as they had declared, an Irishman, or not; whether he was a Turk, a Hottentot, or a native born American; if he claimed to be an American citizen and produced a certificate in due form, under the signature of a proper officer, of his citizenship, and that claim was slighted by the judge, or declared immaterial, and the fact not inquired into of his being a citizen, then he considered the safety of the citizens of America to be equally put in jeopardy, as if the man had been born and raised in Charleston, in the circle of the judge's own acquaintance. "If," he asked, "a dagger aimed at my breast by an assassin in the dark, should, by mistake or impetuosity pierce the bosom of another, would not the discovery of such an attempt awaken alarm and demand a precaution for my future safety? Certainly it would. So in this case; if this man claimed to be a citizen and bore about him the legal voucher of that claim, and if he was told in the presence of American citizens, 'it is of no importance whether you are or are not a citizen, that is a point of no concern in the case,' notwithstanding it may afterwards be found he was no citizen, yet would it equally involve the safety of every true citizen who might fall into similar circumstances. We may congratulate ourselves that it has not fallen on a fellow-citizen, but we ought still to improve the lesson this case has presented." Mr. Jones hoped that it would be improved, and that at least legislative provisions would be made to prevent this decision from operating on a citizen, if such a case should occur in future; this man was a citizen to all intents and purposes, so far as respects the precedent, if he claimed that right and produced a voucher to testify it, and was entitled to all the privileges of a citizen, till his claim and certificate had been formally proved to be false. Mr. J. said, to ascertain with certainty whether this claim was put in, and how it was treated, it certainly was necessary to procure authentic copies of the record and proceedings in the case from the court, and every ray of evidence that could be obtained; nothing could be more essential in deciding on the conduct of the judge than to have an authentic account of the proceedings. Gentlemen seemed extremely anxious to have the question decided early, on account of the censure hanging over the executive by continuing the business on the table. "It is true," Mr. J. said, "the papers now called for were not necessary to determine

on that part of the resolution which charges the executive with interfering with the judiciary; on this point no further evidence was wanted; that was an abstract question, and might be so decided; but there was a probability that the evidence to be obtained from the court in Charleston, might be material as to another charge or implication of the president. If it should by any means be proved, that the president was informed of, or knew the man had claimed to be a citizen, then he was surely as much to blame in not making the distinction, as the judge; it was possible this might appear from some of the proceedings or papers before the court." Gentlemen were sensibly affected for the president's feelings in this case, and if he is blameless, this tenderness was proper, but for his part he considered the case of the judge as equally and more delicate than that of the president. The situation of a judge determining on the life of his fellow creature, was, he thought, the most important and responsible duty mankind could impose on any one; of course to censure a judge for any decision that could affect life, was a severe infliction, and in doing it every possible proof and sight ought to be had. It was said that by the delay which this vote would cause, if carried, the president would be hung up in odious effigy to the people at large. Mr. Jones said he could not conceive how a disposition of the house to receive every light, and go into as ample an investigation as possible, would have that effect; he believed, a contrary conduct would be more likely to render the conduct of the president suspicious and censurable. What effect would a dry vote of approbation have in this case after refusing to permit testimony to be brought forward which was thought material. It would seem as if the friends of the executive were afraid to let the matter be clearly sifted, and wished to avoid everything that could throw light on the subject. What value ought to be put on applause obtained in such a way? He believed the president would disdain the approbation of the house on such terms—to make his exculpation grateful to himself and satisfactory to the nation, nothing ought to be suppressed, everything should be produced that related to the subject. The gentleman from Connecticut, Mr. Dana, who is always so tenderly concerned for the character and dignity of this house, and so frequently complains of other gentlemen committing that dignity and respect by their conduct and opinions, has, on all occasions, when he has addressed the house, in his style and manner, manifested the most unlimited confidence in the talents and penetration of one member of the house; but what kind of respect he had discovered for every other gentleman in it, he appealed to the observations of gentlemen generally to determine. Some gentlemen had indulged themselves in attributing to the mover and friends of this proposition, unworthy motives; he had on many occasions observed that those gentlemen were partial to that kind of debate; he could not see the use or advantage of such conduct; he thought it very unbecoming any gentleman in this body. There was, however, one motive which these gentlemen had not attributed to him, or those with whom he usually acted in the house; they could not insinuate or pretend that their conduct was designed to throw themselves within the benign beams of executive patronage. Mr. Jones said he would not so far conform to a practice which he condemned as to designate what gentleman would bear an insinuation of that kind; it was not necessary to point them out. He could perceive no other object which could induce gentlemen to declaim so frequently and earnestly on those unpleasant topics.

The question was then taken, on the motion of Mr. Harper, to postpone the consideration of the motion of Mr. Nicholson for a call of the record of the court of South Carolina, for one week, and negatived: yeas, 63; nays, 32.

The question then recurred on the adoption of the resolutions of Mr. Nicholson, when Mr. Marshall again spoke in opposition to, and Messrs. Nicholas and Randolph in answer. The call for the question being very loud, it was taken as follows: Yeas—Messrs. Alston, Baily. Bishop, R. Brown, Cabell. Christie, Clay, Condit, Davis. Dawson, Dent, Eggleston, Ebendorf, Fowler, Gallatin, Goode, Gregg, Hanna, Jackson, Jones, Kitchel, Lee, Leib, Lyon, Livingston; Muhlenburg. New, Nicholas, Nicholson, Randolph, Smilie, J. Smith, S. Smith. Stanford, Stone. Sumpter, Taliafero, Thompson, A. Tregg, Van Cortland, Varnum, R. Williams—44. Nays—Messrs. Baer, Bartlet, Bayard, Bird, Brace. J. Brown. Champlin, Cooper. Craik, Dana, F. Davenport, Dennis, Dickson, Edmond, Evans, A. Foster, D. Foster, Freeman, Glen, C. Goodrich, E. Goodrich, Gordon, Gray, Gresworld, Grove, Harper, Huderson, Hill, Hugher. S. Lee, Lyman, Linn, Marshall, Nott, Otis. Page, Parker. Pinckney, Powell. Reed, Rutledge, Sewall, Sheaf, Shepherd, Thatcher, J. C. Thomas, R. Thomas, Wadsworth, Waln, L. Williams, Woods—51.

Monday, March 3d.

The house having resolved itself into committee, Mr. Edmond in the chair, on the resolution proposed by Mr. Livingston and M. Bayard—the resolution of Mr. Livingston being first in order. Mr. Edmond said he almost ceased to wonder at anything done on that floor. If the intentions of gentlemen were to lay the foundation of another inquiry, which should bring the past conduct of the president to view, perhaps this motion might then be proper; but calling for papers relative to another transaction and not included in the original resolutions, was unaccountable, except it was to lay the foundation of an impeachment of the president: and if ever that was the view, the house ought first to get rid of these troublesome resolutions. He knew it was very easy for gentlemen to get up and call for this and that testimony; and if they did not receive it to make a handle of the refusal by saying that the evidence was precluded; but, Mr. Edmond said, such excuses would not in the least affect his vote. Suppose the papers in question were obtained, he could perceive no possible application they would have to the present case: for if the president was wrong in what he did, concerning Johnson (or Brigstock), that would not prove him wrong or right in his conduct respecting Nash. The facts respecting Robbins (or Nash), were only now before the house in the resolutions, and no other case ought to be brought to confound it. Suppose this was admitted, if the gentleman should still find himself deficient in his testimony to support the resolutions, he might want the house to send for more testimony from some other parts. This kind of conduct must take up unnecessary time where a decision was very necessary to be come to. He hoped the motion would be negatived. Mr. Macon confessed he was astonished at the conduct he had seen exemplified in the house: it appeared to him that gentlemen were making every possible excuse to prevent that information coming before the house which the friends of the resolution said they wanted. If, Mr. M. said, he was desirous of injuring the reputation of the president, (and that he declared he was not,) he should think himself facilitating that desire by throwing every embarrassment in the way, and refusing every sort of information on the subject: this conduct would effectually tell the public that the truth dare not be seen: that the facts are too bad to be seen. He could not think it was any great mark of friendship to the president to give rise to such conjectures as the people must and would form by the door to investigation into his conduct being stopped. In his opinion, Mr. M. said, this seclusion of the facts went to prove that the opinion of the president, or his conduct in the New Jersey case, was right, and to reveal them would amount to an evidence

that the latter was wrong with respect to Nash. If it was otherwise, the papers asked for would speak for themselves; it certainly would have a very suspicious appearance to refuse the papers which were declared by several gentlemen to be important to their forming a decision. Mr. M. wished to have got rid of this business altogether, but as it must be examined, he wished it to be done with all the evidence possible. If there were gentlemen who were enemies to the president, he declared he was not one; he desired to do him justice, which he thought could not be done by hiding any part of his conduct which was open to suspicion. If the president had changed his opinion, give him an opportunity to show that he had acted right. If the papers should prove to be of no use in the present investigation, he could see no harm that could accrue from them. Mr. Shepherd hoped the resolution never would be permitted to go on the journals of the house, because it must lead to inquiry. The object he believed only to be delay. He thought when the resolution was first admitted, in having anything to do with the business, the house committed a very great error, but because the house had committed one blunder, was that any reason they should go on blundering? He hoped the house would get rid of this business with all possible expedition. Mr. Livingston said, if he were really a personal enemy to the president, he should rejoice at such a motion as this being opposed; he thought it a very inconsistent part of the conduct of those gentlemen who called themselves exclusive friends of the president: those gentlemen who boasted of giving up their personal ease in the service of their country in contradistinction to those gentlemen of opposite political opinions, with whom they disdained to be seen in their patriotic labours. His bitterest enemies would not wish to place him in a more undignified situation. What inference can be drawn by the people of the United States, but that there is something rotten in the business, and that will bear too hard on the conduct of the president to be made appear; that he had done in the case of Nash without consideration very differently from what he did in the case of Brigstock, after mature consideration? "It had appeared, in the course of his business." Mr. L. said, "that some gentlemen in the house had been in the habit of corresponding with the department of state on the case of Robbins; might it not be inferred from their subsequent conduct that they had discovered something which they did not choose to have exposed? Whether this was a fair inference or not, it would certainly be made."

"The wretched argument with which this opposition was supported," Mr. L. said, "was almost extraordinary, and would be quite so, could it be supported on better grounds. The distinction of the cases when no perceptible distinction exists—the time that it would waste, when a few hours could procure all that was asked, and above all the miserable excuse of trouble to the clerks in the secretary's office, were too futile for gentlemen to suppose they could palm them upon the public. But miserable as they are, it is a convincing proof that no better are to be found, and these are their last resort." To suppose that no correspondence took place would be an absurdity, and equally so would it be, to harbour the opinion which gentlemen had desired to establish, that it could throw no light upon the present subject if it did appear. Gentlemen had actually presumed to say that these cases were not the same; but what gentlemen had pretended to draw a shade of distinction? It was impossible, and nothing was wanted to prove this fact but a slight examination of the two cases. "If they are the same," said Mr. L., "'tis impossible to suppose the conduct of the executive in respect to this one was right; and the proceedings of the court thereupon will not be laid down as

a rule for future proceedings. The opinion of the president in the Jersey case was no doubt given upon a due deliberation, and in a future case, so precisely the same, his conduct ought to have been the same, or not being so, the house ought to be informed why it differed. The result could be obtained; if it should prove favourable to the character of the president," Mr. L. declared, he should be as willing to admit it as those who called themselves his exclusive friends. Mr. Harper said, when the gentleman from New York undertook to direct others in their votes he should be careful to give reasons which must convince their minds; for his part, Mr. H. said, he never chose to accept of advice from his enemy, but if he could get instruction from his errors, and if by viewing his mistaken measures he could improve himself, he was always willing to do it: if he took advice from any man he must know that his motives are good in giving it; if in the present instance, he could believe the design of the gentleman was to preserve the president of the United States from obloquy; if he had not discovered the "pen dipped in gall," he should be more inclined to listen to his advice. He was not afraid that the people of the United States were so stupid as to mistake the true light in which they ought to view the subject. "Was it a common practice," Mr. H. asked, "to exhibit vast charges and then to go and look for testimony? Why, did not the gentleman and his counsel, whoever they might be, know that the testimony from South Carolina, and the testimony from New Jersey, or any other, would be necessary to support the charge? They had plenty of time since the business was first agitated. Had not this business been talked of for eight months past, and paste-board figures of Jonathan Robbins been exhibited at every election ground in the United States? The most ordinary rules of courts of justice in the United States forbade testimony to be admitted at such a period of the proceedings. If any public accuser in the United States was to conduct himself in that way, he would get severely rapped over the knuckles, if not thrown over the bar. The matter has proceeded too far for its admission." "But," said Mr. H., "what can be the use of this testimony? Gentlemen say that the executive has decided on one case in different ways, and that on the present occasion he must be wrong. One gentleman said, the claim of citizenship was important; but this is a wrong idea. The claim of citizenship which was built on falsehood, was not made until after the president had acted on the case, and consequently it must be out of the question. It is scarcely possible that any requisition was ever made by any British agent in the case in New Jersey. Can it be supposed that the president would be guilty of such a boyish trick, of such versatility of conduct in his dealings with a foreign nation, as in a few months to put a different construction upon one and the same action? No, the supposition is absolutely impossible, and gentlemen well knew it." The New Jersey case, Mr. H. said, was an entirely different one; the men were indicted by the circuit court: they were not claimed to be given up to the British; they were indicted for an offence cognizable in that court; bills were found against them: two of them were tried and acquitted, the other the president ordered a nolle prosequi to be entered upon. Why were the men acquitted? Was it through a defect of testimony? "No, sir," said Mr. H., "but through a defect in the jurisdiction. The jury well knew, being judges of law as well as of facts, that the court had no jurisdiction, and therefore they made a return of not guilty. Inasmuch as there was no demand made from Great Britain, the men were discharged." Mr. H. said, he was opposed to this motion on account of the principle contained in it; it was very wrong to first exhibit a charge and then go to hunt for testimony. It was like hanging a

man on a gibbet, and then seeking for his guilt. This principle had been presented to the house in various shapes, but in every one he thought very properly rejected, as he had no doubt this would be. If this were to be acceded to, the next thing would be to search for a piece of evidence in Georgia or in Maine, or anything that would procure the object—delay, and its influence on a certain occasion (election). Here was a criminal charge, dressed up and blazoned out with all the false colours which a stretched imagination could invent, but which was manifestly and totally unfounded, and contrary to facts; it therefore appeared to him necessary, Mr. H. said, to come to a decision speedily and strip the charge of its gloss, in order that its true deformity might appear, and all the world would see that the intention to accused was baffled by an exposure of the truth, and the character accused justified from guilt. Mr. S. Smith said, the gentleman last up had given the most powerful reason why these papers were necessary that could possibly be imagined. He said, in strong language, that no requisitions had ever been made in the New Jersey case to deliver up the men to the British. If this was a fact, most assuredly the case would not apply; but the only way to estimate that fact was to obtain a view of the papers, or know from authority that there were none. Mr. S. said he could not draw that conclusion; he believed that a requisition had been made; that it was precisely the same as the South Carolina case, and that the papers relating to it would be completely in point, to which the house ought to have access, and not to go to British statutes and law books when the country produced a precedent. The gentlemen last up had said that the jury, being judges of law and facts, determined that there was no jurisdiction. How that was he could not say. The verdict was not guilty, which most likely was a verdict upon facts. Suppose it should turn out by the documents that requisition was made for these men, and it should prove that two of them were liberated for want of sufficient proof. Suppose it should turn out that this very lieutenant Foreshaw was sworn to have been killed by Brigstock, and yet now Nash is charged with having killed Foreshaw. Suppose it would turn out that Brigstock was an American citizen, and being such, was liberated from further prosecution, because the president might have thought that an American citizen, impressed on board a British ship of war, was justifiable in getting his liberty. These things might appear. The same claim of citizenship was now made, and in his opinion a jury trial ought to have been had, in order to ascertain facts so material to a man's personal interest.

Mr. Harper explained, that he said the documents did not discover any requisition having been made in the Jersey case. And further, instead of positively saying the jury had acquitted for want of jurisdiction, he said it was presumed so. Mr. Smilie said there was another fact stated by the gentleman which was incorrect. He said the figure of J. R. was hung up at every election ground. This was not truth; for Mr. S. said he was at one election where it was not hung up. (Several other gentlemen also declared that they saw no such thing at their respective districts, but they heard of it in some few places.) One extraordinary feature, Mr. Smilie observed, was easily perceived throughout the whole of this attempt to investigate facts. It appeared that gentlemen were determined to exculpate the president at all events. He was not ready to do so; nor was he ready to accuse him; he only wished to do what was right and lawful; for which purpose he wished every document that could assist him. It was strange that, while there were papers which, it was said, would make the whole of the executive conduct appear free of blame, the friends of the executive should repress them. How could gentlemen say they

had not withheld important testimony, when all the world must perceive that facts were yet hidden that would throw a light on the case. Mr. H. Lee said he had hitherto voted with gentlemen who asked for papers. He did it because they themselves said they wanted such papers to guide their decision. He was unwilling that they should have any excuse. Supposing that other information might possibly be procured, and anxious to obtain it, he wrote to the secretary of state, but received for answer, there was none. Mr. L. said he did it in order, if there had been any papers, to have moved that they might be produced. He should have voted on the present question in the same way, but from what he had perceived he found that any attempts to gratify those gentlemen were in vain, and that to encourage it would be wasting day after day, without any hope of settling the main inquiry before the next session of congress. Besides, Mr. Lee said, the session was far spent, and not one public act was yet passed. And should so many days be spent on a matter of so little consequence, as considering the case of an individual who had transgressed the law and very properly suffered for his crimes? He hoped not. From this moment he was determined to stop, by his vote, every attempt to delay a final decision. Mr. Lee contended that the president had a right to change his proceeding according to his opinion, if he should be convinced of the propriety of it. It was a privilege every public character enjoyed, even if it should appear that they had changed his conduct. He would not vote for a postponement, which he must do were he to vote for the motion. Mr. Nicholas thought there was a very great possibility that a requisition was made in the New Jersey case: the gentleman from South Carolina (Mr. Harper) said there was none; but how did he know it? Did the gentleman believe that the British ministry were not as desirous to have these men delivered as they were of the other? To suppose that they acted understandingly: to suppose they were desirous of pursuing one steady object unremittingly, as they always had done, would warrant a strong presumption that they did demand those men. It was impossible but the papers in question must either add or diminish the construction put upon this case, and solve some important queries. Mr. Dana thought the conduct of the president was consistent, constitutional and proper, and that it was out of the power of any gentleman to prove the contrary. One great reason for his thinking this, was the manner this charge had been conducted from its first appearance, which was contrary to all legal knowledge and constitutional principles; he desired any gentleman to produce a precedent in any public body except it was in the proceedings of the revolutionary government of France. The manner of conducting the business being totally wrong, Mr. D. said he did not expect to receive the least conviction from anything that would be brought forward, or any arguments which would be used. Gentlemen had said it would awaken dreadful suspicions if the motion was negatived. And were the house to be deterred from their duty at the apparition of a demagogue? No, he trusted not, because he well knew that men of understanding would well approve their conduct, and if weak and silly men disapproved he was willing to bear it from them. If gentlemen would look to the record they would find that the cases were different; these men were charged under the statute of the United States, the other was not. The proceeding being different, the case could not illuminate. As well might gentlemen ask for the whole of the state trials in order to discover the law on impeachments. Mr. Gallatin contended that if investigation was the object of the house, they ought to grant the resolution; whether it was admitted or not, it would be impossible to destroy one fact—that the court did admit jurisdiction on that case,

which was exactly similar to this, and that also the court of South Carolina did assume jurisdiction—whether the demand was made in the Jersey case or not, it was clear that it was made in the case of Nash, and that it was complied with, and the man by the advice of the president, was taken out of the hands of the judiciary. But to know how exactly the circumstances of the Jersey case corresponded to the latter, the papers were certainly desirable. This was a case in point much better than all which the English authorities could produce, and there being a different decision, it certainly ought to be known why that difference did occur. The gentleman from South Carolina had stated facts; he said that no jurisdiction was admitted by the jury, and therefore the men were acquitted; and that no requisitions were made. To be sure, he afterwards said it was all founded in supposition: now whether these were or were not facts, the papers could tell. By knowing all the circumstances of that case a decision could be formed with more accuracy as to the other case. Mr. Davis said he was desirous of avoiding this very disagreeable subject, but as a majority of the house thought differently, and they determining he should give a vote, however contrary to his will, he certainly wished to meet it with all the information in the power of the house. The gentleman from New York had brought forward certain resolutions which he had defended; the gentleman from South Carolina said they were blazoning with falsehood: now which of these two gentlemen, Mr. Davis asked, was he to believe? How could he form an opinion without the facts being produced? He wished not to be forced to form it upon bare conjectures; he wished to have the truth before him. Certainly if he was refused facts, he must suppose there was some great reason against the disclosure. He asked gentlemen to recollect in what a situation they placed the executive, exposed to such censure! Let everything appear that will do honour to the character of that gentleman, but to afford such crippled testimony never would acquit the president in the view of the American people, if that house should be satisfied that his conduct was honourable. The question was then taken by yeas and nays: Yeas, 46; nays, 46. The speaker decided in the negative.

Thursday, March 4th.

Mr. Gallatin presented to the house the following resolution: "Resolved, that the president of the United States be requested to cause to be laid before this house, copies of any requisition, or any application that may have been made by the British minister, or any agent of his Britannic majesty, for or concerning the delivery up of Wm. Brigstock, otherwise John Johnson, of John Evans, otherwise Michael Campbel, and of Johannes Williams, otherwise Johannes Williamson, or either of them who were tried at the circuit court of the United States, in the New Jersey district, on a charge of piracy, committed on board the British frigate Hermione; and also copies of any communication in the executive department, or any other of the departments relative thereto." Mr. Nicholas, yesterday, just before the rising of the house, mentioned the necessity of this inquiry, but the house adjourned before a motion was made to that effect. Some conversation occurred as to the disposal of this motion. Mr. Bayard hoped the resolution would follow the usual course, and lie on the table for a day. If the idea was to connect the case with that of Nash, or to bring more evidence to the present case, he thought it must fail of its object. It was impossible, he said, that the decision on that case could be the least guide to the house in the present, as it was a very distinct trial, and therefore, he hoped it would lie. Mr. Livingston hoped the resolution would not lie on the table till another day, and for

this plain reason—what were we to do in the meantime? He believed it perfectly connected with the business that now occupied the house, and therefore, if it was the desire of the house to proceed, they had better dispose of this resolution immediately. But the gentleman from Delaware had intimated that it could bring no new evidence respecting the case now before the house, because it was a case quite distinct from it. To be sure Mr. Livingston said it would operate for the benefit of the gentleman's argument, if he could make the house believe so. But, Mr. L. thought, they were clearly the same, except it was in men, in place of trial, and in judges who tried them. Both were for precisely the same act, and committed at the same time. It would be remarked in the warrant that it appeared, these men were committed under the treaty with Great Britain, and therefore it was more than probable that it was in consequence of application from some British agent, to the executive, that they were apprehended. How could the gentleman say it could give no new light? Was it possible that the conduct of the executive in the case of Brigstock, and others, in New Jersey, could afford no new light to the conduct of the same executive in the very same case on the trial of Thomas Nash? Mr. L. said, he knew nothing of what passed between the executive and others, but suppose, it should appear, if the house obtain possession of the communication, that application had been made before the trial by some British agent for the delivery up of all or either of these men, and the answer of the president had been that it was a judicial point, and therefore he did not choose to meddle with it? Certainly the gentleman would not say that this case had nothing to do with the present, in which such an extraordinary change of conduct had been evinced. If this result could arise, (which it was impossible to deny,) gentlemen ought to yield to the wishes of others. The plea could not now be that they would have to send to South Carolina for what was asked; because this information might be procured in a few hours, and certainly to obtain what was deemed so important, a small delay might well be borne. A gentleman had said it ought to have been brought forward at an earlier period. How was this possible? Mr. Livingston said, that he did not receive the record of the New Jersey case, till just before the house met yesterday; he then made use of it in the discussion, and it was not till just at the rising of the house, any gentleman could make use of it, and then a gentleman did propose something of the kind. It was a plain inference to be drawn that some communication did occur with a foreign agent, and some answer must have been given; the executive no doubt did act on the subject; he also acted in this case. It was, therefore, very proper for the house to be informed how he acted. Mr. Rutledge trusted that the difficulties gentlemen had to encounter in their present precipitate way of acting, would prevent them bringing forward any crimination of so great a character in future, without being better prepared to substantiate it. Mr. R. said that he had no objection to call for all the information that could conveniently be had previous to the debate commencing, but to do it afterwards was most extraordinary indeed! If these proceedings were to prevail, it would be impossible to say when a vote was taken. Gentlemen, now they are entered into the business, find that facts will not bear them out: they find they cannot substantiate what they would prove. One calls for this, another for that, and there would be no end to their calling. He wished for all possible elucidation of the subject, as long as it could be proper, but after going into the argument, it was extremely improper. But, Mr. R. asked, what had this case to do with the business of Nash? The gentleman supposed that it was considered by the executive as a case within the judicial cognizance, and therefore he refused to act in it; suppose it was so; and suppose the executive afterwards changed his opinion, what he might consider an erroneous opinion; certainly he had a right to do so. The object of this he believed to be, to delay and finally to postpone the decision, but he hoped the house would not now agree to delay the business. If the gentleman should hereafter think proper to promote an impeachment upon the proceedings in the case of Brigstock and others, and on that ground should ask for the papers relative thereto, he should have no objection to an acquiescence; but as this was entirely an independent case, he could see no necessity of yielding to the solicitations of gentlemen at present. Mr. Gallatin said, as to the late period of introducing the resolution, it must be clear that it was out of his power to propose it till the time he offered it to the house, because the facts which gave rise to it were not produced until yesterday; and as to the objects for it, the gentleman last up was quite mistaken. A gentleman had said that it was a last effort, in order to support charges against the president of the United States. As to what would be the effect of these papers if they should be sent, Mr. Gallatin could not tell. He did not know that such papers existed at all, but the inference the gentleman had drawn was upon a presumption that they would criminate the president. This Mr. G. did not know was the fact; he knew nothing about them; they might criminate, or they might have a very contrary effect. The gentleman was extremely mistaken if it was his idea that other gentlemen were determined at all events to discover a charge; he only wished an investigation of the truth, and let that truth as well as the law dictate the proper measures to be used. The affair having been brought before the house, he would say it was their duty to obtain all possible information, whether in favour of or against the president; with this view he made the motion. Contrary to the opinion expressed by the gentleman last up, he must consider this case extremely similar, and he believed the most minute scrutiny could not distinguish between them. There was this difference, however, so far as the house had knowledge of it at present; in one there was a requisition made, in the other there possibly was not, but whether so or not he wished to be satisfied, as well as the ground for which a requisition was made and refused. There had been no law passed since the New Jersey case occurred, to carry this 27th article of the treaty into effect, and therefore the proceedings in every case ought to have been precisely the same, but not having been so, Mr. G. said he wished to know on what rule or law the president had acted. Much had been said as to the claim of Thomas Nash to citizenship. How far the president acted in that case with regard to citizenship would be seen; but there was one remarkable fact as to the New Jersey case. One of the men named Brigstock, it appeared, was indicted by three different indictments; two of them were for piracy, and were much alike, the other was for murder; for the two first he was tried and acquitted, but for the last, a nolle prosequi was left; one remarkable difference was in the last indictment from the two others; in that he was represented as being a citizen of the United States. He thought it was very probable the nolle prosequi was ordered by the president, because the man was a citizen of the United States; the opinion of the president on that case, Mr Gallatin thought, would tend much to elucidate his conduct with respect to Nash's case.

Mr Marshall (whose speech, as given in a note to Bee's reports, 266, was written out by himself, which is said by Judge Story to be among the very ablest arguments on record, and is even admitted by the Aurora to have

temporarily silenced opposition, and which is consequently introduced here in full), said, that believing, as he did most seriously, that in a government constituted like that of the United States, much of the public happiness depended, not only on its being rightly administered, but on the measures of administration being rightly understood: on rescuing public opinion from those numerous prejudices with which so many causes might combine to surround it, he could not but have been highly gratified with the very eloquent, and what was still more valuable, the very able and very correct argument which had been delivered by the gentleman from Delaware (Mr. Bayard) against the resolutions now under consideration. He had not expected that the effect of this argument would have been universal; but he had cherished the hope, and in this he had not been disappointed, that it would be very extensive. He did not flatter himself with being able to shed much new light on the subject; but, as the argument in opposition to the resolutions had been assailed, with considerable ability, by gentlemen of great talents, he trusted the house would not think the time misapplied, which would be devoted to the re-establishment of the principles contained in that argument, and to the refutation of those advanced in opposition to it. In endeavouring to do this, he should notice the observations in support of the resolutions, not in the precise order in which they were made; but as they applied to the different points he deemed it necessary to maintain, in order to demonstrate, that the conduct of the executive of the United States could not justly be charged with the errors imputed to it by the resolutions. His first proposition, he said, was that the case of Thomas Nash, as stated to the president, was completely within the 27th article of the treaty of amity, commerce and navigation, entered into between the United States of America and Great Britain. He read the article, and then observed: "The casus fœderis of this articie occurs, when a person, having committed murder or forgery within the jurisdiction of one of the contracting parties, and having sought an asylum in the country of the other, is charged with the crime, and his delivery demanded, on such proof of his guilt as, according to the laws of the place where he shall be found, vould justify his apprehension and commitment for trial, if the offence had there been committed." The case stated is, that Thomas Nash, having committed a murder on board of a British frigate, navigating the high seas under a commission from his Britannic majesty, had scught an asylum within the United States, and on this case his delivery was demanded by the minister of the king of Great Britain. It is manifest that the case stated, if supported by proof, is within the letter of the article, provided a murder committed in a British frigate, on the high seas, be committed within the jurisdiction of that nation. That such a murder is within their jurisdiction, has been fully shown by the gentleman from Delaware. The principle is, that the jurisdiction of a nation extends to the whole of its territory, and to its own citizens in every part of the world. The laws of a nation are rightfully obligatory ou its own citizens in every situation, where those laws are really extended to them. This principle is founded on the nature of civil union. It is supported everywhere by public opinion, and is recognized by writers on the law of nations. Rutherforth, in his second volume (page 180), says: "The jurisdiction which a civil society has over the persons of its members, affects them immediately, whether they are within its territories or not." This general principle is especially true, and is particularly recognized, with respect to the fleets of a nation on the high seas. To punish offences committed in its fleet, is the practice of every nation in the universe; and consequently the opinion of the world is, that a fleet at

sea is within the jurisdiction of the nation to which it belongs. Rutherforth (volume 2, p. 491) says, there can be no doubt about the jurisdiction of a nation over the persons which compose its fleets, when they are out at sea, whether they are sailing upon it or are stationed in any particular part of it. The gentleman from Pennsylvania (Mr. Gallatin), though he has not directly controverted this doctrine, has sought to weaken it by observing, that the jurisdiction of a nation at sea could not be complete even in its own vessels; and in support of this position he urged the admitted practice of submitting to search for contraband— a practice not tolerated on land, within the territory of a neutral power. The rule is as stated; but is founded on a principle which does not affect the jurisdiction of a nation over its citizens or subjects in its ships. The principle is, that in the sea, itself, no nation has any jurisdiction. All may equally exercise their rights, and consequently the right of a belligerent power to prevent aid being given to his enemy, is not restrained by any superior right of a neutral in the place. But if this argument possessed any force, it would not apply to national ships of war, since the usage of nations does not permit them to be searched. According to the practice of the world, then, and the opinions of writers on the law of nations, the murder committed on board of a British frigate navigating the high seas, was a murder committed within the jurisdiction of the British nation. Although such a murder is plainly within the letter of the article, it has been contended not to be within its just construction; because at sea all nations have a common jurisdiction, and the article correctly construed, will not embrace a case of concurrent jurisdiction. It is deemed unnecessary to controvert this construction, because the proposition, that the United States had no jurisdiction over the murder committed by Thomas Nash, is believed to be completely demonstrable. It is not true that all nations have jurisdiction over all offences committed at sea. On the contrary, no nation has any jurisdiction at sea, but over its own citizens or vessels, or offences against itself. This principle is laid down in 2 Ruth. Inst. 488, 491.

The American government has, on a very solemn occasion, avowed the same principle. The first minister of the French republic asserted and exercised powers of so extraordinary a nature, as unavoidably to produce a controversy with the United States. The situation in which the government then found itself was such as necessarily to occasion a very serious and mature consideration of the opinions it should adcpt. Of consequence, the opinions then declared deserve great respect. In the case alluded to, M:. Genet had asserted the right of fitting out privateers in the American ports, and of manning them with American citizens in order to cruise against nations with whom America was at peace. In reasoning against this extravagant claim, the then secretary of state, in his letter of the 17th of June, 1793, says: "For our citizens then to commit murders and depredations on the members of nations at peace with us, or to combine to do it, appeared to the executive, and to those whom they consulted, as much against the laws of the land as to murder or rob, or combine to murder or rob its own citizens; and as much to require punishment, if done within their limits, where they have a territorial jurisdiction, or on the high seas, where they have a personal jurisdiction, tnat is to say, one which reaches their own citizens only; this being an appropriate part of each nation, on an element where all have a common jurisdiction." The well considered opinion, then, of the American government, on this subject, is that the jurisdiction of a nation at sca is "personal," reaching its "own citizens only;" and that this is the "appropriate part of each nation" on that element.

This is precisely the opinion maintained by the opposers of the resolutions. If the jurisdiction of America at sea be personal, reaching its own citizens only; if this be its appropriate part, then the jurisdiction of the nation cannot extend to a murder committed by a British sailor, on board a British frigate navigating the high seas under a commission from his Britannic majesty. As a further illustration of the principle contended for, suppose a contract made at sea, and a suit instituted for the recovery of money which might be due thereon. By the laws of what nation would the contract be governed? The principle is general that a personal contract follows the person, but is governed by the law of the place where it is formed. By what law then would such a contract be governed? If all nations had jurisdiction over the place, then the laws of all nations would equally influence the contract; but certainly no man will hesitate to admit that such a contract ought to be decided according to the laws of that nation to which the vessel or contracting parties might belong. Suppose a duel, attended with death, in the fleet of a foreign nation, or in any vessel which returned safe to port, could it be pretended that any government on earth, other than that to which the fleet or vessel belonged, had jurisdiction in the case; or that the offender could be tried by the laws or tribunals of any other nation whatever? Suppose a private theft by one mariner from another, and the vessel to perform its voyage and return in safety, would it be contended that all nations have equal cognizance of the crime, and are equally authorized to punish it? If there be this common jurisdiction at sea, why not punish desertion from one belligerent power to another, or correspondence with the enemy, or any other crime which may be perpetrated? A common jurisdiction over all offences at sea, in whatever vessel committed, would involve the power of punishing the offences which have been stated. Yet, all gentlemen will disclaim this power. It follows, then, that no such common jurisdiction exists. In truth the right of every nation to punish is limited, in its nature, to offences against the nation inflicting the punishment. This principle is believed to be universally true. It comprehends every possible violation of its laws on its own territory, and it extends to violations committed elsewhere by persons it has a right to bind. It extends also to general piracy. A pirate, under the law of nations, is an enemy of the human race. Being the enemy of all, he is liable to be punished by all. Any act which denotes this universal hostility, is an act of piracy. Not only an actual robbery, therefore, but cruising on the high seas without commission, and with intent to rob, is piracy. This is an offence against all and every nation, and is therefore alike punishable by all. But an offence which in its nature affects only a particular nation, is only punishable by that nation. It is by confounding general piracy with piracy by statute, that indistinct ideas have been produced, respecting the power to punish offences committed on the high seas. A statute may make any offence piracy, committed within the jurisdiction of the nation passing the statute, and such offence will be punishable by that nation. But piracy under the law of nations which alone is punishable by all nations, can only consist in an act which is an offence against all. No particular nation can increase or diminish the list of offences thus punishable. It had been observed by his colleague (Mr. Nicholas), for the purpose of showing that the distinction taken on this subject by the gentleman from Delaware (Mr. Bayard) was inaccurate, that any vessel robbed on the high seas could be the property only of a single nation, and being only an offence against that nation, could be, on the principle taken by the opposers of the resolutions, no offence against the law of nations; but in this his colleague had not accurately considered the principle. As a man who turns out to rob on the highway, and forces from a stranger his purse with a pistol at his bosom, is not the particular enemy of that stranger, but alike the enemy of every man who carries a purse, so those who without a commission rob on the high seas, manifest a temper hostile to all nations, and therefore become the enemies of all. The same inducements which occasion the robbery of one vessel, exist to occasion the robbery of others, and therefore the single offence is an offence against the whole community of nations, manifests a temper hostile to all, is the commencement of an attack on all, and is consequently, of right, punishable by all. His colleague had also contended that all the offences at sea, punishable by the British statutes from which the act of congress was in a great degree copied, were piracies at common law, or by the law of nations, and as murder is among these, consequently murder was an act of piracy by the law of nations, and therefore punishable by every nation. In support of this position he had cited 1 Hawk. P. C. 267, 271; 3 Inst. 112, and 1 Wood. El. Jur. 140.

The amount of these cases is, that no new offence is made piracy by the statutes; but that a different tribunal is created for their trial, which is guided by a different rule from that which governed previous to those statutes. Therefore, on an indictment for piracy, it is still necessary to prove an offence which was piracy before the statutes. He drew from these authorities a very different conclusion from that which had been drawn by his colleague. To show the correctness of his conclusion, it was necessary to observe, that the statute did not indeed change the nature of piracy, since it only transferred the trial of the crime to a different tribunal where different rules of decision prevailed; but having done this, other crimes committed on the high seas, which were not piracy, were made punishable by the same tribunal; but certainly this municipal regulation could not be considered as proving that those offences were, before, piracy by the law of nations. (Mr. Nicholas insisted that the law was not correctly stated, whereupon Mr. Marshall called for 3 Inst. and read the statute:) "All treasons, felonies, robberies, murders, and confederacies, committed in or upon the seas," &c., "shall be inquired, tried, heard, determined and judged in such shires," &c. "in like form and condition as if any such offence had been committed on the land," &c. "And such as shall be convicted," &c., "shall have and suffer such pains of death," &c., "as if they had been attainted of any treason, felony, robbery, or other the said offences done upon the land." This statute, it is certain, does not change the nature of piracy; but all treasons, felonies, robberies, murders and confederacies committed in or upon the sea, are not declared to have been, nor are they piracies. If a man be indicted as a pirate, the offence must be shown to have been piracy before the statute; but if he be indicted for treason, felony, robbery, murder, or confederacy, committed at sea, whether such offence was or was not a piracy, he shall be punished, in like manner as if he had committed the same offence on land. The passage cited from 1 Woodeson, 140, is a full authority to this point. Having stated that offences committed at sea were formerly triable before the lord high admiral, according to the course of the Roman civil law, Woodeson says: "But, by the statutes 27 Hen. VIII., c. 4, and 28 Hen. VIII., c. 15, all treasons, felonies, piracies and other crimes committed on the sea, or where the admiral has jurisdiction, shall be tried in the realm as if done on land. But the statutes referred to affect only the manner of the trial so far as respects piracy. The nature of the offence is not changed. Whether a charge amount to piracy or not, must still depend on the law of nations, except

where in the case of British subjects, express acts of parliament have declared that the crimes therein specified shall be adjudged piracy, or shall be liable to the same mode of trial and degree of punishment." This passage proves not only that all offences at sea are not piracies by the law of nations, but also that all indictments for piracy must depend on the law of nations, "except where, in the case of British subjects, express acts of parliament" have changed the law. Why do not these "express acts of parliament" change the law as to others than "British subjects?" The words are general, "all treasons, felonies," &c. Why are they confined in construction to British subjects? The answer is a plain one: The jurisdiction of the nation is confined to its territory and to its subjects.

The gentleman from Pennsylvania (Mr. Gallatin) abandons, and very properly abandons, this untenable ground. He admits that no nation has a right to punish offences against another nation, and that the United States can only punish offences against their own laws and the law of nations. He admits, too, that if there had only been a mutiny (and consequently if there had only been a murder) on board the Hermione, that the American courts could have taken no cognizance of the crime. Yet mutiny is punishable as piracy by the law of both nations. That gentleman contends that the act committed by Nash was piracy, according to the law of nations. He supports his position by insisting that the offence may be constituted by the commission of a single act; that unauthorized robbery on the high seas is this act, and that the crew having seized the vessel, and being out of the protection of any nation, were pirates. It is true that the offence may be completed by a single act; but it depends on the nature of that act. If it be such as manifests generally hostility against the world—an intention to rob generally, then it is piracy; but if it be merely a mutiny and murder in a vessel, for the purpose of delivering it up to the enemy, it seems to be an offence against a single nation and not to be piracy. The sole object of the crew might be to go over to the enemy, or to free themselves from the tyranny experienced on board a ship of war, and not to rob generally. But, should it even be true that running away with a vessel to deliver her up to an enemy was an act of general piracy, punishable by all nations, yet the mutiny and murder were a distinct offence. Had the attempt to seize the vessel failed, after the commission of the murder, then, according to the argument of the gentleman from Pennsylvania, the American courts could have taken no cognizance of the crime. Whatever then might have been the law respecting the piracy, of the murder there was no jurisdiction. For the murder, not the piracy, Nash was delivered up. Murder and not piracy, is comprehended in the 27th article of the treaty between the two nations. Had he been tried then and acquitted on an indictment for the piracy, he must still have been delivered up for the murder, of which the court could have no jurisdiction. It is certain that an acquittal of the piracy would not have discharged the murder; and, therefore, in the so much relied on trials at Trenton, a separate indictment for murder was filed after an indictment for piracy. Since, then, if acquitted for piracy, he must have been delivered to the British government on the charge of murder, the president of the United States might, very properly, without prosecuting for the piracy, direct him to be delivered up on the murder.

All the gentlemen who have spoken in support of the resolutions, have contended that the case of Thomas Nash is within the purview of the act of congress, which relates to this subject, and is by that act made punishable in the American courts. That is, that the act of congress designed to punish crimes committed on board a British frigate. Nothing can be more completely demonstrable than the untruth of this proposition. It has already been shown that the legislative jurisdiction of a nation extends only to its own territory, and to its own citizens, wherever they may be. Any general expression in a legislative act must, necessarily, be restrained to objects within the jurisdiction of the legislature passing the act. Of consequence an act of congress can only be construed to apply to the territory of the United States, comprehending every person within it and to the citizens of the United States. But, independent of this undeniable truth, the act itself affords complete testimony of its intention and extent. See 1 Laws U. S. p. 10 [1 Stat. 112]. The title is: "An act for the punishment of certain crimes against the United States." Not against Britain, France or the world, but singly "against the United States." The first section relates to treason, and its objects are, "any person or persons owing allegiance to the United States." This description comprehends only the citizens of the United States, and such others as may be on its territory or in its service. The second section relates to misprision of treason; and declares, without limitation, that any person or persons, having knowledge of any treason, and not communicating the same, shall be guilty of that crime. Here then is an instance of that limited description of persons in one section, and of that general description in another, which has been relied on to support the construction contended for by the friends of the resolutions. But will it be pretended that a person can commit misprision of treason who cannot commit treason itself? That he would be punishable for concealing a treason who could not be punished for plotting it? Or, can it be supposed that the act designed to punish an Englishman or a Frenchman, who, residing in his own country, should have knowledge of treasons against the United States, and should not cross the Atlantic to reveal them? The same observations apply to the sixth section, which makes any "person or persons" guilty of misprision of felony, who, having knowledge of murder or other offences enumerated in that section, should conceal them. It is impossible to apply this to a foreigner, in a foreign land, or to any person not owing allegiance to the United States. The eighth section, which is supposed to comprehend the case, after declaring that if any "person or persons" shall commit murder on the high seas, he shall be punishable with death, proceeds to say, that if any captain or mariner shall piratically run away with a ship or vessel, or yield her up voluntarily to a pirate, or if any seaman shall lay violent hands on his commander, to prevent his fighting, or shall make a revolt in the ship, every such offender shall be adjudged a pirate and a felon. The persons who are the objects of this section of the act are all described in general terms, which might embrace the subjects of all nations. But is it to be supposed that if in an engagement between an English and a French ship of war, the crew of the one or the other should lay violent hands on the captain and force him to strike, that this would be an offence against the act of congress, punishable in the courts of the United States? On this extended construction of the general terms of the section, not only the crew of one of the foreign vessels forcing their captain to surrender to another would incur the penalties of the act, but if in the late action between the gallant Truxton and the French frigate, the crew of that frigate had compelled the captain to surrender, while he was unwilling to do so, they would have been indictable as felons in the courts of the United States. But surely the act of congress admits of no such extravagant construction. His colleague, Mr. Marshall said, had cited and particularly relied on the ninth section of the act; that section declares that if a citizen shall com-

mit any of the enumerated piracies, or any acts of hostility, on the high seas, against the United States, under colour of a commission from any foreign prince or state, he shall be adjudged a pirate, felon and robber, and shall suffer death. This section is only a positive extension of the act to a case which might otherwise have escaped punishment. It takes away the protection of a foreign commission from an American citizen, who, on the high seas. robs his countrymen. This is no exception from any preceding part of the law, because there is no part which relates to the conduct of vessels commissioned by a foreign power: it only proves that, in the opinion of the legislature, the penalties of the act could not, without this express provision, have been incurred by a citizen holding a foreign commission. It is then most certain that the act of congress does not comprehend the case of a murder committed on board a foreign ship of war.

The gentleman from New York has cited 2 Wood. El. Jur. 428, to show that the courts of England extend their jurisdiction to piracies committed by the subjects of foreign nations. This has not been doubted. The case from Woodeson is a case of robberies committed on the high seas by a vessel without authority. There are ordinary acts of piracy which, as has been already stated. being offences against all nations, are punishable by all. The case from 2 Woodeson, and the note cited from the same book by the gentleman from Delaware, are strong authorities against the doctrines contended for by the friends of the resolutions.

It has also been contended that the question of jurisdiction was decided at Trenton, by receiving indictments against persons there arraigned for the same offence, and by retaining them for trial after the return of the habeas corpus. Every person in the slightest degree acquainted with judicial proceedings knows that an indictment is no evidence of jurisdiction; and that in criminal cases, the question of jurisdiction will seldom be made but by arrest of judgment after conviction. The proceedings after the return of the habeas corpus only prove that the case was not such a case as to induce the judge immediately to decide against his jurisdiction. The question was not free from doubt, and therefore might very properly be postponed until its decision should become necessary.

It has been argued by the gentleman from New York, that the form of the indictment is, itself, evidence of a power in the court to try the case. Every word of that indictment. said the gentleman, gives the lie to a denial of the jurisdiction of the court. It would be assuming a very extraordinary principle indeed, to say that words inserted in an indictment for the express purpose of assuming the jurisdiction of a court, should be admitted to prove that jurisdiction. The question certainly depended on the nature of the fact, and not on the description of the fact. But as an indictment must necessarily contain formal words in order to be supported. and as forms often denote what a case must substantially be to authorize a court to take cognizance of it, some words in the indictments at Trenton ought to be noticed. The indictments charge the persons to have been within the peace, and murder to have been committed against the peace of the United States. These are necessary averments, and, to give the court jurisdiction, the fact ought to have accorded with them. But who will say that the crew of a British frigate on the high seas are within the peace of the United States, or a murder committed on board such a frigate against the peace of any other than the British government? It is then demonstrated that the murder with which Thomas Nash was charged, was not committed within the jurisdiction of the United States, and. consequently, that the case stated was completely within the letter, and the spirit of the twenty-seventh

article of the treaty between the two nations. If the necessary evidence was produced, he ought to have been delivered up to justice. It was an act to which the American nation was bound by a most solemn compact. To have tried him for the murder would have been mere mockery. To have condemned and executed him, the court having no jurisdiction, would have been murder; to have acquitted and discharged him would have been a breach of faith, and a violation of national duty.

But, it has been contended, that although Thomas Nash ought to have been delivered up to the British minister, on the requisition made by him in the name of his government, yet the interference of the president was improper. This Mr. Marshall said led to his second proposition, which was: That the case was a case for executive and not judicial decision. He admitted implicitly the division of powers, stated by the gentleman from New York, and that it was the duty of each department to resist the encroachments of the others. This being established, the inquiry was, to what department was the power in question allotted? The gentleman from New York had relied on the second section of the third article of the constitution, which enumerates the cases to which the judicial power of the United States extends, as expressly including that now under consideration. Before he examined that section, it would not be improper to notice a very material misstatement of it made in the resolutions, offered by the gentleman from New York. By the constitution, the judicial power of the United States is extended to all cases in law and equity, arising under the constitution, laws and treaties of the United States; but the resolutions declare that judicial power to extend to all questions arising under the constitution, treaties and laws of the United States. The difference between the constitution and the resolutions was material and apparent. A case in law or equity was a term well understood, and of limited signification. It was a controversy between parties which had taken a shape for judicial decision. If the judicial power extended to every question under the constitution, it would involve almost every subject proper for legislative discussion and decision; if to every question under the laws and treaties of the United States, it would involve almost every subject on which the executive could act. The division of power which the gentleman had stated could exist no longer, and the other departments would be swallowed up by the judiciary. But it was apparent that the resolutions had essentially misrepresented the constitution. He did not charge the gentleman from New York with intentional misrepresentation; he would not attribute to him such an artifice in any case, much less in a case where detection was so easy, and so certain. Yet this substantial departure from the constitution, in resolutions affecting substantially to unite it, was not less worthy of remark for being unintentional. It manifested the course of reasoning by which the gentleman had himself been misled, and his judgment betrayed into the opinions those resolutions expressed. By extending the judicial power to all cases in law and equity, the constitution had never been understood to confer on that department any political power whatever. To come within this description, a question must assume a legal form for forensic litigation and judicial decision. There must be parties to come into court, who can be reached by its process. and bound by its power; whose rights admit of ultimate decision by a tribunal to which they are bound to submit. A case in law or equity proper for judicial decision may arise under a treaty, where the rights of individuals acquired or secured by a treaty are to be asserted or defended in court. As under the fourth or sixth article of the treaty of peace with Great Britain. or under those articles of our late treaties with France, Prussia and oth-

er nations, which secure to the subjects of those nations their property within the United States: or, as would be an article, which, instead of stipulating to deliver up an offender, should stipulate his punishment, provided the case was punishable by the laws and in the courts of the United States. But the judicial power cannot extend to political compacts: as the establishment of the boundary line between the American and British dominions: the case of the late guarantee in our treaty with France, or the case of the delivery of a murderer under the twenty-seventh article of our present treaty with Britain. The gentleman from New York has asked, triumphantly asked. what power exists in our courts to deliver up an individual to a foreign government? "Permit me," said Mr. Marshall, "but not triumphantly, to retort the question. By what authority can any court render such a judgment? What power does a court possess to seize any individual and determine that he shall be adjudged by a foreign tribunal? Surely our courts possess no such power, yet they must possess it, if this article of the treaty is to be executed by the courts." Gentlemen have cited and relied on that clause in the constitution, which enables congress to define and punish piracies and felonies committed on the high seas, and offences against the law of nations; together with the act of congress, declaring the punishment of those offences: as transferring the whole subject to the courts. But that clause can never be construed to make to the government a grant of power, which the people making it do not themselves possess. It has already been shown that the people of the United States have no jurisdiction over offences committed on board a foreign ship against a foreign nation. Of consequence, in framing a government for themselves, they cannot have passed this jurisdiction to that government. The law, therefore, cannot act upon the case. But this clause of the constitution cannot be considered, and need not be considered, as affecting acts which are piracy under the law of nations. As the judicial power of the United States extends to all cases of admiralty and maritime jurisdiction, and piracy under the law of nations is of admiralty and maritime jurisdiction, punishable by every nation, the judicial power of the United States of course extends to it. On this principle the courts of admiralty under the Confederation took cognizance of piracy, although there was no express power in congress to define and punish the offence. But the extension of the judicial power of the United States to all cases of admiralty and maritime jurisdiction must necessarily be understood with some limitation. All cases of admiralty and maritime jurisdiction which, from their nature, are triable in the United States, are submitted to the jurisdiction of the courts of the United States. There are cases of piracy by the law of nations, and cases within the legislative jurisdiction of the nation; the people of America possessed no other power over the subject, and could consequently transfer no other to their courts; and it has already been proved that a murder committed on board a foreign ship-of-war is not comprehended within this description.

The consular convention with France, has also been relied on, as proving the act of delivering up an individual to a foreign power to be in its nature judicial and not executive. The ninth article of that convention authorizes the consuls and vice consuls of either nation to cause to be arrested all deserters from their vessels, "for which purpose the said consuls and vice consuls shall address themselves to the courts, judges and officers competent." This article of the convention does not. like the 27th article of the treaty with Britain, stipulate a national act, to be performed on the demand of a nation; it only authorizes a foreign minister to cause an act to be done, and prescribes

the course he is to pursue. The contract itself is, that the act shall be performed by the agency of the foreign consul. through the medium of the courts; but this affords no evidence that a contract of a very different nature is to be performed in the same manner. It is said that the then president of the United States declared the incompetency of the courts, judges and officers to execute this contract without an act of the legislature. But the then president made no such declaration. He has said that some legislative provision is requisite to carry the stipulations of the convention into full effect. This, however, is by no means declaring the incompetency of a department to perform an act stipulated by treaty, until the legislative authority shall direct its performance.

It has been contended that the conduct of the executive on former occasions, similar to this in principle, has been such as to evince an opinion, even in that department, that the case in question is proper for the decision of the courts. The fact adduced to support this argument is the determination of the late president on the case of prizes made within the jurisdiction of the United States, or by privateers fitted out in their ports. The nation was bound to deliver up those prizes in like manner. as the nation is now bound to deliver up an individual demanded under the 27th article of the treaty with Britain. The duty was the same, and devolved on the same department. In quoting the decision of the executive on that case, the gentleman from New York has taken occasion to bestow a high encomium on the late president; and to consider his conduct as furnishing an example worthy the imitation of his successor. It must be cause of much delight to the real friends of that great man; to those who supported his administration while in office from a conviction of its wisdom and its virtue, to hear the unqualified praise which is now bestowed on it by those who had been supposed to possess different opinions. If the measure now under consideration shall be found, on examination, to be the same in principle with that which has been cited, by its opponents as a fit precedent for it, then may the friends of the gentleman now in office indulge the hope, that when he, like his predecessor, shall be no more, his conduct too may be quoted as an example for the government of his successors.

The evidence relied on to prove the opinion of the then executive on the case, consists of two letters from the secretary of state, the one of the 29th of June, 1793, to Mr. Genet, and the other of the 16th of August, 1793, to Mr. Morris. In the letter to Mr. Genet, the secretary says, that the claimant having filed his libel against the ship William, in the court of admiralty. there was no power which could take the vessel out of court until it had decided against its own jurisdiction; that having so decided, the complaint is lodged with the executive, and he asks for evidence to enable that department to consider and decide finally on the subject. It will be difficult to find in this letter an executive opinion, that the case was not a case for executive decision. The contrary is clearly avowed. It is true, that when an individual, claiming the property as his, had asserted that claim in court, the executive acknowledges in itself a want of power to dismiss or decide upon the claim thus pending in court. But this argues no opinion of a want of power in itself to decide upon the case, if, instead of being carried before a court as an individual claim, it is brought before the executive as a national demand. A private suit instituted by an individual, asserting his claim to property, can only be controlled by that individual. The executive can give no direction concerning it. But a public prosecution carried on in the name of the United States can, without impropriety, be dismissed at the will of the government. The opinion, therefore, given in this letter, is unquestionably correct;

but it is certainly misunderstood, when it is considered as being an opinion that the question was not in its nature a question for executive decision. In the letter to Mr. Morris, the secretary asserts the principle, that vessels taken within our jurisdiction ought to be restored, but says. it is yet unsettled whether the act of restoration is to be performed by the executive or judicial department. The principle, then, according to this letter, is not submitted to the courts—whether a vessel captured within a given distance of the American coast, was or was not captured within the jurisdiction of the United States, was a question not to be determined by the courts, but by the executive. The doubt expressed is, not what tribunal shall settle the principle. but what tribunal shall settle the fact. In this respect, a doubt might exist in the case of prizes, which could not exist in the case of a man. Individuals on each side claimed the property, and therefore their rights could be brought into court, and there contested as a case in law or equity. The demand of a man made by a nation stands on different principles.

Having noticed the particular letters cited by the gentleman from New York, "permit me now," said Mr. Marshall, "to ask the attention of the house to the whole course of executive conduct on this interesting subject." It is first mentioned in a letter from the secretary of state to Mr. Genet, of the 25th of June, 1793. In that letter, the secretary states a consultation between himself and the secretaries of the treasury and war, (the president being absent,) in which (so well were they apprised of the president's way of thinking in those cases), it was determined that the vessels should be detained in the custody of the consuls, in the ports, until the government of the United States shall be able to inquire into and decide on the fact. In his letter of the 12th of July, 1793, the secretary writes: The president has determined to refer the questions concerning prizes "to persons learned in the laws," and he requests that certain vessels enumerated in the letter should not depart "until his ultimate determination shall be made known." In his letter of the 7th of August, 1793, the secretary informs Mr. Genet that the president considers the United States as bound "to effectuate the restoration of, or to make compensation for, prizes which shall have been made of any of the parties at war with France, subsequent to the 5th day of June last, by privateers fitted out of our ports." That it is consequently expected that Mr. Genet will cause restitution of such prizes to be made, and that the United States "will cause restitution" to be made "of all such prizes as shall be hereafter brought within their ports by any of the said privateers." In his letter of the 10th of November, 1793, the secretary informs Mr. Genet, that for the purpose of obtaining testimony to ascertain the fact of capture within the jurisdiction of the United States, the governors of the several states were requested, on receiving any such claim, immediately to notify thereof the attorneys of their several districts, whose duty it would be to give notice "to the principal agent of both parties, and also to the consuls of the nations interested; and to recommend to them to appoint by mutual consent arbiters to decide whether the capture was made within the jurisdiction of the United States, as stated in my letter of the 8th inst., according to whose award the governor may proceed to deliver the vessel to the one or the other party." "If either party refuse to name arbiters, then the attorney is to take depositions on notice, which he is to transmit for the information and decision of the president." "This prompt procedure is the more to be insisted on, as it will enable the president, by an immediate delivery of the vessel and cargo to the party having title, to prevent the injuries consequent on long delay." In his letter of the 22d of November,

1793, the secretary repeats, in substance. his letter of the 12th of July and 7th of August, and says that the determination to deliver up certain vessels, involved the brig Jane of Dublin, the brig Lovely Lass, and the brig Prince Wm. Henry. He concludes with saying: "I have it in charge to inquire of you, sir, whether these three brigs have been given up according to the determination of the president, and if they have not, to repeat the requisition that they may be given up to their former owners." Ultimately it was settled that the fact should be investigated in the courts, but the decision was regulated by the principles established by the executive department.

The decision then on the case of vessels captured within the American jurisdiction, by privateers fitted out of the American ports, which the gentleman from New York has cited with such merited approbation; which he has declared to stand on the same principles with those which ought to have governed in the case of Thomas Nash; and which deserves the more respect, because the government of the United States was then so circumstanced as to assure us, that no opinion was lightly taken up, and no resolution formed but on mature consideration. This decision, quoted as a precedent and pronounced to be right, is found, on fair and full examination, to be precisely and unequivocally the same with that which was made in the case under consideration. It is a full authority to show, that, in the opinion always held by the American government, a case like that of Thomas Nash is a case for executive and not judicial decision. This clause in the constitution which declares that "the trial of all crimes, except in cases of impeachment, shall be by jury," has also been relied on as operating on the case, and transferring the decision on a demand for the delivery of an individual from the executive to the judicial department. But certainly this clause in the constitution of the United States cannot be thought obligatory on, and for the benefit of, the whole world. It is not designed to secure the rights of the people of Europe and Asia, or to direct and control proceedings against criminals throughout the universe. It can then be designed only to guide the proceedings of our own courts, and to prescribe the mode of punishing offences committed against the government of the United States, and to which the jurisdiction of the nation may rightfully extend.

It has already been shown that the courts of the United States were incapable of trying the crime for which Thomas Nash was delivered up to justice. The question to be determined was, not how his crime should be tried and punished, but whether he should be delivered up to a foreign tribunal which was alone capable of trying and punishing him. A provision for the trial of crimes in the courts of the United States is clearly not a provision for the performance of a national compact for the surrender to a foreign government of an offender against that government. The clause of the constitution declaring that the trial of all crimes shall be by jury, has never even been construed to extend to the trial of crimes committed in the land and naval forces of the United States. Had such a construction prevailed, it would most probably have prostrated the constitution itself, with the liberties and the independence of the nation before the first disciplined invader who should approach our shores. Necessity would have imperiously demanded the review, and amendment of so unwise a provision. If then this clause does not extend to offences committed in the fleets and armies of the United States, how can it be construed to extend to offences committed in the fleets and armies of Britain or of France, or of the Ottoman or Russian empires? The same argument applies to the observations on the seventh article of the amendments to the constitution. That article relates only to trials in the courts of the United States, and not to the performance of a contract for the delivery of a murderer not tria-

ble in those courts. In this part of the argument, the gentleman from New York has presented a dilemma—of a very wonderful structure indeed. He says, that the offence of Thomas Nash was either a crime or not a crime. If it was a crime, the constitutional mode of punishment ought to have been observed; if it was not a crime, he ought not to have been delivered up to a foreign government, where his punishment was inevitable. It had escaped the observation of that gentleman, that if the murder committed by Thomas Nash was a crime, yet it was not a crime provided for by the constitution, or triable in the courts of the United States; and that if it was not a crime, yet it is the precise case in which his surrender was stipulated by treaty. Of this extraordinary dilemma then, the gentleman from New York is, himself, perfectly at liberty to retain either form. He has chosen to consider it as a crime, and says it has been made a crime by treaty, and is punished by sending the offender out of the country. The gentleman is incorrect in every part of his statement. Murder on board a British frigate is not a crime created by treaty. It would have been a crime of precisely the same magnitude, had the treaty never been formed. It is not punished by sending the offender out of the United States. The experience of this unfortunate criminal, who was hung and gibbeted, evinced to him that the punishment of his crime was of a much more serious nature than mere banishment from the United States. The gentleman from Pennsylvania, and the gentleman from Virginia, have both contended that this was a case proper for the decision of the courts, because points of law occurred, and points of law must have been decided in its determination.

The points of law which must have been decided, are stated by the gentleman from Pennsylvania to be, first, a question whether the offence was committed within the British jurisdiction; and secondly, whether the crime charged was comprehended within the treaty. It is true, sir, these points of law must have occurred, and must have been decided: but it by no means follows that they could only have been decided in court. A variety of legal questions must present themselves in the performance of every part of executive duty, but these questions are not therefore to be decided in court. Whether a patent for land shall issue or not is always a question of law, but not a question which must necessarily be carried into court. The gentleman from Pennsylvania seems to have permitted himself to have been misled by the misrepresentation of the constitution made in the resolutions of the gentleman from New York: and, in consequence of being so misled, his observations have the appearance of endeavoring to fit the constitution to his arguments, instead of adapting his arguments to the constitution. When the gentleman has proved that these are questions of law, and that they must have been decided by the president, he has not advanced a single step towards proving that they were improper for executive decision. The question whether vessels captured within three miles of the American coast, or by privateers fitted out in the American ports, were legally captured or not, and whether the American government was bound to restore them, if in its power, were questions of law, but they were questions of political law, proper to be decided, and they were decided by the executive, and not by the courts. The casus fœderis of the guaranty was a question of law, but no man could have hazarded the opinion that such a question must be carried into court, and can only be there decided. So the casus fœderis, under the twenty-seventh article of the treaty with Britain, is a question of law, but of political law. The question to be decided is, whether the particular case proposed be one in which the nation has bound itself to act, and this is a question depending on principles never submitted to courts. If a murder should be committed within the United

States, and the murderer should seek an asylum in Britain, the question whether the casus fœderis of the twenty-seventh article had occurred, so that his delivery ought to be demanded, would be a question of law, but no man would say it was a question which ought to be decided in the courts. When, therefore, the gentleman from Pennsylvania has established, that in delivering up Thomas Nash, points of law were decided by the president, he has established a position which in no degree whatever aids his argument. The case was in its nature a national demand made upon the nation. The parties were the two nations. They cannot come into court to litigate their claims, nor can a court decide on them. Of consequence the demand is not a case for judicial cognizance. The president is the sole organ of the nation in its external relations, and its sole representative with foreign nations. Of consequence, the demand of a foreign nation can only be made on him. He possesses the whole executive power. He holds and directs the force of the nation. Of consequence, any act to be performed by the force of the nation is to be performed through him. He is charged to execute the laws. A treaty is declared to be a law. He must then execute a treaty, where he, and he alone, possesses the means of executing it. The treaty, which is a law, enjoins the performance of a particular object. The person, who is to perform this object, is marked out by the constitution, since the person is named who conducts the foreign intercourse, and is to take care that the laws be faithfully executed. The means by which it is to be performed, the force of the nation, are in the hands of this person. Ought not this person to perform the object, although the particular mode of using the means has not been prescribed? Congress, unquestionably, may prescribe the mode, and congress may devolve on others the whole execution of the contract; but, till this be done, it seems the duty of the executive department to execute the contract by any means it possesses. The gentleman from Pennsylvania contends, that, although this should be properly an executive duty, yet it cannot be performed until congress shall direct the mode of performance. He says that, although the jurisdiction of the courts is extended by the constitution to all cases of admiralty and maritime jurisdiction, yet if the courts had been created without any express assignment of jurisdiction, they could not have taken cognizance of cases expressly allotted to them by the constitution. The executive, he says, can, no more than courts, supply a legislative omission. It is not admitted that, in the case stated, courts could not have taken jurisdiction. The contrary is believed to be the correct opinion. And although the executive cannot supply a total legislative omission, yet it is not admitted or believed that there is such a total omission in this case.

The treaty, stipulating that a murderer shall be delivered up to justice, is as obligatory as an act of congress making the same declaration. If, then, there was an act of congress in the words of the treaty, declaring that a person who had committed murder within the jurisdiction of Britain, and sought an asylum within the territory of the United States, should be delivered up by the United States, on the demand of his Britannic majesty, and such evidence of his criminality, as would have justified his commitment for trial, had the offence been here committed; could the president, who is bound to execute the laws, have justified the refusal to deliver up the criminal, by saying, that the legislature had totally omitted to provide for the case? The executive is not only the constitutional department, but seems to be the proper department to which the power in question may most wisely and most safely be confided. The department which is entrusted with the whole foreign intercourse of the nation, with the negotiation of all its treaties, with the power of demanding a reciprocal performance of the article, which is accountable to the nation for the violation of its engagements

with foreign nations, and for the consequences resulting from such violation, seems the proper department to be entrusted with the execution of a national contract like that under consideration. If, at any time, policy may temper the strict execution of the contract, where may that political discretion be placed so safely as in the department whose duty it is to understand precisely the state of the political intercourse and connection between the United States and foreign nations, to understand the manner in which the particular stipulation is explained and performed by foreign nations, and to understand completely the state of the Union? This department, too, independent of judicial aid, which may, perhaps, in some instances, be called in, is furnished with a great law officer, whose duty it is to understand and to advise when the casus fœderis occurs. And if the president should cause to be arrested under the treaty an individual who was so circumstanced as not to be properly the object of such an arrest, he may perhaps bring the question of the legality of his arrest before a judge by a writ of habeas corpus. It is then demonstrated, that, according to the practice and according to the principles of the American government, the question whether the nation has or has not bound itself to deliver up any individual, charged with having committed murder or forgery within the jurisdiction of Britain, is a question the power to decide which rests alone with the executive department.

It remains to inquire whether, in exercising this power, and in performing the duty it enjoins, the president has committed an unauthorized and dangerous interference with judicial decisions. That Thomas Nash was committed originally at the instance of the British consul at Charleston, not for trial in the American courts, but for the purpose of being delivered up to justice in conformity with the treaty between the two nations, has been already so ably argued by the gentleman from Delaware, that nothing further can be added to that point. He would, therefore, Mr. Marshall said, consider the case as if Nash, instead of having been committed for the purposes of the treaty, had been committed for trial. Admitting even this to have been the fact, the conclusions which have been drawn from it were by no means warranted. Gentlemen had considered it as an offence against judicial authority, and a violation of judicial rights to withdraw from their sentence a criminal against whom a prosecution had been commenced. They had treated the subject as if it was the privilege of courts to condemn to death the guilty wretch arraigned at their bar, and that to intercept the judgment was to violate the privilege. Nothing can be more incorrect than this view of the case. It is not the privilege, it is the sad duty of courts to administer criminal judgment. It is a duty to be performed at the demand of the nation, and with which the nation has a right to dispense. If judgment of death is to be pronounced, it must be at the prosecution of the nation, and the nation may at will stop that prosecution. In this respect the president expresses constitutionally the will of the nation; and may rightfully, as was done in the case at Trenton, enter a nolle prosequi, or direct that the criminal be prosecuted no further. This is no interference with judicial decisions, nor any invasion of the province of a court. It is the exercise of an indubitable and a constitutional power. Had the president directed the judge at Charleston to decide for or against his own jurisdiction, to condemn or acquit the prisoner, this would have been a dangerous interference with judicial decisions, and ought to have been resisted. But no such direction has been given, nor any such decision been required. If the president determined that Thomas Nash ought to have been delivered up to the British government for a murder committed on board a British frigate, provided evidence of the fact was adduced, it was a question which duty

obliged him to determine, and which he determined rightly If, in consequence of this determination, he arrested the proceedings of a court on a national prosecution, he had a right to arrest and to stop them, and the exercise of this right was a necessary consequence of the determination of the principal question. In conforming to this decision, the court has left open the question of its jurisdiction. Should another prosecution of the same sort be commenced, which should not be suspended but continued by the executive, the case of Thomas Nash would not bind as a precedent against the jurisdiction of the court. If it should even prove that, in the opinion of the executive, a murder committed on board a foreign fleet was not within the jurisdiction of the court, it would prove nothing more; and though this opinion might rightfully induce the executive to exercise its power over the prosecution, yet if the prosecution was continued, it would have no influence with the court in deciding on its jurisdiction. Taking the fact, then, even to be as the gentleman in support of the resolutions would state it, the fact cannot avail them. It is to be remembered, too, that in the case stated to the president, the judge himself appears to have considered it as proper for executive decision, and to have wished that decision. The president and judge seem to have entertained, on this subject, the same opinion, and in consequence of the opinion of the judge, the application was made to the president.

It has then been demonstrated: (1) That the case of Thomas Nash, as stated to the president, was completely within the twenty-seventh article of the treaty between the United States of America and Great Britain; (2) that this question was proper for executive, and not for judicial decision; and (3) that in deciding it, the president is not chargeable with an interference with judicial decisions. After trespassing so long, Mr. Marshall said, on the patience of the house, in arguing what had appeared to him to be the material points growing out of the resolutions, he regretted the necessity of detaining them still longer for the purpose of noticing an observation which appeared not to be considered by the gentleman who made it as belonging to the argument. The subject introduced by this observation, however, was so calculated to interest the public feelings, that he must be excused for stating his opinion on it. The gentleman from Pennsylvania had said, that an impressed American seaman, who should commit homicide for the purpose of liberating himself from the vessel in which he was confined, ought not to be given up as a murderer In this, Mr. Marshall said, he concurred entirely with that gentleman. He believed the opinion to be unquestionably correct, as were the reasons that gentleman had given in support of it. He had never heard any American avow a contrary sentiment, nor did he believe a contrary sentiment could find a place in the bosom of any American. He could not pretend, and did not pretend to know the opinion of the executive on the subject, because he had never heard the opinions of that department; but he felt the most perfect conviction, founded on the general conduct of the government, that it could never surrender an impressed American to the nation, which, in making the impressment, had committed a national injury. This belief was in no degree shaken by the conduct of the executive in this particular case. In his own mind, it was a sufficient defence of the president from an imputation of this kind, that the fact of Thomas Nash being an impressed American was obviously not contemplated by him in the decision he made on the principles of the case. Consequently, if a new circumstance occurred, which would essentially change the case decided by the president, the judge ought not to have acted under that decision, but the new circumstance ought to have been stated. Satisfactory

as this defence might appear, he should not resort to it because to some it might seem a subterfuge. He defended the conduct of the president on other and still stronger ground. The president had decided that a murder committed on board a British frigate on the high seas, was within the jurisdiction of that nation, and consequently within the twenty-seventh article of its treaty with the United States. He therefore directed Thomas Nash to be delivered to the British ministers, if satisfactory evidence of the murder should be adduced. The sufficiency of the evidence was submitted entirely to the judge. If Thomas Nash had committed a murder, the decision was that he should be surrendered to the British minister; but if he had not committed a murder, he was not to be surrendered. Had Thomas Nash been an impressed American, the homicide on board the Hermione would, most certainly, not have been a murder. The act of impressing an American is an act of lawless violence. The confinement on board a vessel is a continuation of that violence, and an additional outrage. Death committed within the United States, in resisting such violence, would not have been murder, and the person giving the wound could not have been treated as a murderer. Thomas Nash was only to have been delivered up to justice on such evidence as, had the fact been committed within the United States, would have been sufficient to have induced his commitment and trial for murder. Of consequence, the decision of the president was so expressed as to exclude the case of an impressed American liberating himself by homicide. He concluded with observing, that he had already too long availed himself of the indulgence of the house to venture farther on that indulgence by recapitulating or reinforcing the arguments which had already been urged.

Saturday, March 8. The only business which occupied the house was the unfinished business of Friday, on the question to agree with the committee of the whole in their disagreement with the resolution proposed by Mr. Livingston on the case of Jonathan Robbins. Mr. Nicholas spoke in answer to Mr. Marshall; immediately after which the question of agreement with the reported disagreement was taken by yeas and nays, as follows: Yeas. Messrs. Bartlett, Bayard, Bird, J. Brown, Cooper, Craik, J. Davenport, Davis, Dennis, Dent, Dickson, Edmond, Evans, A. Foster, D. Foster, Freeman, Glen, Goode, C. Goodrich, Gordon, Gray, Griswold, Groves, Harper, Henderson, Hill, Imlay, Jones, Kittera, H. Lee, S. Lee, Lyman, Linn, Marshall, Nott, Otis, Page, Parker, Pinckney, Platt, Powell, Reed, Rutledge, Sewell, Sheafe, Sheppard, Spaight, Stone, Taliafero, Thatcher, J. C. Thomas, R. Thomas, Wadsworth, Waln, L. Williams, Varnum, Woods. 61. Nays. Messrs. Baily, Bishop, R. Brown, Cabel, Christee, Clay, Conduit, Eggleston, Elmendorf, Fowler, Gallatin, Gregg, Hanna, Heister, Holmes, Jackson, Kitchell, Leib, Lyon, Livingston, Macon, Muhlenburgh, New, Nicholas, Nicholson, Randolph, Smilie, J. Smith, S. Smith, Sumpter, Thomson, A. Trigg, J. Trigg, Van Courtland, R. Williams. 35. A motion was then made to adjourn. Mr. Macon hoped the house would sit and decide the resolution proposed by the gentleman from Delaware, so as to have done with the business, and not to enter on another week with it: however, fifty-four rising for the adjournment, it was carried.

Monday, March 10. Mr. Bayard moved that the committee of the whole house, to whom was referred the message of the president relative to Thomas Nash alias Jonathan Robbins, and a resolution submitted by himself to the house, approbating the conduct of the president, and referred to that committee, be discharged from the further consideration thereof. A long debate arose upon this motion, in which Messrs. Randolph, Davis, Jones, Nicholas, Livingston and Eggleston spoke against it; and Messrs. Bayard, Bird, Otis, Kittera, Varnum, Rutledge, Edmund, Shephard and H. Lee in favour of it; when the question was taken by yeas and nays, and carried in the affirmative in manner following, to wit: Affirmative. Messrs. Baer, Bayard, Bartlett, Bird, Brace, J. Brown, Champlin, Claiborne, Craik, J. Davenport, F. Davenport, Dennis, Dent, Dickson, Edmond, Evans, A. Foster, D. Foster, Freeman, Glenn, Goode, G. Goodrich, E. Goodrich, Gordon, Gray, Gregg, Griswold, Grove, Hanna, Harper, Henderson, Hill, Huger, Imlay, Kitchell, Kittera, H. Lee, S. Lee, Lyman, Linn, Nott, Otis, Parker, Pinckney, Platt, Powell, Reed, Rutledge, Sewell, Sheafe, Shepherd, S. Smith, Spaight, Thatcher, J. Thomas, Thompson, Varnum, Wadsworth, Waln, L. Williams, Woods. 62. Negative. Messrs. Alston, Bishop, R. Brown, Cabel, Christie, Clay, Conduit, Davis, Dawson, Eggleston, Elmendorf, Fowler, Gallatin, Heister, Jackson, Jones, Lich, Lyon, Livingston, Macon, Muhlenburgh, New, Nicholas, Nicholson, Randolph, Smilie, J. Smith, Standford, Stone, Sumpter, Taliafero, A. Trigg, J. Trigg, Van Courtland, R. Williams. 35.

Notwithstanding this disposal of the question, so far as its congressional aspect was concerned, Robbins' surrender continued a fertile subject for party declamation.

The views taken by the opposition after the adjournment, may be gathered from the following extract from the Aurora, of June 20, 1800.

## Jonathan Robbins.

During the late session of congress we were promised some facts concerning this unfortunate citizen; and we hoped to have had them in time for the discussion upon Mr. Livingston's motion. We were disappointed then. We have been more successful since, and shall now lay before our readers the information we have obtained, literally, as we have obtained it, in a letter addressed by a gentleman residing at Danbury, to the editor of the Aurora. In the view of national independence; as it relates to our character as a nation; as it relates to the character and independence of our judiciary, it is a matter of utter insignificance, whether Jonathan Robbins was a native of the Irish bogs or of the rough declivities of Connecticut. Judge Bee himself declared as much from the bench; but he declared it in a sense different from what we conceive to be the law of the land, or the law of nations. Judge Bee, according to the report published, asserted that it made no difference whether Robbins was a British or an American citizen; the treaty comprehended both descriptions, and he was delivered up. We conceive that, having a law paramount to every treaty, that is the great charter of the federal constitution, to deliver him up, was (1) As a citizen, contrary to the constitution. (2) As charged with the crime of piracy on the high seas, over which the jurisdiction of all nations is common, it was a violation of law and justice. (3) That it was a violation of the constitution to deliver him up without the inquest of a jury.

The principal ground of defence set up to justify the interference of our executive, (and this appears to have been Pickering's act solely,) was that Robbins was an alien born; and the prejudices of the public were called forth to palliate and mitigate the disgrace of the act, under this black subterfuge of inhumanity. It is well worthy of consideration, however, with what nice sympathy in crimes and maxims of government, the anglo-federalists and their British friends agree. It was a sufficient palliation of disgrace to say, Jonathan Robbins was a feigned name, and that in truth his name was Thomas Nash, a native of Waterford! It is remarkable that an Englishman was acquitted of murder at Waterford, in Ireland, under the British government, and upon this plea: The accused confessed that he had killed

this man, but alleged that it was not murder, because he was a mere Irishman. The Hottentots are less barbarous than such civilized savages. Public weakness having tolerated. in some measure at least by its sullen silence, the delivery of this unfortunate man into the talons of the British. it became a matter of some moment to discover the validity and authority which the certificates procured from Danbury, by the immediate application of Mr. Pickering, carried with them. The certificates of the selectmen stated that they could find no such name as Jonathan Robbins on the records of Danbury. The public will be surprised to find this fact literally true, and yet covering a most gross deception. The records of Danbury were burnt along with the town, by the British, during our Revolutionary war. Consequently, these selectmen could not find his name therein. Thus, we see too. that the barbarity of the British soldiery during our war with them has been accessary to the murder at the distance of twenty years. The selectmen likewise asserted that they did not remember any family of the name of Robbins in Danbury. The matter has passed before the public, and the selectmen have recovered their memories. and they have actually found a family of that name. nay more, a brother of Jonathan Robbins, living within a few miles from that town. Read the letter—whoever wishes to see the original may see it in the hands of the editor. Extract of a letter to the editor, dated Danbury, June 1, 1800: "The delivering up of Jonathan Robbins under the 27th article of the British treaty, (for the furtherance of justice) cannot, with all its palliation. be palatable to our citizens. On the subject of the certificates from this town, I wish to make a few observations. The gentlemen who wrote those certificates are, I believe, men of common honesty: they are so reported here. but assure yourself they are party. men. In the first place the records of this town were burnt with the town in the time of the last war. It is not difficult to suppose a man might forget the record of a person whom he could not have thought of in twenty years, when the records where his name must have been deposited. had been reduced to ashes for that length of time; still less is the difficulty in conceiving that he might be born there, but never recorded. There is no impossibility or improbability that he belonged to an obscure family. then scarcely known, and now long since forgotten. Our selectmen have certified that they never knew a person by that name residing in this town for any length of time. but they now acknowledge a person, by the name of Robbins, once laboured somewhere in this neighbourhood. whose age would not altogether disagree with that of Jonathan Robbins, the pirate. But, the following is an important and an astonishing fact, a fact which nonplused many of our certifiers. and which was related to me by one of the number. On making inquiry after the receipt of the secretary's request, they found that a person of the name of Robbins was then residing in the boundaries of New York state. but near those of this town. This person they visited, and the information they obtained was, 'that he once had a brother by the name of Jonathan Robbins; that he had been absent some years, and he concluded dead, as he had not heard from him for a great length of time; that he believed. if his brother was alive, he was about thirty-three years old.'"

In what way the proceeding was made use of at the fall election, may be seen from the following handbill, which. enclosed in black lines, like the "coffin handbills" of later days. was posted throughout the country:

Reader,
If thou art a Christian and a freeman,
consider
By what unexampled causes.
It has become necessary to construct
This monument
Of national degradation
and
Individual injustice, which is erected
To commemorate a citizen of the United States,
Jo·athan Robbins, Mariner.
A native of Danbury, in the pious and industrious
State of Connecticut,
who,
Under the Presidency of John Adams,
And by his advice
When Timothy Pickering was Secretary of State,
Was delivered up to the British Government,
By whom he was ignominiously put to death
Because
He was an American Citizen,
who,
After having been barbarously forced into the service of
His country's worst enemy,
And forced to fight
Against his conscience and his country,
On board the British frigate Hermione. commanded by
A monster of the name of Pigott,
Bravely asserted his right to freedom as a man,
And boldly extricated himself from the bondage of his
Tyrannical oppressors.
After devoting them to merited destruction.
If you are a Seaman,
Pause—
Cast your eyes into your soul,
and ask,
If you had been as Robbins was,
What would you have done?
What ought you not to do?
And look at Robbins
Hanging at a British yard-arm!
He was your comrade,
And as true a tar as ever strapped a block;
He was your fellow-citizen,
And as brave a heart as bled at Lexington or Trenton;
Like you.
He was a member of a Republic,
Proud of past glories,
and
Boastful of national honour, virtue and independence;
Like him, you one day may be
Trussed up to satiate British vengeance,
Your heinous crime
Daring to prefer danger or death
To a base bondage.
Alas, poor Robbins,
Alas, poor Liberty.
Alas, poor, humbled, and degenerate Country.

For an explanation of the present position of the law in reference to extradition under a treaty with a foreign state, it is only necessary to turn to the admirable opinion of Judge Betts, in the late Case of Metzger [Case No. 9,511]. It was there held that, as a treaty is the supreme law of the land, it is entitled. when coming before the courts. to the same effect as an act of congress, though no act has been passed to define the method of its operation; that under such treaty a fugitive is subject to apprehension and commitment for a crime committed against the laws of the country demanding him as a fugitive, whether such crime be an offence in the country to which he has fled or not; and that, whether the casus fœderis has arisen, or whether the compact will be executed. is a political question to be decided by the president, the courts having no power to direct or contravene his decisions in the first instance. Whether the judiciary has authority in habeas corpus, after the fugitive is under arrest, to prevent his extradition, if the president decides to make it, was not decided.